# Exhibit A

**INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION
Case No. 21763/CYK/PTA (c. 21992/CYK)**


**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**


**1. ORIGIN & CO., LTD.** (Republic of Korea)
*Claimant and First Counterclaim*
*Respondent*

**2. ILJIN MATERIALS CO., LTD.** (Republic of Korea)
*Second Counterclaim*
*Respondent*


and


**1. JFI GLOBAL PURCHASING, LTD.** (Barbados)
*Counterclaimant and First Respondent*

**2. LOBLAW COMPANIES LIMITED** (Canada)
*Second Respondent*


_____

**FINAL AWARD**

_____


**The Arbitral Tribunal**

Sir David A. R. Williams, QC (President)
Professor Lucy Reed
Professor Bernard Hanotiau


31 December 2017

## Table of Contents

I.  INTRODUCTION.................................................................................................1
II.  DETAILS OF THE PARTIES AND THEIR REPRESENTATIVES............................2
III.  THE ARBITRAL TRIBUNAL..............................................................................4
IV.  ARBITRATION AGREEMENT AND GOVERNING LAW.......................................4
V.  PROCEDURAL HISTORY ...................................................................................6
VI.  FACTUAL SUMMARY ......................................................................................14
VII.  SUMMARY OF THE PARTIES' PRIMARY POSITIONS......................................21

    A.  Summary of Origin / ILJIN's Primary Positions ......................................21
       *Origin's Claims*......................................................................................21
       *Factual circumstances advanced by Origin in support of its claims* ............22
       *Termination of the Distribution Agreement* ...............................................24
       *Origin's case against Loblaw* ...................................................................25
       *New York Franchise Sales Act* .................................................................25
       *Common law liability for fraud and fraudulent misstatements*.....................30
       *Breaches of the Distribution Agreement* ...................................................30
       *Parent Guaranty* ...................................................................................31
       *Damages* ..............................................................................................31

    B.  Summary of JFI / Loblaw's Primary Positions ........................................32
       *Origin's breaches of the Distribution Agreement*......................................33
       *Termination*..........................................................................................35
       *Losses from Termination*........................................................................35
       *Overall Damages* ..................................................................................36
       *JFI's Defences to Origin's Claims*...........................................................36

VIII.  REQUESTS FOR RELIEF ................................................................................40
IX.  ISSUES TO BE DETERMINED .........................................................................42
X.  TRIBUNAL'S ANALYSIS AND CONCLUSIONS .................................................43

    A.  Application and Effect of the New York Franchise Sales Act....................43
       *Tribunal's Analysis* ................................................................................44

    B.  Fraudulent Misstatements During Contract Negotiations ........................48
       *Common Law Test for Fraud* ..................................................................50
       *Profitability of the Joe Fresh New York Stores*.........................................53
       *Pricing and SKUs* .................................................................................62
       *JCPenney and International Expansion*....................................................65

*The Role of Joe Mimran* ........................................................................................ **68**

*Disclaimers* ............................................................................................................ 72

*Conclusion* ............................................................................................................. 72

C.   Implied and/or statutory covenant of good faith and fair dealing .......................... 73

*Good Faith Performance of Contractual Obligations* ............................................ 74

D.   Alleged Breaches of Contract by JFI .................................................................... 75

*Unreasonable Assortment and Related Pricing* ................................................... **76**

*JFI Purchase Pricing* ............................................................................................ **82**

*Scaled Sizing* ........................................................................................................ 87

*Brand Management, Positioning and Marketing* ................................................... 94

*Departure of Mr Mimran* ....................................................................................... 98

*Store Design and Location* .................................................................................... **98**

*Guidelines, Manuals, and Training* ....................................................................... 104

E.   Alleged Breaches of Contract by Origin ............................................................... 110

*Outstanding and Late Payments* ........................................................................... 110

*Marketing and Advertising* .................................................................................... 114

*Visual Merchandising Displays* ............................................................................. 116

*Minimum Purchase Requirements* ......................................................................... 121

F.   Termination ......................................................................................................... 125

G.   Letter of Credit Draw Down ................................................................................ 138

*Interest* ................................................................................................................. 144

H.   Concluding Comments ......................................................................................... 146

**XI.  COSTS** ...................................................................................................................... **146**

*The Parties' Claims* ............................................................................................... 146

*Arbitration Agreement* ........................................................................................... 147

*The ICC Rules* ...................................................................................................... 148

*The Costs of the Arbitration* .................................................................................. 148

*The Tribunal's Analysis* ......................................................................................... 148

**XII. DISPOSITIVE SECTION** ......................................................................................... **149**

## I.   INTRODUCTION

1.   The dispute involves a Distribution Agreement in the highly competitive international "fast fashion" retail clothing sector.  The dispute relates to the Joe Fresh® brand of apparel and related merchandise, which was established in 2006 under the oversight of fashion designer Joseph "Joe" Mimran, and launched in Loblaw Companies Limited's grocery store chains throughout Canada.

2.   On 13 September 2013, ILJIN Trading Co., Ltd and JFI Global Purchasing Ltd (**JFI**) entered into an agreement entitled the "Joe Fresh® Distribution Agreement for the Republic of Korea, entered into by and between JFI Global Purchasing Limited and ILJIN Trading Co., Ltd, as of 13 September 2013" (**the Distribution Agreement**).   The Distribution Agreement was subsequently re-executed on 10 December 2014 (and backdated to 13 September 2013) with Origin & Co., Ltd (**Origin**) replacing ILJIN Trading Co., Ltd as the "Distributor" under the Agreement.  Under the Distribution Agreement, JFI granted Origin the right to distribute, market and sell the Joe Fresh line of apparel and related merchandise in the Republic of Korea for a ten-year period.  Origin's indirect parent company, ILJIN Materials Co., Ltd. (**ILJIN**), provided a Parent Company Guaranty dated 13 September 2013 which was attached to the Distribution Agreement (**the Guaranty**).

3.   The Joe Fresh Korean venture encountered serious difficulties right from the start.  These difficulties, in the Tribunal's view based on the evidence as a whole, were primarily due to ILJIN's and Origin's lack of experience in the fashion sector and JFI's lack of experience in expansion beyond North America.  Despite efforts on both sides, the parties unfortunately proved unable to overcome the difficulties and their commercial relationship ultimately broke down by early 2016.

4.   On 16 March 2016, Origin commenced this arbitration against JFI under the 2012 Rules of Arbitration of the ICC International Court of Arbitration (**the

**ICC Rules)**[1]  ILJIN and Loblaw Companies Limited (**Loblaw**) were added as parties, and multiple claims and counterclaims for contract and statutory breach require consideration and determination.  Origin and JFI seek more than US$25 million and US$47 million in damages, respectively.

5.  On the basis of the parties' extensive written submissions and evidence and the hearing conducted on 29 May through 7 June 2017, the Tribunal has found no actionable statutory or contract breach by any party.  Therefore, this Award dismisses all claims and counterclaims, and leaves each party responsible for its own arbitration and other costs.

## II.  DETAILS OF THE PARTIES AND THEIR REPRESENTATIVES

*The Claimant and Counterclaim Respondents*

6.  Origin is the signatory to the Distribution Agreement and the Claimant and First Counterclaim Respondent in this arbitration.  Origin's address is:

> 9F, H Tower
> 179 Bongeunsa-ro
> Gangam-gu
> Seoul
> Republic of Korea

7.  ILJIN is the indirect parent company of Origin and signatory to the Guaranty attached to the Distribution Agreement.  ILJIN is the Second Counterclaim Respondent in the arbitration.  ILJIN's address is:

> 10F, ILJIN Building
> 50-1 Dohwa-Dong
> Mapo-Gu
> Seoul 121-716
> Republic of Korea

8.  Origin and ILJIN are represented by:

> Mr. Lance A. Etcheverry
> Ms. Stacy North-Herbert
> Skadden, Arps, Slate, Meagher & Flom LLP

---

[1] Origin's Request for Arbitration, 16 March 2016, para 1.

300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
United States of America

Mr. Timothy G. Nelson
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
United States of America

*The Respondents and Counterclaimant*

9.   JFI is the signatory to the Distribution Agreement and the Counterclaimant and First Respondent in this arbitration. JFI's address is:

2nd Floor, ITC Building
Warrens, St. Michael
Barbados

10.   Loblaw is the 100% indirect parent company of JFI and the Second Respondent in this arbitration. Loblaw's address is:

1 President's Choice Circle
Brampton, Ontario L6Y 5S5
Canada

11.   JFI and Loblaw are represented by:

Mr. Erik Wulff
Ms. Mary E. Gately
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
United States of America

Mr. Yu-Jin Tay
Mr. Kenneth Tan
Mayer Brown JSM
6 Battery Road, #11-06
Singapore 049909

12.   For ease of reference in this Award, the Tribunal refers to the Origin/ILJIN entity conducting the Joe Fresh business in Korea as "Origin". References to ILJIN pertain specifically to ILJIN as the parent company and Second Counterclaim Respondent to this arbitration (and not to Origin).

3

13.   Similarly, the Tribunal refers to the Joe Fresh entity conducting business with Origin as JFI, even though some of the persons involved were employed by other Joe Fresh and Loblaw entities.   References to Loblaw pertain specifically to Loblaw as the parent company and Second Respondent to this arbitration (and not to JFI).

## III.   THE ARBITRAL TRIBUNAL

14.   The Members of the Arbitral Tribunal are as follows:

**President:**

Sir David A.R. Williams KNZM, Q.C.
Bankside Chambers
Level 22, Lumley Centre
88 Shortland Street
Auckland 1010
New Zealand

**Arbitrator:**

Professor Lucy F. Reed
Centre for International Law
National University of Singapore
469A Bukit Timah Road
Tower Block #09-01
Singapore 259770

**Arbitrator:**

Professor Bernard Hanotiau
Hanotiau & Van Den Berg
IT Tower – Ave Louise, 480/9 1050 Brussels
Belgium

## IV.   ARBITRATION AGREEMENT AND GOVERNING LAW

15.   The Arbitration Agreement is contained in Section 15.4 of the Distribution Agreement, which states:

> *Any controversies, disputes or claims between, on the one hand, JFI (including any of JFI's Affiliates or any of JFI's or JFI's Affiliates' respective officers, directors, agents and*

4

*employees) and, on the other hand, Distributor (including any of Distributor's Affiliates or any of Distributor's or Distributor's Affiliates' respective officers, directors, agents and employees) arising out of or in connection with this Agreement and the relationship of the parties hereto, including any disputes regarding the existence, validity or termination of this Agreement (the "Dispute"), shall be finally resolved and determined by arbitration under the Rules of the International Chamber of Commerce ("ICC"), which rules are deemed to be incorporated by reference into this Section 15.4.*

[…]

*The arbitrators shall be bound by, and shall strictly enforce the terms of, this Agreement and shall not limit, expand or otherwise modify its terms. The arbitrators shall endeavor to conclude the proceedings and issue their final award within 210 days from the appointment of the Chairman, and shall adopt such reasonable procedures regarding evidence and briefing as may be appropriate towards achieving that end; provided, however, that the parties may jointly agree in writing to extend this 210-day deadline, or the arbitrators may unilaterally extend this deadline in their sole discretion if they determine that this is required in the interests of justice. The arbitrators shall have sole authority to resolve any and all issues as to the legitimacy of the use of arbitration in resolving any Dispute, including any disputes as to the jurisdiction of the arbitrators, the application or running of any statute of limitations and all questions involving issue preclusion. The arbitrators shall have the power to determine the nature and extent of any discovery and to resolve all issues of admissibility of evidence. The arbitrators shall not have the power to award damages in connection with any Dispute in excess of actual compensatory damages, which may include interest on unpaid amounts from date due, consequential damages and recovery of legal fees and costs. The arbitrators shall not have the power to award punitive damages or to multiply actual damages.*

*The arbitrators shall have the power to grant any remedy or relief that they deem just and equitable, including but not limited to specific performance and injunctive relief, whether interim and/or final, and any provisional measures ordered by the arbitrators may be enforced by any court of competent jurisdiction. In addition, and notwithstanding the foregoing, nothing in this Agreement shall prevent either Party from seeking any provisional/preliminary relief from any court of competent jurisdiction in aid or arbitration – including but not limited to temporary restraining orders and preliminary injunctions against conduct or threatened conduct for which*

5

*no adequate remedy at law may be available or which may cause either Party irreparable harm — and any such application to a court for provisional/preliminary relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate...*

*The final award of the arbitrators shall be in writing and state the reasons for such award. The award shall be final and binding upon all parties to the arbitration proceedings, and each party thereto waives to the fullest extent permitted by law any right it may otherwise have under the laws of any jurisdiction to any form of appeal of, or collateral attack against, such award. Judgment upon any awards rendered by the arbitrators may be entered in any court of competent jurisdiction, including any court having jurisdiction over any of the parties or their assets. The arbitrators, the parties, their representatives and participants shall hold the existence, contents and result of any arbitration in confidence, except to the limited extent necessary to enforce a settlement agreement, to obtain enforcement of the arbitrators' award, or as otherwise required by law. This provision shall continue in full force and effect subsequent to and notwithstanding expiration or termination of this Agreement.*

16.     Section 15.6 of the Distribution Agreement provides that "this Agreement (and any legal proceedings commenced hereunder) shall be governed by and construed under the laws of the State of New York, without regard to its conflict of law principles, provided that the United Nations Convention on Contracts for the International Sale of Goods shall not apply".


## V.     PROCEDURAL HISTORY

17.     The present arbitration commenced on 16 March 2016 when Origin, in reliance on the Arbitration Agreement and pursuant to Article 4 of the ICC Rules,[2] filed a Request for Arbitration against JFI.

18.     On 13 February 2017, the Secretariat of the ICC relayed the Tribunal's Partial Award on Jurisdiction dated 8 February 2017, which found that Loblaw was bound by the Distribution Agreement and is a proper party to this dispute.

---

[2] ICC Rules at art 4(2).

6

19.     The procedural history up until the end of January 2017 is contained in the Partial Award on Jurisdiction and is incorporated into this Award.

20.     On 3 February 2017, Origin filed its Statement of Claim, outlining the facts relevant to its claim, its allegations against JFI, and the relief sought.  In support of its Statement of Claim, Origin filed the factual second witness statement of Sungho Chung dated 3 February 2017, the factual witness statements of Gana Kim and Jeonggyun Seo dated 3 February 2017, the factual witness statements of Jung-Woo Park and Seungkwon Park dated 31 January 2017, and the expert report of Susanne Kernan dated 2 February 2017.

21.     JFI filed its Memorial on 3 February 2017.  In support of its Memorial, JFI filed the factual witness statements of Ian Freedman, Lindsay Cook and Justin Leve dated 2 February 2017, the second factual witness statement of Norah Hanratty dated 2 February 2017, the expert statement of Dr George G Korenko dated 2 February 2017, and the expert statement of Professor Jaehee Jung dated 3 February 2017.

22.     On 3 February 2017, Loblaw filed its Memorial, denying the claims brought by Origin and adopting JFI's claims, defences, arguments, submissions and requests for relief as set out in JFI's Memorial dated 3 February 2017.

23.     In accordance with the timetable established by the Tribunal in Procedural Order No 2 (as amended by agreement of the parties and with the Tribunal's consent), the parties submitted Redfern Schedules dated 3 March 2017 which set out the parties' requests for production of documents and their positions with respect to each of those requests.

24.     On 11 March 2017, the Tribunal issued its Ruling on Document Production Requests, which made general rulings and rulings on the parties' individual requests for document production.  The parties were due to produce any additional documents pursuant to the Tribunal's Ruling by 24 March 2017.

25.    On 6 March 2017, Loblaw applied for a stay of the arbitral proceedings pending the outcome of an intended challenge to the Jurisdiction Award in the Singapore courts (**Stay Application**). JFI wrote an email on the same date in support of Loblaw's Stay Application, and reserved the right to develop its position.

26.    On 7 March 2017, the Tribunal acknowledged receipt of the emails referred to above and set a timetable for further comment first from Loblaw and then from Origin/ILJIN.  On the same date, Loblaw confirmed that the Tribunal should consider its Stay Application based on the reasons provided in the email of 6 March, and asked the Tribunal to truncate the original timetable so that the Tribunal could issue a decision by 15 March 2017.

27.    On 8 March 2017, the President wrote to acknowledge Loblaw's email and requested that Origin/ILJIN file any response by 10 March 2017. Origin/ILJIN subsequently responded by letter dated 10 March 2017.

28.    On 12 March 2017, Loblaw provided by way of email an unsolicited response to Origin/ILJIN's letter of 10 March 2017.  Origin/ILJIN then provided an unsolicited response to Loblaw's email by letter dated 12 March 2017.

29.    On 13 March 2017, the President noted the unsolicited responses and informed the parties that the Tribunal had all the information it required to make its decision.  However, on the same date, Loblaw sent a further unsolicited submission which the Tribunal took into account with reluctance.

30.    On 14 March 2017, the Tribunal issued its Ruling on Loblaw's Application to Stay the Arbitral Proceedings.  The Ruling denied the Stay Application, and ordered that the parties proceed in accordance with the procedural timetable as set out in Procedural Order No 2.

31.    On 27 March 2017, Origin/ILJIN wrote to the Tribunal requesting directions in relation to translations and certain alleged deficiencies in the Respondents' document production.  Origin/ILJIN noted that the number of documents that

required translation and the associated costs were considerable, and suggested the approach of translating only "key" documents. JFI/Loblaw responded by letter on 29 March 2017. Origin/ILJIN provided a further response on 29 March 2017. The main point of contention between the parties related to translations.

32.   On 2 April 2017, the Tribunal issued Procedural Order No 3, which primarily addressed the issue of translations. The Tribunal observed that Origin/ILJIN's primary obligation was to provide English translations with any foreign language documents produced in accordance with the Tribunal's Ruling on Document Production. However, the Tribunal took into account its duty to conduct the hearing in an expeditious and cost-effective manner, and made the directions that:

a.   Origin/ILJIN were not required to translate documents which contained only one word or phrase in Korean;

b.   Origin/ILJIN were not required to translate documents which were a translation of the original English into Korean or which were duplicative of existing English language documents; and

c.   Origin/ILJIN were not required to translate press reports about the fashion industry collected by Ms Kim which did not refer to Joe Fresh.

33.   On 6 April 2017, Origin/ILJIN wrote to the Tribunal in relation to their Document Production Request No 5, which had been granted by the Tribunal in its Ruling on Document Production Requests on 11 March 2017. Origin/ILJIN stated that JFI/Loblaw had produced four redacted documents, and sought a ruling from the Tribunal that JFI/Loblaw produce unredacted versions of these documents. JFI/Loblaw responded on 10 April 2017, stating that they had redacted the information as it was commercially confidential and had effectively been deemed irrelevant by the Tribunal's ruling in relation to Origin's Document Production Request No 4.

34.   On 11 April 2017, the Tribunal provided directions to the parties by email, stating that it was impermissible for JFI to redact documents responsive to

9

Origin's Request No 5 without first seeking the permission of the Tribunal to do so, and granting Origin's request for an opportunity to respond to new issues by 12 April 2017. The Tribunal also directed that Origin should include in its response further submissions on the relevance of the information that JFI has redacted from the four documents in relation to Request No 5.

35.   On 12 April 2017, JFI/Loblaw by email requested a declaration from the Tribunal that the redactions to the four documents at issue be permitted.

36.   By letter dated 12 April 2017, Origin/ILJIN provided their explanation for the relevance of the redacted materials sought. In relation to seven document production complaints by JFI, Origin/ILJIN also confirmed in the letter that they had conducted a search for documents in relation to the requests and had either disclosed or claimed privilege over all responsive documents that were found.

37.   JFI/Loblaw were granted an opportunity to respond to Origin/ILJIN's 12 April letter, which they did by letter dated 14 April 2017.

38.   On 19 April 2017, the Tribunal issued Procedural Order No 4, which noted JFI/Loblaw's email dated 12 April 2017 and their commitment to comply with the Tribunal's directions, and stated that that Tribunal understood that JFI/Loblaw's non-compliance by redacting documents without permission was not deliberate. The Tribunal directed JFI/Loblaw to produce unredacted versions of the four documents without delay. The Tribunal also accepted Origin/ILJIN's confirmation that they had either disclosed or claimed privilege over responsive documents found in relation to the seven requests identified by Origin/ILJIN.

39.   On 22 April 2017, Origin/ILJIN filed their Reply Memorial. In support of the Reply Memorial, Origin filed the factual third witness statement of Sungho Chung, the second expert report of Susanne Kernan, and the expert report of Andrew Harington, all dated 22 April 2017.

40.    JFI/Loblaw filed their Reply Memorial on 22 April 2017.  In support of the Reply Memorial, JFI/Loblaw submitted the second expert report of Professor Jaehee Jung dated 21 April 2017, the rebuttal expert report of Dr George G. Korenko dated 21 April 2017, the expert witness affidavit of David J Kaufmann dated 17 April 2017, the second factual witness statements of Ian Freedman, Jonathan Feigen, Justin Leve and Lindsay Cook dated 20 April 2017, and the third factual witness statement of Norah Hanratty dated 20 April 2017.

41.    On 2 May 2017, Origin/ILJIN requested by letter that the Tribunal order supplemental document disclosure, and that this was warranted due to additional evidence provided in the second factual witness statement of Ian Freedman.

42.    On 4 May 2017, JFI/Loblaw filed a response in which they opposed the requests for further disclosure on the basis that the requests were burdensome and indicated a potential late change in the arguments being advanced by Origin/ILJIN.  JFI/Loblaw also submitted that Origin/ILJIN should not be allowed to re-open document requests regarding JCPenney (described in the Factual Summary below) that had already been denied for lack of relevance.

43.    On 8 May 2017, the Tribunal issued Procedural Order No 5, in which it noted that the requested supplemental disclosure would cause significant disruption to the Respondents' case preparation and would impose an unreasonable and disproportional burden on them.  The Tribunal denied the requests, but noted that certain Stock Keeping Unit (**SKU**) related requests could be reconsidered if those documents became sufficiently important as the case progressed.  (Such reconsideration did not prove necessary.)

44.    On 16 May 2017, the parties submitted the Joint Memorandum of Experts Andrew Harington and Dr George Korenko.

45.    On 18 May 2017, a Pre-Hearing Conference was held at 8:00am Singapore time.

46. On 19 May 2017, the Tribunal issued Procedural Order No 6, which directed the parties to revise the Hearing Schedule, and also made directions regarding witnesses, the agreed bundle of documents and the list of issues.

47. On 17 May 2017, Origin/ILJIN applied to the Tribunal for leave to file a Supplemental Report from their expert Andrew Harington dated 12 May 2017. JFI/Loblaw objected to the admission of the supplemental report in a letter dated 20 May 2017.

48. On 22 May 2017 the Tribunal issued Procedural Order No 7, which admitted Andrew Harington's Supplemental Report dated 12 May 2017 into the record, and permitted the filing of a Rebuttal Supplemental Report by Dr George Korenko. Dr Korenko's supplemental report was dated 4 June 2017.

49. On 23 May 2017, the parties submitted an Agreed Dramatis Personae. On 25 May 2017, they submitted the Joint Memorandum of Experts Susanne Kernan and Professor Jaehee Jung. On 25 May 2017, they submitted separate chronologies and, on 27 May 2017, separate lists of issues.

50. By the time the hearing opened in May 2017, the parties had collectively filed four major merits submissions, 18 factual witness statements, 10 expert witness statements (including the Supplemental Reports described above), and 869 exhibits. The hearing bundle consisted of 17 volumes, with the seven-volume Core Bundle containing 325 exhibits.

51. The Tribunal and the parties attended a hearing on the merits in Singapore from 29 May through 7 June 2017. At the hearing, evidence was provided by Sungho Chung, Jeonggyun Seo, Jung-Woo Park and Seungkwon Park for Origin and Ian Freedman, Justin Leve, Jonathan Feigen and Lindsay Cook for JFI. Gana Kim did not provide oral testimony for Origin due to a medical condition. Origin provided documentary evidence to the Tribunal and JFI to substantiate the medical condition which prevented Ms Kim from attending, which was discussed at an *in camera* hearing and accepted. Origin decided that it would not call Norah Hanratty for cross-examination. Expert

testimony was also provided by Susanne Kernan, Professor Jaehee Jung, Andrew Harington and Dr George Korenko.

52.   At the end of the hearing, the President gave the following directions to the parties concerning the filing of Post-Hearing Memorials:

    a.   The parties will file Post-Hearing Memorials on 30 June 2017, with a maximum length of 75 pages (exclusive of transcript pages which may be appended where specific pages are referenced);

    b.   The parties will file Reply Post-Hearing Memorials on 19 July 2017, with a maximum length of 25 pages (exclusive of transcript pages which may be appended where specific pages are referenced);

    c.   The parties will file their Costs Claims by 9 August 2017; and

    d.   No new factual or legal exhibits may be adduced without permission from the Tribunal.

53.   On 20 June 2017, the Tribunal issued Procedural Order No 8 which delivered written questions to the parties for their consideration in their Post-Hearing Memorials.

54.   On 29 June 2017, Counsel for the Respondents informed the Tribunal that the parties had agreed a short extension for filing the Post-Hearing Memorials and the Replies.  The Tribunal approved this extension.

55.   The Post-Hearing Memorials were filed on 3 July 2017, and the Reply Post-Hearing Memorials on 24 July 2017.

56.   On 7 August 2017, the parties requested an extension for filing cost submissions to 24 August 2017.  The Tribunal granted the extension and the parties filed their cost submissions on the deadline.

57.     On 31 October 2017, the Secretariat of the ICC International Court of Arbitration informed the Tribunal (with a copy to the parties) that on 12 October 2017, the ICC Court had extended the time limit for rendering the final award until 30 November 2017 under Article 30(2) of the ICC Rules. The ICC Court further extended the time limit for rendering the final award on 9 November 2017 until 29 December 2017, on 14 December 2017 until 31 January 2018, and on 11 January 2018 until 28 February 2018.

58.     On 6 December 2017, the Tribunal declared the proceedings closed.

## VI.    FACTUAL SUMMARY

59.     This Factual Summary contains undisputed facts underpinning the parties' business relationship.   Disputed and more detailed facts, including the relevant sections of the Distribution Agreement, are set out in the sections below describing the parties' claims and supporting evidence.

60.     JFI is part of a group of related companies which operates the Joe Fresh business in Canada, the United States and elsewhere.  JFI is the wholly owned indirect subsidiary of Loblaw, one of Canada's largest grocery, pharmacy and health and beauty retailers, and a leading provider of apparel and general merchandise.  Loblaw's ultimate parent company is George Weston Ltd., a major Canadian public company formed in 1882.   Galen Weston is the Chairman and Chief Executive Officer of both Loblaw and George Weston Ltd.

61.     Origin is a wholly owned indirect subsidiary of ILJIN, established to operate ILJIN's first fashion retail business.  ILJIN, which was founded in 1968, is a leading Korean company in the components and materials manufacturing industries.   ILJIN is the ultimate parent company of the "ILJIN Group" which is controlled by the Huh family.   Jae Myung Huh is the Junior Chairman of the ILJIN Group, as well as being the Chief Executive Officer of ILJIN since July 1997. His father Chin Kyu Huh is the Senior Chairman of the ILJIN Group.

14

62.   Loblaw launched the Joe Fresh brand in 2006 under the guidance of fashion designer Joe Mimran, who was responsible for the successful global Club Monaco clothing stores.   The Joe Fresh "fast fashion" brand originally was sold in Loblaw's grocery stores throughout Canada, as "shop-in-shops".   Mr Mimran distinguished the Joe Fresh brand by, among other things, hosting live fashion shows in Toronto.

63.   In 2010, Joe Fresh opened its first stand-alone store in Canada and, in 2012, its first store in New York.   In July 2012, Joe Fresh and JCPenney agreed to open over 600 Joe Fresh shops in JCPenney's chain of stores in the United States from the start of spring 2013.

64.   With its expansion, Joe Fresh was recognized to fall into the category of "SPA" fashion, meaning "Specialty Store Retailer of Private Label Apparel".   Other SPA brands are Uniqlo, Zara and H&M.

65.   Having initially sought to make contact around mid-2012, Sungho Chung of ILJIN emailed Lindsay Cook (Senior Director of Marketing for Joe Fresh) on 8 October 2012, stating that ILJIN had "a strong interest in [being] an exclusive distributor … for JOE FRESH in Korea".   Attached to Mr Chung's email was an ILJIN Group "Business Proposal" for Joe Fresh, a summary of the Korean fashion retail market and potential competitors, a 5-year profit and loss projection, a launch plan, and an overview of the ILJIN Group.

66.   Jonathan Feigen, then Senior Vice President for Business Development and International for Joe Fresh, replied to Mr Chung's email saying he would be pleased to talk further about potential opportunities.

67.   On 13 November 2012, Mr Chung met Mr Feigen in New York.   During the discussions during this meeting, Mr Feigen made a PowerPoint presentation.[3]   Following the meeting, Mr Chung prepared a revised business plan and sent projections to Mr Feigen based on the revised figures.[4]   On 14 December

---

[3] O-32.
[4] O-25.

2012, Mr Feigen sent Mr Chung a preliminary "Franchise Agreement Term Sheet" between Loblaw Inc. and ILJIN Group.[5] This draft had a placeholder for an "Advance Payment / Signing Fee".

68.     In January 2013, Mr Feigen went to Korea to visit ILJIN's offices, where he met with a number of ILJIN representatives, and to see proposed Joe Fresh store sites. During that time, Mr Feigen presented his November 2012 PowerPoint presentation once again to Mr Chung and other ILJIN representatives.

69.     On 2 March 2013, Mr Feigen sent ILJIN an updated term sheet entitled "JFI Global Purchasing Limited / ILJIN Group Distribution Agreement Term Sheet".[6] This draft no longer included a section entitled "Advance Payment / Signing Fee".

70.     Thereafter, in early March 2013, Mr Chung made a visit to Canada, where he toured a Joe Fresh store with Mr Feigen and met Joe Fresh CEO Joe Mimran on 5 March 2013.

71.     Around March 2013, Joe Fresh retained DLA Piper to draft an agreement with ILJIN based on the preliminary term sheet. At this stage, David Gore, Loblaw's General Counsel, also became involved in negotiations.[7] Drafts of a Distribution Agreement were exchanged between April and July 2013.[8] Negotiations included a multi-day meeting in Vancouver, Canada, attended by ILJIN representatives Mr Gore and Mr Feigen and a DLA Piper lawyer. Negotiations were complete and the text was essentially agreed by August 2013.

72.     Mr Feigen sent a signed copy of the Distribution Agreement to Mr Chung on 29 or 30 August 2013, and the signed Parent Guaranty on 12 September 2013.

---

[5] O-26.
[6] O-28.
[7] O-30.
[8] R-67, R-69, R-71 and R-73.

The ILJIN entity that executed the Distribution Agreement on 13 September 2012, in Korea, was ILJIN Trading Co., Ltd. ILJIN Materials Co., Ltd. executed the Guaranty as Guarantor, and ILJIN Trading Co., Ltd. as Distributor.

73.   In October 2013, ILJIN Junior Chairman Jae Myung Huh, Mr Chung and Gana Kim travelled to New York to plan the design and launch of the Korean stores with Joe Fresh representatives. JFI designed plans for Origin's first store at Lotte World Mall in Seoul, and Origin used these plans to design subsequent stores. JFI also assisted in selecting ILJIN's initial orders for stock for the stores. Later in October, agreement was reached on the standard retail price for certain basic items.[9]

74.   JFI was first notified in February 2014 that the name of the ILJIN Distributor entity was changing from "ILJIN Trading Co. Ltd" to "Origin".[10] Origin was not incorporated until April 2014.[11]

75.   The Guaranty called for a US\$5 million standby Letter of Credit, which ILJIN issued on 13 February 2014.[12]

76.   JFI and Origin worked together to set up the first Korean Joe Fresh store in the early part of 2014. JFI held training in New York for senior Origin managers and the Joe Fresh Visual Merchandising Display (**VDM**) team helped to set up the visual displays for the first store in May 2014.

77.   The brand launch took place in Korea on 30 May 2014 at Beyond Museum in Cheongdam-dong. Mr Mimran personally hosted this event, which included one of his signature fashion shows. Origin's first store was opened in Myeong-dong on 31 May 2014. The AK Suwon store opened in early August 2014, followed by other stores in the Hyundai Department Stores in

---

[9] R-18.
[10] R-46 and R-47.
[11] R-4.
[12] O-53.

Gasan and Joong-dong and in the Daegu Department Store later in August 2014. In October 2014, two further stores were opened in Seoul Times Square and Lotte World Jamsil Mall. Finally, stores in Lotte World Suwon and COEX were opened in October 2014. In total, Origin opened nine free-standing stores within six months of the Joe Fresh launch in Korea.

78. The Joe Fresh venture in Korea did not go well. Even in the early months of operation in 2014, it became apparent that the Joe Fresh stores were not performing as well as Origin had projected. In September 2014, Origin was attempting to engage with JFI to address these issues and Mr Feigen and Mr Leve visited Korea to discuss the issues.

79. As a result of discussions between JFI and Origin, an agreement was reached in October 2014 that JFI would reduce its margin from 45% to 38% across all categories of merchandise until the end of 2015, to allow a reduction in the retail price chargeable by Origin. JFI also agreed to cancel certain merchandise orders for January to June 2015, in an effort to assist Origin in reducing its inventory. Origin agreed to pay JFI a charge of US$375,000 for the decrease in inventory.[13]

80. However, despite efforts by both sides over the months that followed, problems persisted with the Korean Joe Fresh stores. Sales were well below initial projections.

81. In late 2014, JFI became aware that ILJIN Trading Co., Ltd – the entity that had originally executed the Distribution Agreement – had not been properly incorporated in Korea. JFI re-signed the Distribution Agreement in December 2014 with Origin, which had been incorporated in April 2014, replacing ILJIN Trading Co., Ltd. The Guaranty was not re-executed by ILJIN.

---

[13] O-76.

82. In April 2015, Mr Mimran left Joe Fresh. He was replaced as CEO by Mario Grauso. Shortly after this, Joe Fresh's relationship with JCPenney in the United States came to an end.

83. Also in April 2015, ILJIN held an internal "status meeting" to discuss Origin's business. It was decided at that meeting that a "turning point" had to be reached within six months or the Joe Fresh venture might be unable to continue.[14]

84. The performance of Origin's stores in Korea did not improve. In May 2015, JFI and Origin met again to try to resolve the underlying issues. JFI offered price adjustments and other discounts to Origin in an attempt to relieve the financial situation, in exchange for a release of any claims against JFI. The proposed changes were included in a draft Amendment to the Distribution Agreement. Although this draft Amendment was not signed by Origin, JFI nonetheless implemented the discounted pricing going forward.

85. In July 2015, a Joe Fresh team visited Korea and met with Origin executives to discuss ongoing issues. Mr Freedman, among others from Joe Fresh, then visited the stores in Korea and had further meetings with Origin in August 2015. Despite these efforts, Origin's business in Korea continued to lose money.

86. On 6 October 2015, Wooyoung Choi, General Counsel of ILJIN, sent Mr Freedman, then the Chief Operating Officer of Joe Fresh, an email with the heading "Confidential Business Discussion". Mr Choi asked to discuss the "current situation" and stated that "we think that we have no choice but to discontinue our Joe Fresh business in Korea".[15] (The full text of the email is set out at paragraph 398 below.)

87. Mr Freedman responded on 17 October 2015 stating "we are prepared to work with you (without waiving our rights under the Agreement) to close the

---

[14] R-298.
[15] R-35.

19

business in a manner that is least disruptive to both of our businesses, both in terms of mitigating financial and brand exposure to our respective companies (hereinafter referred to as a "Settlement Plan")".[16]  (The full text of this email is set out at paragraph 402 below.)  Further correspondence followed and the parties agreed to enter into discussions regarding a "settlement plan" for closure of the Korean stores.[17]

88.    On 2 November 2015, JFI drew down the ILJIN Letter of Credit for the full amount of US$5 million.[18]

89.    Party representatives met in New York on 20 November 2015,[19] but no agreement was reached as to a settlement plan.  At this meeting, Origin proposed continuing with the relationship, but JFI rejected this offer and took the position that Origin had terminated the Distribution Agreement.[20]

90.    On 22 December 2015, Monieka Bos, Legal Counsel at Loblaw, sent a letter to Mr Seo stating "[o]n October 6, Mr Wooyoung Choi sent Ian Freedman an email … In this email, you stated that you were terminating the Joe Fresh business and asked JFI to consider a short transition period to dispose of inventory, etc."[21]  In the letter, Ms Bos reiterated that Origin could not now change its mind regarding termination.

91.    On 6 January 2016, Ms Bos sent a further letter to Origin stating that "JFI hereby expressly confirms the termination of the Distribution Agreement".[22]

92.    At this point in early January 2016, the parties had further discussions to facilitate a wind-down.  On 13 January 2016, Mr Seo and Mr Chung had a conference call with Loblaw's in-house counsel team, during which it was agreed that: (i) all Joe Fresh stores in Korea would be closed by the end of

---

[16] R-36.
[17] See chain of emails at O-85.
[18] O-82 and O-84.
[19] O-260.
[20] O-261 and Freedman I, para 43.
[21] O-89 and O-90.
[22] O-92.

February 2016, subject to any delay necessary for negotiations with lessor department stores and shopping malls; and (ii) with regards to 2016 orders that were in production and could not be cancelled, Origin would sell this merchandise itself rather than have the Joe Fresh team do it.

93.   By June 2016, Joe Fresh had closed all of its New York stores.  In July of that year, Mr Grauso moved to another George Weston company and was replaced as Joe Fresh CEO by Mr Freedman.

## VII.   SUMMARY OF THE PARTIES' PRIMARY POSITIONS

### A.   Summary of Origin / ILJIN's Primary Positions

*Origin's Claims*

94.   Origin's overall complaint in essence was that the Joe Fresh management team "failed to deliver on the commitments made by them under the Distribution Agreement and, indeed, failed even to meet the basic level of competence that would be expected from an international fashion brand manager".[23]

95.   More specifically, Origin alleged that:

a.   The Joe Fresh management team was not adequately prepared to expand into Korea, due to lack of required structures and policies and lack of local market knowledge;[24]

b.   JFI made a number of misrepresentations about the status of the business, including the profitability of the New York stores, and the prospects of success to induce Origin to enter into the agreement;[25]

---

[23] Origin's Statement of Claim, para 2.
[24] Origin's Statement of Claim, para 3.
[25] Origin's Statement of Claim, paras 4 and 143.

    c.    JFI acted to maximise its own short term profit at the expense of Origin's long term success;[26] and

    d.    The departure of Mr Mimran, along with other changes to the brand and its offering, caused Origin's Joe Fresh business to fail.[27]

96.    As a result of the above, Origin claimed that JFI is liable for fraud and fraudulent non-disclosure under both the New York Franchise Sales Act and common law and that JFI breached a number of provisions of the Distribution Agreement. JFI, alleged Origin, also failed to comply with the implied covenant of good faith and fair dealing.

*Factual circumstances advanced by Origin in support of its claims*

97.    The main factual circumstances emphasised by Origin in making its claims include the following:

    a.    When the Joe Fresh brand was initially launched in Korea, Origin was offered only 2000 SKU items per year with an average price of US$40. This was very different from the 15,000 SKU items per year at an average price of US$13 that were included in the initial presentations by the Joe Fresh team, in particular Mr Feigen's November 2012 slide presentation. Origin claimed that the comparatively high price and small selection offered to it made the brand uncompetitive in Korea and was the reason why sales were extremely low from the outset;[28]

    b.    The assortment of Joe Fresh merchandise available at the launch was very limited, as noted by the Joe Fresh VDM team itself when attempting to set up displays at the Myeong-dong store. This was a problem that persisted throughout the relationship;

---

[26] Origin's Statement of Claim, para 5.
[27] Origin's Statement of Claim, para 6.
[28] Origin's Statement of Claim, paras 70-72.

c.   JFI was late with deliveries;[29]

d.   Merchandise line reviews were reduced to four times a year and pre-ordering was demanded 10 months in advance, which violated the Distribution Agreement;[30]

e.   While JFI created a new XS and XXS sizing range for Origin, even these smaller sizes were too large for Korean customers.  No changes were made to the actual sizing of clothing, despite Origin's complaints about the large sizes, particularly in relation to competitors;[31]

f.   The JFI management team did not provide adequate training manuals, operation manuals, brand standards, displays, signage and other similar information.[32]  Staff training was inadequate[33] and the Joe Fresh logo changed three times during the lifetime of the Distribution Agreement, causing confusion for customers;

g.   JFI shifted its target market from a youthful market to one aimed at the 35-45 year-old demographic, with no warning to Origin.  Origin stores were located in areas frequented by younger shoppers;

h.   JFI did not assist with marketing plans and required Origin to market in media and styles that were out-of-line with the Korean marketplace;[34] and

i.   The departure of Joe Mimran from Joe Fresh, and the end to his signature fashion shows, was a significant blow for Origin as he was an integral part of the marketing of the brand.  Origin was told to cease using Mr Mimran's name or image in its marketing.[35]

---

[29] Origin's Statement of Claim, para 77.
[30] Origin's Statement of Claim, para 78.
[31] Origin's Statement of Claim, paras 83-84.
[32] Origin's Statement of Claim, para 88.
[33] Origin's Statement of Claim, para 91.
[34] Origin's Statement of Claim, paras 103-107.
[35] Origin's Statement of Claim, paras 112-115; R-25; Chung II, para 203.

*Termination of the Distribution Agreement*

98.   Origin submitted that the email of 6 October 2015 from ILJIN Group General
Counsel Mr Choi to Joe Fresh COO Mr Freedman was a "plea for help", and
was not intended to terminate the contract.[36]  Mr Choi's email informed JFI
that:

> we think that we have no choice but to discontinue our Joe Fresh
> business in Korea.  In that regard, we want to discuss with you
> cancelling all outstanding purchase orders and deliveries.  In addition,
> we would like to request your proposal as to disposition of our
> inventories and other assets.  Although, we are willing to cooperate
> and accommodate your wish for a smooth transition with a minimal
> negative impact to your brand reputation, as you know well, we want
> to close our operation as quickly as possible since we keep losing
> approximately $800,000 per month.  So, we will highly appreciate
> your proposal for a short transition period.

Although the email sought further discussions, Origin contended that JFI
nonetheless took the opportunity to use the email to sever relations and to
draw down the entire US$5 million Letter of Credit that ILJIN had provided
to JFI under the Guaranty.[37]  JFI then instructed Origin to wind down its
operations.[38]

99.   Origin alleged that JFI drew down more on the Letter of Credit than what it
was actually owed for merchandise, because JFI had re-calculated
merchandise prices without applying the new discounted prices agreed in
May 2015.[39]  Mr Seo, as Origin's CEO, wrote to Mr Grauso, then  President
of Joe Fresh, saying that JFI's "$5 million of SBLC withdrawal destroys our
capability to keep running the business properly" and asked him to come to
Seoul for a meeting.[40]  A meeting in New York and subsequent phone calls
produced no way forward that was acceptable to Origin.

---

[36] R-35.
[37] Origin's Statement of Claim, para 128.
[38] O-82.
[39] Origin's Statement of Claim, para 130.
[40] O-84.

100.   Origin then received the 22 December 2015 letter from Ms Bos of Loblaw confirming that the Distribution Agreement had been terminated.

101.   Origin eventually agreed to a wind-down plan that included selling off pre-ordered merchandise already in production. However, Origin stated that JFI had delayed or failed to deliver some of this merchandise, causing loss to Origin. Origin alleged that even at this late stage JFI conducted business in "disregard of the financial and reputational harm inflicted on Origin".[41]

102.   Origin also alleged that the end of the Joe Fresh – JCPenney relationship in the United States in May 2015 harmed the brand and hence Origin's business. Origin further alleged that, during the Distribution Agreement negotiations JFI presented, and Origin considered, the JCPenney relationship to be an item of key appeal, and its demise was a signal to the market that Joe Fresh was a failing brand.[42] This was compounded by the closure of all free-standing Joe Fresh stores in New York by June 2016.

*Origin's case against Loblaw*

103.   Origin brought its claims against both JFI and Loblaw, on the basis of Loblaw's alleged substantive role in the negotiations for the Distribution Agreement and Guaranty, as the owner of the Joe Fresh brand and business. Origin alleged that the entity "JFI" was unknown to ILJIN until March 2013, and even then JFI was only the nominal counterparty for the arrangements.

*New York Franchise Sales Act*

104.   Origin alleged that both JFI and Loblaw were liable for fraud and fraudulent non-disclosure under the New York Franchise Sales Act (**the Franchise Act**). This is despite the recitation in Section 2.1 of the Distribution Agreement that the parties "acknowledge and agree that no direct or indirect fee is payable by [JFI] for the rights granted hereunder and that no franchise

---

[41] Origin's Statement of Claim, para 139.
[42] Origin's Statement of Claim, para 141.

relationship is intended to be created by this Agreement", and other disclaimers.

105.   The sections of the Distribution Agreement relevant to Origin's Franchise Act claims are as follows:

(a)   Section 1.2, entitled "Distributor's Acknowledgments", provides (in part):

> Distributor has read and understands the terms of this Agreement and accepts them as being reasonably necessary to protect the goodwill associated with the [Joe Fresh] marks.

(b)   Section 2.1, with the heading "Distribution Rights", which provides Origin with exclusive rights "to distribute, market and sell Joe Fresh Merchandise through free-Standing Stores and Shop-in-Shops" in Korea, ends with the following provision:

> The Parties acknowledge and agree that no direct or indirect fee is payable by Distributor for the rights granted hereunder and that no franchise relationship is intended to be created by this Agreement.

(c)   Section 15.6, the New York Governing Law clause, provides (in part):

> Nothing in this Section is intended to subject this Agreement to any franchise or similar law, rule or regulation of the State of New York to which it otherwise would not be subject.

(d)   Section 15.8, the merger clause, provides (in part):

> Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement that either Party may or does rely on or that will have any force or effect.

106.   Origin described Section 2.1 of the Distribution Agreement – reciting that "no direct or indirect fee is payable by Distributor for the rights granted hereunder and that no franchise relationship is intended to be created by this Agreement" – as a "standard-form disclaimer of a 'franchise' relationship

that [JFI] counsel drafted and inserted", which is ineffective under the Franchise Act.[43] Origin alleged the same as to the disclaimers in Section 15.6 of the Distribution Agreement —reciting that "[n]othing in this Section is intended to subject this Agreement to any franchise or similar law, rule or regulation in the State of New York to which it would otherwise would not be subject" – as well as the acknowledgments in Section 1.2 and the merger clause in Section 15.8.

107.    These clauses are ineffective to exempt the parties' legal relationship from the Franchise Act, argued Origin, because the Act – which was described by JFI's own expert David Kaufman as "perhaps the [United States'] toughest franchise law"[44] – explicitly prohibits parties to a franchise arrangement (whatever the legal label) from contracting out of its important protections. Sections 687(4) and (5) of the Franchise Act provide that "[a]ny condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated thereunder, shall be void," and "[i]t is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article".[45]

108.    In support of this position, Origin relied upon, among other cases, *International Motor Sports Group, Inc. v Gordon*, in which the U.S. District Court for the Southern District of New York found that, to be effective to escape a legal franchise arrangement, the relevant disclaimer "must contain *explicit* disclaimers of the *particular* representations that form the basis of the fraud-in-the-inducement claim" (emphasis in original).[46]

109.    According to Origin, "[s]horn of the (statutorily unlawful) disclaimers, the Distribution Agreement amply satisfies the characteristics of a "franchise"

---

[43] Origin's Statement of Claim, para 160.
[44] David J. Kaufman, *The New York Franchise Act* 205 (2011), Ex. OL-144.
[45] N.Y. Gen. Bus. Law s. 687(4) and (5).
[46] *International Motor Sports Group, Inc. v. Gordon*, 98 Civ. 5611 (MBM), 1999 U.S. Dist. LEXIS 12610, at *21-23 (S.D.N.Y. 1999), OL-75.

under the Act."[47]  Furthermore, Mr Feigen originally provided ILJIN with a "Franchise Agreement Term Sheet" and later gave a presentation to the JFI Board in August 2013 stating that "a franchise agreement would be the most preferable route for the [Korean] market".[48]

110.   According to Origin, "the Distribution Agreement falls within the geographical scope of the [Franchise Act], and satisfies the definitional requirement that it grants one party (Origin) the right both to distribute Joe Fresh goods in a manner prescribed in substantial part by JFI, as well as the right to use Joe Fresh trademarks on terms imposed by JFI, for purposes of Section 681."[49] Origin emphasised that the primary Joe Fresh personnel were based in New York, which was the Joe Fresh "international" headquarters; critical meetings were held in New York; drafts of the Agreement were exchanged from New York; and New York law was the applicable law in the Distribution Agreement.

111.   It was Origin's position that the Distribution Agreement did contain a franchise fee, which is necessary to bring the Distribution Agreement under the Franchise Act.  The Franchise Act defines a "franchise fee" as covering any payments made "directly or indirectly" for the right to operate a franchise.[50]   Here, as Section 6.3 of the Distribution Agreement required Origin, annually, "to spend on consumer-facing advertising and promoting Joe Fresh Merchandise" at least the greater of 3% of annual Retail or US$2 million, this indirect payment requirement constituted a franchise fee.

112.   Origin relied on two cases to support its position that the minimum advertising expenditure requirement in the Distribution Agreement was a franchise fee covered by the Franchise Act: *Nature's Plus Nordic A/S v. Natural Organics, Inc.* and *Luzim v. Phillips*.[51]  In *Nature's Plus*, the U.S. District Court for the Eastern District of New York considered that

---

[47] Origin's Statement of Claim, para 162.
[48] Origin's Reply Memorial, para 84; O-338.
[49] Origin's Post-Hearing Memorial, para 71, citing N.Y. Gen. Bus. Law s. 681(3).
[50] N.Y. Gen. Bus. Law s. 681(7).
[51] *Nature's Plus Nordic A/S v Natural Organics, Inc.*, 980 F. Supp. 2d 400 (E.D.N.Y. 2013), OL-56.
**(Nature's Plus)**; *Luzim v Phillips*, No. 87 C 112, 1987 WL 30214 at *3 (E.D.N.Y. Dec. 10, 1987), OL-54.

advertising expenditures do constitute franchise fees.  Citing to *Luzim*, the court stated:

> Plaintiffs point to [Nature Plus Nordic's] contractual obligation to 'spend on Product advertising and promotion in each contract year no less than 5% of Distributor's net purchases of Products during the applicable contract year.'  *See Luzim v. Phillips* ... (holding that a distributor's payment to an advertising fund of a sum equal to 3% above the United States wholesale price of the supplier's goods bought by the distributor satisfied the required 'franchise fee' payment for purpose of creating a franchise between the supplier and the distributor).

> In the Court's view, nothing in the [Franchise Act] requires that a 'franchise fee' be paid directly from a franchisee to a franchisor. Indeed, the [Franchise Act] specifically provides that a 'franchise fee' may be paid 'directly or indirectly.'  This interpretation is consistent with the 'New York's definition of a franchise [as] among the broadest in the country.' *Aristacar Corp. v. Attorney General*, 142 Misc. 2d 551, 552 (Sup. Ct., New York County 1989).[52]

113.    After addressing the franchise fee gateway issue, Origin alleged that JFI and Loblaw had violated the Franchise Act by making numerous untrue or misleading statements of material facts, and omissions, during the negotiations on which ILJIN's team relied in entering into the Distribution Agreement.

114.    Distinct from its common law fraud claims, Origin argued that JFI and Loblaw failed to make the mandatory disclosures required by Section 683 of the Franchise Act.  Specifically, Origin allegedly was owed disclosure of financial data for JFI and the whole Joe Fresh international enterprise, as well as details of JFI's contractual arrangements with Mr Mimran.  The concealment of this information, said Origin, is statutory fraud.  Origin further challenged JFI's claim to exemption from the Section 683 disclosure requirements by operation of Section 684, because it had not proven that it was a "large franchisor" with a net worth exceeding US$15 million or made the specific disclosures prescribed by Section 684.

---

[52] *Nature's Plus*, at 415-16.

115.    Origin also submitted that Loblaw was separately liable under the Franchise
        Act as a defined "control person", in relation to JFI's conduct in violation of
        the Act.[53]

*Common law liability for fraud and fraudulent misstatements*

116.    In addition to the alleged violations of the Franchise Act, Origin contended
        that the same untrue or misleading statements and omissions by JFI and
        Loblaw supported liability for fraud and fraudulent misstatement and
        omission at common law.[54]

117.    Origin submitted that the law is clear that even where there is a specific
        contractual disclaimer, it will not protect against claims of fraudulent
        omission where the matter concealed was within the sole knowledge of the
        disclaiming counterparty.

*Breaches of the Distribution Agreement*

118.    Origin alleged that JFI breached the Distribution Agreement in a number of
        respects, including:

        a.    Section 1.1: Misrepresentation of JFI's role;

        b.    Section 2.3: JFI represented that it had reviewed the Business Plan and
              judged it to be sound;

        c.    Sections 5.1 and 7.1: JFI failed to fulfil its contractual obligations to
              supply a reasonable assortment of Asian-sized clothing at a competitive
              price;

        d.    Sections 3.2, 3.3, 6.2, 7.1 and 7.13: JFI failed to provide adequate Store
              Operation Manuals or Brand Use Guidelines and to train staff

---

[53] N.Y. Gen. Bus. Law s. 691(3).
[54] Origin's Statement of Claim, paras 217-221.

adequately. More generally, JFI failed in its brand management obligations; and

e.   Implied covenant of good faith and fair dealing: JFI breached this duty by changing the pricing structure, merchandise assortment and brand marketing of Joe Fresh after the Distribution Agreement was signed, and by drawing down the Letter of Credit.

119.   Further, JFI failed to provide the tools and approvals Origin needed to succeed in the marketplace by, among other things, failing to provide appropriate and timely marketing approvals, insisting on inappropriate store sizes and design, delaying merchandise delivery, failing to provide the agreed upon number of annual line reviews and insisting on longer than agreed pre-order times, and, ultimately, improperly drawing down the Letter of Credit and terminating the Distribution Agreement.[55]

*Parent Guaranty*

120.   Origin also sought a declaration that the Guaranty was void and ineffective as it was induced by fraud and fraudulent misrepresentation.

121.   However, Origin alleged that, even if the Guaranty is valid, Origin had performed its obligations under the Distribution Agreement (as modified by the parties) until JFI's purported termination and, therefore, ILJIN bears no liability under the Guaranty.[56] Moreover, JFI's misconduct was the cause of any non-performance by Origin (which is denied) under the Distribution Agreement, and therefore "may serve to discharge the guarantor's obligation".[57]

*Damages*

---

[55] Origin's Statement of Claim, para 247.
[56] Origin's Statement of Claim, para 285.
[57] Origin's Statement of Claim, para 286.

122.    Origin claimed damages for its losses resulting from the investment of substantial sums of money in the establishment and operation of the Korean Joe Fresh stores. Origin presented evidence from Mr Park that the sum invested and lost allegedly was US$25,269,714.[58]

123.    Under Section 691 of the Franchise Act, Origin sought to recover the sums it lost, together with interest at six percent per year from 2013, plus its attorneys' fees and costs.

124.    Additionally, or in the alternative, Origin claimed damages for common law fraud and fraudulent inducement and damages for breach of contract, together with interest plus attorneys' fees and costs.

**B.    Summary of JFI / Loblaw's Primary Positions**

125.    JFI rejected Origin's claims and counterclaimed that Origin had breached the Distribution Agreement and wrongfully repudiated and terminated the Distribution Agreement in October 2015.

126.    JFI's overall position was that Origin was attempting to subvert the agreement struck between sophisticated commercial parties in an effort to compensate for its own business failings. JFI also emphasised that, while the Distribution Agreement was entered into by equally sophisticated commercial parties, it was Origin – not JFI – that sought and pursued the deal.[59]

127.    JFI contended that it was Origin's incompetence and inexperience in the fashion business that led to the failure of the Joe Fresh brand in Korea, together with its repeated breaches of the Distribution Agreement. Origin alone, said JFI, was responsible for the failure of the business, and it cannot now blame JFI.

---

[58] J. Park I, Annex A.
[59] JFI's Reply Memorial, paras 3-4.

128.  JFI noted that ILJIN's initial approach about a prospective relationship in Korea came at the outset of JFI's efforts to expand the Joe Fresh brand internationally. The Distribution Agreement was JFI's first international relationship, and at all relevant times ILJIN was aware that JFI had not previously conducted any business outside of North America.[60]

129.  In refuting Origin's allegations, JFI recalled Origin's commitments in Sections 1.2 and 15.8 of the Distribution Agreement (set out in paragraph 105 above and paragraph 181 below) that it had not relied on any assurances it had received and had conducted its own investigation of the business before entering the Distribution Agreement and that, other than as expressly provided, there were no oral or written representations or statements relied on by either party.

130.  JFI alleged that ILJIN had made false representations and warranties as to the legal status of the original signatory, ILJIN Trading Co. Additionally, JFI claimed that ILJIN breached its Guaranty by failing to set up Origin as a wholly owned subsidiary of ILJIN.[61]

*Origin's breaches of the Distribution Agreement*

131.  In its Counterclaim, JFI alleged that Origin committed the following additional breaches of the Distribution Agreement described below:

a.  Origin failed to coordinate internet and social media marketing with JFI, and disseminated unauthorized and brand-damaging internet and social media marketing materials;[62]

b.  Origin presented untimely marketing plans to the Joe Fresh team for review;[63]

---

[60] JFI's Memorial, para 27.
[61] JFI's Memorial, paras 38 and 62.
[62] JFI's Memorial, para 62.
[63] JFI's Memorial, para 72; R-152 and R-153.

c.    Origin failed to make minimum purchases of merchandise;[64]

d.    Origin failed to maintain and present its stores in a manner consistent with both the store and VDM standards and guidelines provided to Origin by JFI, and with basic industry standards;[65]

e.    Origin failed to renew the Letter of Credit by 21 October 2015; and

f.    Origin wrongfully and prematurely terminated the Agreement.

132.    Additionally, JFI alleged that ILJIN breached the Guaranty by failing to cover Origin's payment and performance thereunder.

133.    JFI posited that it tried to address the issues it saw as contributing to the poor performance of Joe Fresh stores in Korea during a meeting with Origin in New York on 5 May 2015, but Origin refused to discuss issues other than price concessions from JFI.[66]  As a result, the stores continued to deteriorate.[67]

134.    As price was so important to Origin, JFI agreed to amend the Distribution Agreement to provide substantial discounts to Origin.  Even though Origin did not sign the amendment, JFI said that it honoured the discounts under the draft Amendment to try to aid Origin's business urgently, while making it clear that the amendment was non-binding until signed.[68]  However, JFI alleged that Origin refused to take any of the steps required by JFI in exchange for the discounts, including lowering the merchandise retail pricing and improving store layout.  After Origin purported to terminate the Distribution Agreement, JFI notified Origin that it would be reversing the discounts and "various credits" as the Amendment had not come into effect.[69]

---

[64] JFI's Memorial, para 6.
[65] JFI's Memorial, para 93.
[66] R-33; Leve I, paras 30-31.
[67] See R-34 and R-184.
[68] JFI's Memorial, para 141.
[69] R-206.

135.    JFI alleged that the brand damage sustained as a result of Origin's breaches impaired JFI's prospects to be able to sell Joe Fresh merchandise in the Korean market in the future.

*Termination*

136.    JFI alleged that, with Mr Choi's 6 October 2015 email to Mr Freedman, Origin terminated the Distribution Agreement on 6 October 2015 in breach of Sections 12.1 and 12.2 of the Distribution Agreement (set out in paragraphs 409 and 411 below).

137.    JFI argued that, under the applicable New York law, a material breach is required in order for a party to terminate a contract for lack of performance. The only legal basis for termination by Origin would have been an Event of Default under Section 12.1 of the Distribution Agreement, and JFI was not responsible for any such event.

*Losses from Termination*

138.    JFI claimed that by terminating the Distribution Agreement prematurely and wrongfully, Origin caused JFI substantial loss and damage, including loss of eight years of profits under the Distribution Agreement.[70]

139.    According to JFI, Origin's annual Minimum Purchases were established in Exhibit 2.3 of the Distribution Agreement, starting with calendar year 2014. The Distribution Agreement projected ten years of Minimum Purchases because, under Section 2.5(a), it was set to expire on 31 December 2023. Those minimum purchase amounts were:
    a.  Agreement Year 1 - $4 million
    b.  Agreement Year 2 - $10 million
    c.  Agreement Year 3 - $20 million
    d.  Agreement Year 4 - $30 million

---

[70] JFI's Memorial, para 168.

35

    e.  Agreement Year 5 - $35 million

    f.  Agreement Year 6 through Agreement Year 10 - annual increase of 3% over the minimum for the immediately preceding year.

140.    JFI calculated that, based on the reasonable projected Minimum Purchases agreed to by both parties, Origin owes JFI US$47,997,258 in lost profits and accrued interest arising from its wrongful termination of the Distribution Agreement and its failure to meet the Minimum Purchasing requirement contained therein.[71]

*Overall Damages*

141.    JFI claimed total damages as follows:

    a.  US$47,997,258 in lost profits and accrued interest resulting from Origin's wrongful termination of the Distribution Agreement and failure to meet its minimum purchases required thereunder;

    b.  US$3,718,959 in compensation for brand damage resulting from Origin's unauthorized marketing campaigns, and Origin's mismanagement of the Joe Fresh stores in Korea; and

    c.  US$340,744 in interest on Origin's untimely payments for Joe Fresh merchandise.

142.    ILJIN guaranteed Origin's performance and payment under the Distribution Agreement, and so JFI claimed that both ILJIN and Origin are liable for these amounts.

*JFI's Defences to Origin's Claims*

143.    JFI rejected all of Origin's claims and asked the Tribunal to dismiss them based on the arguments summarised below.

---

[71] JFI's Memorial, para 177.

*Fraudulent Inducement*

144. JFI denied the allegation that it had made false statements, knowingly or not, during the pre-negotiation period for the Distribution Agreement. JFI noted that New York courts warn that any claims of fraudulent inducement in relation to high-value transactions between sophisticated contracting parties should be viewed with scepticism.[72] JFI argued that Origin had failed to make out the elements of fraud required under New York law, including reliance.

145. JFI recalled that Origin had repeatedly reaffirmed the Distribution Agreement, in particular by re-executing it in December 2014 under its own signature and by negotiating the May 2015 draft Amendment. Origin would not have done so, argued JFI, if it believed that fraudulent misrepresentations had been made.

146. JFI also emphasised that Origin did not seek to terminate the Distribution Agreement on the basis of any alleged misrepresentations, suggesting that Origin's present claims are an "afterthought" made to distract from its own lack of performance and to attempt to evade liability for the damage caused to JFI and the Joe Fresh brand.[73]

*New York Franchise Sales Act*

147. In defence of Origin's claims under the New York Franchise Sales Act, JFI argued that the Act does not apply and so "all other imaginary issues" relating to the [Franchise Act] fall away".[74] JFI put primary emphasis on Section 2.1 of the Distribution Agreement, in which the parties "mutually agreed, legally and legitimately, to structure the transaction in a manner that would take it

---

[72] *N. Shipping Funds I, L.L.C. v. Icon Capital Corp.*, 998 F. Supp. 2d 301, 318; RLA-106.
[73] JFI's Reply Memorial, para 18.
[74] JFI's Post-Hearing Memorial, para 40.

beyond the scope of the [Franchise Act's] application".[75]   That an early term sheet was labelled "Franchise Agreement Term Sheet" was irrelevant, in light of the final language agreed and, in particular, in light of the deletion of a direct franchise fee component from that earlier term sheet.[76]   It was equally irrelevant that Mr Feigen may have internally described the ILJIN transaction as a franchise arrangement, as he was using commercial rather than statutory language.

148.   JFI's expert Mr Kaufman, introduced as the author of the Franchise Act, testified that the Distribution Agreement did not meet the statutory definition of a "franchise", including the essential element of a "franchise fee".[77]   Although the statutory definition covers a direct or indirect franchise fee, JFI submitted that the weight of New York jurisprudence requires that an indirect franchise fee must be payable to the putative franchisor and not to unaffiliated third parties, as with Origin's minimum advertising expenditure to local Korean advertisers unaffiliated with JFI.  JFI cited eight cases supporting the proposition that a franchise fee is payable only for the franchisee's right to enter into a business with or otherwise sell the franchisor's goods, and must be paid to the franchisor or an affiliate.  For example, in *In re Matterhorn Grp., Inc.*, which involved design and construction fees to open a Swatch watch store, a New York federal bankruptcy court held that such fees were not franchise fees under the Franchise Act, because they were "payments to unaffiliated third parties".[78]   In *Carlucci v. Owens-Corning Fiberglas Corp.*, another New York federal court found purchases from third parties of specialised equipment "clearly cannot qualify as a franchise fee with relation to [the putative franchisor], as there is no allegation that any of this equipment was purchased from [the putative franchisor]".[79]

---

[75] JFI's Post-Hearing Memorial, para 49.
[76] JFI's Post-Hearing Memorial, para 49.
[77] JFI's Reply Memorial, paras 132–146.
[78] *In re Matterhorn Grp., Inc.*, No. 97 B 41274 SMB, 2000 WL 1174215, at para 9 (Bankr. S.D.N.Y. 17 Aug 2000).
[79] *Carlucci v Owens-Corning Fiberglas Corp.*, 646 F. Supp. 1486 (E.D.N.Y. 1986).  The other six cases on which JFI relies, which are not New York cases, are listed in footnote 329 of JFI's Reply Memorial.

149.   According to JFI, and Mr Kaufman, the *Luzim* and *Nature's Plus* cases, when read correctly, are consistent with this jurisprudence. Neither concerned a minimum advertising expenditure payable by a putative franchisee to a third party not affiliated with the putative franchisor.

150.   Even if the Franchise Act were applicable, JFI contended that it would not be required to meet the disclosure requirements in Section 683, because it was exempted under Section 684 as a "large franchisor" with a net worth of more than US$15 million.[80]   Nor was Loblaw a "control person" under the Franchise Act, because it did not materially aid in any violation alleged against JFI.

151.   Finally, even if the Franchise Act were to apply and have been violated, JFI contended that no damage was caused by such violation and therefore no damages were payable.

### *Bad Faith and Breach of Contract Allegations*

152.   JFI denied acting in bad faith in the performance of the contract. It noted that many of the representations that Origin relied to support these allegations were made early in the contractual negotiations and were true, or were not discussed at all, such as the tenure of Mr Mimran's position.   The negotiations focussed on commercial issues such as Asian sizing, pricing and product assortment, although JFI argued that Origin has exaggerated the importance of assortment.[81]

153.   JFI alleged that ILJIN prepared its own initial sales projections which it described as "conservative" and "minimum".[82]   During negotiations, ILJIN revised these figures of its own accord and based on its own information, in order to entice JFI to enter into the arrangement.[83]

---

[80] JFI's Reply Memorial, paras 150-151.
[81] JFI's Reply Memorial, para 37.
[82] R-6.
[83] JFI's Reply Memorial, para 47.

154. From the first draft of the Distribution Agreement, JFI included a "Key Personnel" requirement which provided that Origin would employ certain key personnel with requisite knowledge and experience essential to ensuring the success of the venture.[84] JFI alleged that "[s]hortly after the brand was launched, Junior Chairman Huh, who had no experience in fashion or retail, began supplanting all key managers (including Mr. Chung) and obstructed their performance of their duties, as Mr. Chung later confessed to Mr. Leve in April 2015".[85]

155. Overall, JFI emphasised that Origin had the benefit of sophisticated legal advice and had bargained hard and in detail on all points of importance to it during the extended negotiations leading up to the Distribution Agreement. JFI recalled that Origin had proposed a number of creative terms, including a most-favoured-nation style clause, which showed that it was eminently capable of proposing complex protective clauses in its favour. JFI requested that the Tribunal enforce the terms of the Distribution Agreement.

## VIII. REQUESTS FOR RELIEF

156. In their formal Requests for Relief, Origin and ILJIN ask the Tribunal to:

a. Award Origin all monetary damage and relief available as a matter of law for the Respondents' wrongful conduct, including interest;

b. Grant a declaration that the Respondents have engaged in violation of the New York State Franchise Act, common law fraud, fraudulent omission and breach of contract (including breach of the implied covenant of good faith and fair dealing);

---

[84] JFI's Reply Memorial, para 87.
[85] JFI's Reply Memorial, para 88 and Leve I, para 29.

  c.  Declare that ILJIN has no direct liability under the Distribution Agreement or any other purported contract with JFI and that, accordingly, there is no jurisdiction over ILJIN;

  d.  Dismiss each of JFI's claims;

  e.  Grant Origin such further relief as the Tribunal deems just and proper; and

  f.  Award all their costs and expenses, including attorneys' and experts' fees and arbitration costs.[86]

157. Origin also seeks out-of-pocket damages in the amount of US$ 25 million, plus interest, plus costs and fees.[87]

158. In their formal Request for Relief, JFI and Loblaw ask the Tribunal to:

  a.  Declare that the Parent Guaranty remains valid as to ILJIN;

  b.  Find that ILJIN and Origin breached the Distribution Agreement;

  c.  Order ILJIN and Origin to pay JFI lost profits and accrued interest in the amount of US$47,997,258 resulting from Origin's wrongful terminations of the Distribution Agreement and failure to meet its minimum purchases required thereunder;

  d.  Order ILJIN and Origin to compensate JFI in the amount of US$4,276,320 in brand damages resulting from ILJIN and Origin's fraudulent inducement of JFI into entering the Distribution Agreement, Origin's unauthorized marketing campaigns, and Origin's mismanagement of the Joe Fresh stores in Korea;

---

[86] Origin's Reply Memorial, paras 323 and 324.
[87] Origin's Post-Hearing Reply Memorial, para 55.

e.    Order ILJIN and Origin to pay JFI interest in the amount of US$340,774 on Origin's untimely payment for Joe Fresh merchandise;

f.    Order ILJIN and Origin to pay and indemnify JFI for all of its costs, expenses and fees (including legal and arbitration costs and expenses, and fees and expenses of experts and consultants, in-house management and personnel costs) incurred in connection with enforcing JFI's rights under the Distribution Agreement and Parent Guaranty, in an amount to be quantified in due course;

g.    Order ILJIN and Origin to pay compound interest on all sums awarded to JFI, including interest running from the date that payment is due under any arbitral award until final payment of the corresponding sums;

h.    Reject ILJIN and Origin's claims in their entirety;

i.    Grant JFI such other relief as the Arbitral Tribunal deem just and appropriate in the circumstances; and

k.    Declare that any merits award rendered will be provisionally enforceable.[88]


## IX.    ISSUES TO BE DETERMINED

159.    While the parties could not agree on a joint list of issues for resolution, the issues included in their separate lists were similar and overlapping. The Tribunal therefore combined the parties' lists into the composite List of Issues attached as Appendix 1 to this Award and asked the parties to address that composite list in their Post-Hearing Memorials.

---

[88] JFI's Reply Memorial, para 412, as modified by JFI's Post-Hearing Memorial, para 230.

160.   The analysis and conclusions that follow in Section X below address the issues in the composite List of Issues, albeit that certain issues are formulated slightly differently so as to capture both parties' iterations.

## X.   TRIBUNAL'S ANALYSIS AND CONCLUSIONS

### A.   Application and Effect of the New York Franchise Sales Act

161.   The Tribunal turns first to the question of whether Origin may successfully claim under the New York Franchise Sales Act. As set out in Appendix 1, the issues as framed by the parties are these:

    a.   Do the terms of the Franchise Act apply to the Distribution Agreement? In particular:

        i.   Does the Distribution Agreement (including Section 6.3, mandating that Origin pay certain monies annually by way of a minimum advertising expenditure) involve payment of a "franchise fee" as defined by Section 681(7) of the Franchise Act?

        ii.   What is the relevance and/or effect of the provisions of the Distribution Agreement (including Sections 1.2, 15.6 and 15.8 thereof) having regard to Section 687(4) and (5) of the Franchise Act (providing that "[a]ny condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated thereunder, shall be void," and that "[i]t is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article")?

        iii.   Assuming the Franchise Act applies, was Loblaw a "control person" that "materially aid[ed] in the act or transaction

constituting" the alleged violations of the statute, so as to be liable under Section 691(3) of the Franchise Act?

c.   If the Franchise Act applies, have ILJIN/Origin established any violations of the statute?

d.   Is either Respondent liable for breaching the mandatory disclosure provisions of Section 683 of the Franchise Act? In this respect:

   i.    Was either Respondent required to make disclosures in the form prescribed by Section 683 of the Franchise Act (and accompanying regulations)?

   ii.   As to JFI's claim that it was exempt from the provisions of Section 683 by reason of Section 684, did JFI comply with the pre-requisites for such exemption as stated in Section 684?

   iii.  Had prescribed disclosures been made, what (if any) would have been their materiality and/or effect with respect to the transaction?

*Tribunal's Analysis*

162.   Having carefully considered the parties' arguments and evidence, and reviewed the Franchise Act and the New York case law in the record, the Tribunal determines that Origin's claims under the Franchise Act must fail. The Tribunal finds that the Franchise Act does not apply, because the Distribution Agreement does not include a franchise fee.

163.   As a preliminary matter, the Tribunal notes that we found the New York case references in Mr Kaufman's Expert Witness Affidavit helpful. However, to the extent that Mr Kaufman in effect argued JFI's legal case, the Tribunal considers that this went beyond expert legal testimony and hence the Tribunal

gave little weight to his Expert Witness Affidavit. The Tribunal therefore drew no inferences from Origin's decision not to cross-examine Mr Kaufman at the hearing.

164.   The Tribunal starts with the definition of a franchise under the Franchise Act. Section 681(3) provides in full (emphasis added):

> *"Franchise" means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:*
>
> *(a) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and **the franchisee is required to pay, directly or indirectly, a franchise fee;** or*
>
> *(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and **the franchisee is required to pay, directly or indirectly, a franchise fee.***

165.   The parties agree that the Franchise Act issue central to their dispute is not the scope of Origin's rights to sell Joe Fresh trademarked merchandise, but whether the Distribution Agreement required Origin to pay a franchise fee to JFI or not.

166.   As noted in the highlighted quoted language in Section 681(3) above, a franchise fee may be "direct or indirect". It is undisputed that the Distribution Agreement contained no express direct or indirect franchise fee.

167.   The dispute before the Tribunal is whether the minimum annual advertising expenditure imposed on Origin in Section 6.3 of the Distribution Agreement qualified as an indirect franchise fee for purposes of the Franchise Act. To recall, Section 6.3 required Origin, annually, "to spend on consumer-facing advertising and promoting Joe Fresh Merchandise" at least the greater of 3% of annual Retail or US$2 million". It is not disputed that Origin was to make

these payments not to JFI or a JFI affiliate, but to local Korean advertisers and promoters.

168.    JFI directly and through Mr Kaufman's Witness Statement presented a line of cases in which New York courts have accepted that indirect franchise fees, for purposes of bringing an arrangement under the Franchise Act, may be fees paid by the putative franchisee through third parties to the franchisor. An example is *In re Matterhorn Grp. Inc.*, in which the court found that "franchise fees" do not include "payments to unaffiliated third parties".[89] The Tribunal agrees with JFI that the focus of these cases is on the purpose of a franchise fee, whatever the underlying transaction is labelled, which is for the franchisee to pay the franchisor for the right to deal in the franchisor's products.

169.    In contrast, Origin relied on only two New York cases – the *Nature's Plus* and *Luzim* cases – to support its argument that indirect franchise fees may include fees paid by the putative franchisee to third parties with no onward credit to the franchisor, such as Origin's indirect minimum annual advertising expenditures to local Korean entities under the Distribution Agreement.

170.    The Tribunal cannot accept Origin's arguments based on either case. First, although the court in *Nature's Plus* did state that "nothing in the [Franchise Act] requires that a 'franchise fee' be paid directly from a franchisee to a franchisor", the court did not indicate whether the relevant franchise fee had to end up with the franchisor or not.[90] The *Nature's Plus* court, in fact, found that the advertising requirement at issue was not a franchise fee, because it was made in connection with a pricing discount rather than for the putative franchisee's right to deal in the franchisor's goods. It was in this context that the Nature's Plus court cited the *Luzim* case, which also involved advertising expenditures.    However, *Luzim* involved a franchisee's payment of advertising fees into an advertising fund actually administered by the

---

[89] *In re Matterhorn Grp., Inc.*, No. 97 B 41274 SMB, 2000 WL 1174215 at *9 (Bankr. S.D.N.Y. Aug 17, 2000) (Ex RLA-56).  JFI includes other cases in its Reply Memorial, para 139, fn 129.
[90] *Nature's Plus*, supra note 51; Ex. OL-56.

franchisor.[91]   Under the circumstances, the Tribunal can read *Nature's Plus* as no more than *dicta*, arguably in favour of Origin's position only in the abstract.

171.   On balance, the Tribunal cannot ignore that no New York court has applied the Franchise Act to an arrangement in which the putative franchisee paid a fee indirectly to a third party with no pass-through of funds to the putative franchisor.  The Tribunal is compelled to hold that Origin's minimum annual advertising expenditure, while no doubt of indirect benefit to JFI, did not constitute a franchise fee for the purposes of Section 687(4) of the Franchise Act.

172.   Having held that the Franchise Act does not apply to the JFI-Origin legal relationship, the Tribunal strictly need not examine Origin's argument that the disclaimers in the Distribution Agreement were ineffective to avoid protection under the Franchise Act.  However, the Tribunal's assessment of that argument supports the holding.   It may well be that the general disclaimers in Sections 1.2 and 15.8 of the Distribution Agreement would not be sufficient to bring a disguised franchise relationship under the protection of the Franchise Act, but the same cannot be said for the explicit disclaimers in Sections 2.1 and 15.6.  To recall, Section 2.1 recites that the parties "acknowledge and agree that no direct or indirect fee is payable by [JFI] for the rights granted hereunder and that no franchise relationship is intended to be created by this Agreement", and Section 15.6 provides that "[n]othing in this Section is intended to subject this Agreement to any franchise or similar law, rule or regulation of the State of New York to which it otherwise would not be subject."  Although these provisions are not explicit disclaimers of the particular misrepresentations and omissions that Origin alleged JFI made during negotiations, they could not be clearer – especially when repeated – that neither contracting party intended to create a franchise relationship and, most importantly, that the Distribution Agreement as executed contained no direct or indirect franchise fee obligation.

---

[91] *Luzim*, supra note 51; Ex. OL-54.

173.    If there were any doubt as to whether Origin's minimum annual advertising expenditure effectively was a franchise fee, the Tribunal would find it compelling that Mr Feigen's December 2012 draft "Franchise Agreement Term Sheet" did contemplate an "Advance Payment / Signing Fee", which would appear to be a direct franchise fee from ILJIN to JFI.  However, this element did not appear in the subsequent draft "Distribution Agreement Term Sheet" or in the final Distribution Agreement.   Although the Tribunal appreciates Origin's argument that the Franchise Act is meant to recognize franchise arrangements disguised by other titles, ILJIN is a sophisticated commercial entity and cannot rely on ignorance as to the legal effect of this change in the draft transaction documents.

174.    Having held that the Franchise Act does not apply to the Distribution Agreement, the Tribunal need not address Origin's fraud claims based on the mandatory disclosure requirements of Section 683 of the Franchise Act, or on other alleged misrepresentations and omissions in violation of the Act. Nor need the Tribunal address Origin's argument that Loblaw was a "control person" under Section 691(3) of the Franchise Act.

175.    Other than the mandatory disclosure requirements of the Franchise Act, which the Tribunal need not examine, Origin's fraud claims based on JFI's alleged misrepresentations and omissions during the Distribution Agreement negotiation phase were the same under the Franchise Act and common law. It is to Origin's common law fraud allegations that the Tribunal now turns.

**B.      Fraudulent Misstatements During Contract Negotiations**

176.    The relevant issues relating to common law fraudulent misrepresentation identified by the parties, as set out in the List of Issues in Appendix 1, are:

    a.    What statements were made by JFI to Origin during the negotiation period between October 2012 and September 2013?

In particular, did JFI make the alleged statements that Origin bases its pre-contractual claims on?

b.   Were any actionable statements materially accurate and complete and/or reasonably honest at the time of its making?

c.   Did Origin rely on any such statements when entering into the Distribution Agreement?   Was reliance reasonable in the circumstances?

d.   What role (actual or apparent) did Loblaw and/or JFI have with respect to negotiations undertaken with Origin in the period October 2012 to September 2013?

e.   What effect, if any, do the following have on the claims:

   i.   The express contractual undertaking at Section 1.2 of the Distribution Agreement;

   ii.   The express contractual undertaking at Section 15.8 of the Distribution Agreement (the "integration clause");

   iii.   The fact that the parties were sophisticated entities, advised by external and internal legal counsel, during the contractual negotiations; and

   iv.   The fact that, in respect of certain alleged representations, the Distribution Agreement deals with the very same subject matter of the alleged prior statement?

f.   Have ILJIN/Origin waived their rights to advance claims based on alleged fraud under common law?

49

*Common Law Test for Fraud*

177.   The Tribunal begins its analysis of the issues above by noting the test for fraud under New York law.  Origin summarised the test at common law in its Post-Hearing Memorial as follows:[92]

> The standard for fraud at common law is that "the defendant knowingly uttered a falsehood intending to deprive the plaintiff of a benefit and that the plaintiff was thereby deceived and damaged."   At common law, fraud also may occur through omission when the defendant fails to meet a duty to disclose, has an intent to defraud, and the plaintiff relies thereon, resulting in injury.  A "duty to disclose" arises when the defendant has made a statement (or "half-truth") that, if left unqualified, can give a misleading impression.

178.   While JFI did not dispute that the above elements are part of the New York law test for fraudulent misrepresentation, it did contend that Origin oversimplified this test by failing to acknowledge that "reasonable reliance" must be shown.[93]

179.   Neither side addressed in great detail the burden of proof or the standard of proof for fraud and breach of contract claims.  It is common ground that the burden of proof rests on the party making the claim, with the caveat that, as emphasised by Origin, the opposing party "cannot shelter behind denials and obfuscation":[94]

> [once] a claimant has established a prima facie case through its initial submissions, the responding party must present a more compelling case or it will lose.  While the burden of proof never shifts, the burden of proceeding or onus of proof can be said to shift back and forth depending upon whose case is relatively stronger at any stage of the proceedings.[95]

The Tribunal adopts the civil standard of proof required under New York law

---

[92] Origin's Post-Hearing Memorial, para 45.
[93] JFI's Reply Post-Hearing Memorial, para 24.
[94] Origin's Post-Hearing Memorial, para 23.
[95] Jeffrey Waincymer, *Procedure & Evidence in International Arbitration* 772 (2012), OL-48.

for fraudulent misrepresentation, which is generally expressed as the "preponderance of the evidence" or the "balance of probabilities".

180.   JFI emphasised that under New York law a fraudulent misrepresentation case is undermined where a sophisticated commercial entity dealing at arms' length with another entity fails to make reasonable inquiries regarding representations or to seek protection in the form of contractual representations/warranties.  Essentially, a party making a claim of fraudulent inducement cannot establish reasonable reliance on a representation if that party could have discovered the truth of the matter by the exercise of "ordinary care or intelligence".[96]  JFI cited *Hindsight Sols., LLC v. Citigroup Inc.*,[97] where the court made it clear that sophisticated parties may not simply rely on oral representations without seeking documentary confirmation or performing their own due diligence.

181.   JFI contended that Origin's claim fails on this point, because ILJIN (which was the negotiating party at the relevant time) never made any inquiries or sought any contractual confirmation regarding the alleged misrepresentations.  JFI also contended that reliance is precluded when an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.[98]  JFI pointed to Sections 1.2 and 15.8 of the Distribution Agreement which, to recall, state:

> 1.2    Distributor's Acknowledgments.    Distributor has conducted an independent investigation of the business contemplated by this Agreement, and Distributor has received all information necessary to make an informed decision to proceed with this Agreement.  Distributor has not received or relied on any guaranty or assurance, express or implied, as to the revenues, profits or success of the business to be conducted pursuant to this Agreement.

---

[96] *B. Lewis Prods. v. Angelou*, 2003 U.S. Dist. LEXIS 12655, (2nd Cir. 2004); RLA-91.
[97] *Hindsight Sols., LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 773 (S.D.N.Y. 2014); RLA-97.
[98] JFI's Reply Memorial, para 176.

> 15.8   Construction.   ... Except as otherwise expressly
> provided herein, there are no other oral or written agreements,
> understandings, representations or statements relating to the
> subject matter of this Agreement that either Party may or does
> rely on or that will have any force or effect.

182.   As noted above in relation to the Franchise Act, Origin dismissed Sections
1.2 and 15.8 as "boilerplate disclaimers", which do not operate as a bar to
bringing a fraudulent misrepresentation claim unless they specially address
the subject matter of the alleged fraud.[99]  In response, JFI cited several cases
in contending that, under New York law, the existence of general disclaimers
and merger clauses make the legal and factual threshold for proving
reasonable reliance more difficult to reach for the party alleging fraud, as
such provisions embody the parties' mutual intention to make the contract
itself comprehensive and controlling.[100]

183.   JFI also submitted that the "peculiar knowledge"[101] doctrine does not apply
here, as it is only triggered when discovery of the truth is exceedingly
difficult or costly for the relying party, given its means and sophistication.[102]
JFI emphasised that none of Origin's authorities involved application of that
exception to a well-advised, sophisticated entity and that all cases cited were
based on unusual circumstances.   JFI noted that in the *Warner Theatre v
Metropolitan Life* case,[103] the U.S. Court of Appeals for the Second Circuit
gave short shrift to a sophisticated party's attempt to invoke the peculiar
knowledge doctrine.

---

[99] Origin's Statement of Claim, para 224 (see *Danann Realty Co. v. Harris*, 5 N.Y.2d 317, 320-321, 157
N.E.2d 597, 184 N.Y.S.2d 599 (1959); RLA-114.)
[100] *Junk v. Aon Corp.*, No. 07 Civ. 4640(LMM)(GWG) 2007 WL 4292034 (S.D.N.Y. Dec. 3, 2007); RLA-
117; *Wurtsbaugh v. Banc of Am. Sec. LLC*, No. 05 CIV. 6220(DLC) 2006 WL 1683416 (S.D.N.Y. June 20,
2006); RLA-115; *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 323 n.2 (S.D.N.Y.
2008); RLA-116.
[101] Under the "peculiar knowledge" doctrine, if the alleged representations "are not matters peculiarly within
the party's knowledge, and the other party has the means available to him of knowing, by the exercise of
ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of
those means, or he will not be heard to complain that he was induced to enter into the transaction by
misrepresentations". *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 278-
79, 952 N.E.2d 995 (2011); RLA-112.
[102] JFI's Reply Post-Hearing Memorial, para 24.
[103] *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998); RLA-109.

184.   The Tribunal now turns to examine the specific statements that Origin alleged
       amount to fraudulent misrepresentations or omissions under common law,
       which fall within the following categories:

   a.   Statements regarding the profitability of the Joe Fresh New York
        stores;

   b.   Statements regarding average prices, number of SKUs and sell-through
        rates;

   c.   Statements regarding the Joe Fresh-JCPenney relationship and plans
        for further international expansion; and

   d.   Statements regarding Mr Mimran's role in Joe Fresh and the
        concealment of his succession plan.

*Profitability of the Joe Fresh New York Stores*

185.   Origin alleged that Mr Feigen told Mr Chung at their meeting on 13
       November 2012 in New York that the "the average sales of each mid-size
       shop-in-shop store in Canada was US$300,000, that the average sales of
       stand-alone stores in New York, Toronto and Vancouver was greater".[104]
       While in New York, Mr Feigen took Mr Chung to visit Joe Fresh's flagship
       store on Fifth Avenue which had opened earlier that year.  Mr Chung said
       that Mr Feigen told him that the store was "profitable".[105]

186.   Mr Feigen recalled the visit to the Fifth Avenue store, but denied saying that
       the store was profitable.  He agreed that a statement to this effect would have
       been incorrect.[106]  Mr Feigen gave evidence that, although he could not recall

---

[104] Chung II, para 39.
[105] Chung II, para 37 and Transcript, 31 May 2017 (Chung) at 41:18-21.
[106] Transcript, 7 June 2017 (Feigen) at 62:10-12.

the conversation in detail, he remembered telling Mr Chung that Joe Fresh was "happy with the performance" of the New York stores.[107]

187. Mr Chung also testified that Mr Feigen advised him that Mr Chung's initial projections of average sales per Korean store of US$150,000 per month were too low. Mr Chung said Mr Feigen asked that the estimates be revised because Mr Feigen expected that sales would be between the sales level of shop-in-shop stores in Canada (US$300,000 per month) and stand-alone stores in New York (which had a higher sales level).[108] Mr Chung said that he then revised Origin's estimates upwards to take account of average monthly sales in North America. During the hearing, Mr Chung clarified that his next proposal of December 2012 did not include these revised figures and instead retained the US$150,000 figure,[109] but the revised figure was included in his January 2013 proposal.[110] Mr Feigen said he did not recall making any such statements about revision and that, in any case, the New York stores made sales of over US$1 million per month.[111] Mr Feigen denied instructing Mr Chung to revise his projections and stated that his understanding was that Mr Chung had arrived at those figures by an analysis of competitors in the local market.[112]

188. The Tribunal is therefore faced with two conflicting accounts of a conversation from two witnesses. In the Tribunal's view, both witnesses were helpful and forthcoming throughout their testimony. The Tribunal does not consider that either witness deliberately concealed the truth, but simply that the witnesses had differing recollections of a conversation that happened almost five years ago. This is not surprising.

---

[107] Transcript, 7 June 2017 (Feigen) at 55:16 – 56:4 and Feigen II, para 52.
[108] Chung II, para 39.
[109] O-25, O-486 and O-306.
[110] Transcript, 31 May 2017 (Chung) at 68-71.
[111] Feigen II, para 45.
[112] Feigen II, para 45.

189.   The Tribunal has considered the context of the 13 November 2012 visit to the New York stores and the surrounding factual circumstances, as evidenced by the following contemporaneous documentation:

a.   Mr Chung sent his initial email to Ms Cook on 8 October 2012 with ILJIN's initial proposal to partner with Joe Fresh.[113] After receiving a response from Mr Feigen, Mr Chung confirmed on 9 October 2012 that he had been "preparing a business plan for JOE FRESH" which he sent to Mr Feigen the following day.[114] Mr Chung then sent an email to Mr Feigen suggesting that they have a meeting and visit "the popular NY store at the same time."[115] Mr. Feigen agreed and the date was set for a meeting on 13 November 2012.

b.   At that meeting, Mr Feigen gave his PowerPoint presentation about Joe Fresh.[116] Mr Chung presented ILJIN's proposal for a partnership, which included profit and loss projections showing an expected profit in Financial Year 4 with projected monthly sales of US$150,000 per store.[117]

c.   On 14 November 2012, Mr Chung sent Mr Feigen an email stating:[118]

> Hi Jonathan,
> I would love to thank you for your time yesterday. I am very much happy with the discussion we made. After meeting you and seeing the stores, I am much more confident about the successful business of Joe Fresh, a wonderful brand with great partners to work with.
> I do hope we could make the following process as quickly as possible to meet our target.
> If there is anything you want to do before I leave, please do let me know.

---

[113] R-6.
[114] O-23.
[115] O-24.
[116] O-32.
[117] O-468.
[118] R-60.

> As I have full days today and tomorrow just for Joe Fresh
> sample buying and competiton [sic] research, if you need, I can
> always meet you during the time.
> Best,
> Sungho

d.  Mr Feigen emailed Mr Mimran following the 13 November meeting
    with Mr. Chung. Mr Feigen set out his initial thoughts on margins and
    how a relationship with Origin might work.  Mr Feigen proposed
    sending an initial term sheet that would give Origin a 55% free-on-
    board margin based on the U.S. retail price.[119]

e.  On 29 November 2012, Mr Chung chased Mr Feigen for more
    information, stressing that ILJIN desired to enter negotiations urgently
    and that "it doesn't look normal that I haven't heard anything from you
    for 2 weeks after the meeting. I personally can do anything to have this
    deal done, however ILJIN's pride don't allow me to be in such a
    begging position for a long time".[120]

f.  On 5 December 2012, Mr Chung re-sent Mr Feigen his sales
    projections from the earlier proposal.[121]  Mr Feigen responded on 14
    December with a draft term sheet and seemingly resisted the pressure
    from Origin for speedy negotiations by saying that Joe Fresh was
    currently focused on the U.S. market, and Korea was only one of a
    number of opportunities that Joe Fresh would turn its attention to in the
    first half of 2013.[122]  The term sheet did not include minimum purchase
    amounts.

g.  Despite this holding response, contemporaneous documents reflect
    that, internally, Joe Fresh continued to progress the possibility of
    expanding into Korea.[123]  Indeed, Korea appeared to be the preferred

---

[119] O-452.
[120] R-9.
[121] O-25.
[122] R-82 and R-83.
[123] O-453 and O-336.

Joe Fresh option for international expansion beyond the United States.[124]

h.   A conference call was scheduled for 27 December 2012.  Mr Chung sent Mr Feigen a memorandum in advance which included a bullet point stating that Loblaw was to propose minimum purchase requirements by 27 December 2012.[125]

i.   Mr Chung emailed Mr Feigen on 9 January 2013 with his revised proposal.[126]  The cover email to the revised proposal, which included the new projection figures of US$300,000 sales per month, said in relation to those projections:

> Projection
> - This projection is my target and plan
> - You will easily understand how I am planning to develop stores and how much I am planning to spend for marketing, store building and etc.
> - UNICLO [sic] is selling US$500million with 90 stores, Zara is selling US$200Million with 34 stores and H&M is selling US$ 70Million with 10 stores
>   Based on this number, I think that my projection is not too conservative or positive
> - This projection is my plan and not the minimum

j.   Mr Feigen responded to Mr Chung asking: "One question...can you confirm the productivity you are assuming in the model (i.e. what is the sales per square meter for both flagships, malls and department stores."[127]  Mr Chung replied "[f]or all case, I assumed US$300 per square feet per month. So Average 1,000 Square Feet Normall [sic] stores' average monthly sales is US$300,000 and 500 Square Feet Commission stores' average monthly sales is US$150,000".[128]

---

[124] O-283.
[125] O-454 and O-456.
[126] R-235 and R-236.
[127] R-237.
[128] R-238.

k.  Although Mr Chung's monthly sales projections were increased to US$300,000, the overall projection was that Origin would not become profitable until Financial Year 3.[129]

l.  At a meeting of the JFI Advisory Board on 6 February 2013, as reported in the Minutes, Mr Weston "commented on the importance of capturing the momentum from the New York stores and the JCPenney launch in order to secure international partnerships".[130]

190.  There are two core issues the Tribunal must consider in relation to the above factual matrix, before it can turn to consider whether fraudulent misrepresentations were relied upon by Origin when entering into the Distribution Agreement. The first is whether Mr Feigen told Mr Chung that the New York stores were profitable. The second is whether Mr Feigen asked Mr Chung to revise his projections upward to reflect average Korean store sales of US$300,000 per month. The Tribunal addresses each of these in turn.

191.  When the evidence is considered as a whole, the Tribunal considers that it was unlikely that Mr Feigen would have deliberately and dishonestly misled Mr Chung as to the profitability of the New York Joe Fresh stores. The motive to do so is lacking. While it appears that Mr Feigen was keen to make a good impression and was enthusiastic about the prospect of a Korean partner, it was Origin that had initiated discussions and was actively pursuing the partnership. Origin was seeking to convince Joe Fresh to expand into Korea, in preference to other international possibilities. It is therefore unlikely that Mr Feigen would lie to Mr Chung to convince him to enter into a partnership that Origin was already pursuing with vigour; there was simply no need to deceive Mr Chung into action.

---

[129] R-7; Transcript, 1 June 2017 (Chung) at 41:18–45:13.
[130] O-321 at 6.

58

192.   Nonetheless, the Tribunal appreciates that a statement by Mr Feigen to the effect that Joe Fresh was "happy" with the performance of the New York stores reasonably could have conveyed the impression of profitability. It is understandable that Mr Chung would have perceived it in this way. Indeed, this appears to have been the case and likely accounts for Mr Chung's recollection of the conversation in the way that he testified. However, the fact that Mr Chung inferred profitability from Mr Feigen's statements concerning his general assessment of Joe Fresh performance in New York is insufficient to found a claim of fraudulent misrepresentation. This is particularly so in the present situation, where the performance of the New York stores apparently was not a particular focus during contractual negotiations.

193.   Most importantly, ILJIN (the negotiating party) did not require documentation of the financial performance or profitability of the Joe Fresh New York stores. Given the New York fraud law requirement of reasonable reliance by sophisticated entities such as ILJIN, had this matter been important, ILJIN could and should have confirmed its understanding of New York store profitability. While Mr Chung gave evidence that he had asked for Joe Fresh financial information and was told that this would not be provided,[131] there is no contemporaneous documentation to support this. If this had been an important element, ILJIN could and should have sought contractual warranties on the issue during negotiations.

194.   In summary, the factual matrix confirms that it is simply not credible that Origin entered into the Distribution Agreement in reliance on Joe Fresh statements that its New York stores were profitable.

195.   In relation to the projections for monthly sales, Origin submitted that Mr Feigen had a strong motive to encourage higher monthly sales projections for Korea, and minimum purchase requirements would be based on these figures.[132]   However, the Tribunal finds nothing in the contemporaneous

---

[131] Transcript, 1 June 2017 (Chung) at 25:3 – 26:1.  See also Chung II, para 42.
[132] Origin's Post-Hearing Memorial, para 54.

documentation demonstrating that Mr Chung was pressured into revising his estimates. Indeed, the emails between Mr Chung and Mr Feigen between 9 and 12 January 2013 suggest that Mr Chung made the upward revision based on his own analysis of the Korean market, and Mr Feigen was keen to understand the assumptions underpinning Mr Chung's revised figures.

196.  The Tribunal recalls the conference call between Origin and JFI on 27 December 2012, after Mr Chung had re-sent his original figures on 5 December but before he sent the revised figures on 9 January 2013, during which – according to the pre-conference memorandum – JFI was to propose minimum purchase requirements. In its Post-Hearing Memorial, Origin stated that there were a number of conference calls at that time and "Mr. Chung testified that, during those conversations, Mr. Feigen encouraged him to increase projected spend, and, in that context, told him that the Canadian stand-alone stores were experiencing sales of $300,000 per month, with US stores experiencing sales above that number",[133]  Although Mr Chung's primary evidence was that Mr Feigen made these statements during their New York meeting in November 2012, he did testify during cross-examination that "we made a phone call communication about the process of revising it from time to time".[134]

197.  The Tribunal notes that, even if Mr Feigen did make such representations regarding store sales in Canada and the United States, there is no suggestion that these figures were inaccurate. As such, these statements cannot form the basis of fraudulent misrepresentations. Instead, the allegation appears to be that Mr Chung felt pressured into revising his projections and, as a result, Origin agreed to minimum purchase requirements much higher than would have been the case if Mr Chung's original projections had remained in place.

198.  The emails between Mr Chung and Mr Feigen from 9 to 11 January 2013 (as described in paragraphs 189(i) and (j) above) militate against a finding of coercion or undue influence on Origin. Mr. Chung may well have been eager

---

[133] Origin's Post-Hearing Memorial, para 52.
[134] Transcript, 1 June 2017 (Chung) at 120:15-17.

to impress or please JFI in order to secure the deal, but there is no suggestion that ILJIN would have agreed to anything JFI asked. Moreover, there is no documentary evidence supporting a conclusion that Mr Chung was pressured into revising projection figures against his own best judgement. Indeed, the evidence suggests that he did use his own judgement and calculations.

199. Origin also alleged that it was misleading for Mr Feigen to provide monthly sales figures for the New York stores without being clear as to the actual profitability of these stores.[135] Mr Chung gave evidence that had Origin been told that the representations regarding the profitability of the U.S. stand-alone stores were inaccurate, Origin would never have proceeded with the arrangement.[136]

200. It should be recalled that, according to Mr Chung's evidence, the US$300,000 figure that Mr Feigen allegedly wanted to be used for Origin's projections related to mid-size shop-in-shop stores in Canada, and not the New York stores.[137] The Tribunal has not been provided with evidence or submissions concerning the profitability of these Canadian stores.

201. The evidence reflects that the New York Joe Fresh stores, although they had much higher average monthly sales than the Canadian stores, were losing money due to high overheads. However, based on the discussion above in connection with alleged misrepresentations concerning New York store profitability, conflating any suggestion of New York profitability with representations regarding sales figures in Canada does not assist the Tribunal.

202. The allegation of fraudulent misrepresentation is a serious one, requiring Origin to demonstrate deliberate or reckless dishonesty. The Tribunal considers that any statements made by Mr Feigen about New York Joe Fresh store profitability were made honestly, with no intention to deceive Origin into entering an agreement.

---

[135] Origin's Post-Hearing Memorial, paras 54-55.
[136] Chung III, para 8.
[137] Chung II, para 39.

203.  The fact that ILJIN was a large and experienced company, which had conducted its own market research before (and after) approaching Joe Fresh and was advised by external counsel, also militates against Origin's argument of reasonable reliance on statements made by JFI about the performance of its North American stores.  At the time of the negotiations, ILJIN professed to have knowledge of the local market conditions and Mr Chung held himself out to JFI as "an expert in fashion branding with many success stories in the market".[138] Again, this suggests that it is unlikely that Origin relied on information provided by JFI in relation to the U.S. or Canadian markets in making decisions in relation to the Korean market.

204.  This conclusion is reinforced by the fact that Origin did not require JFI to provide supporting financial data or documentation for the Joe Fresh New York or Canadian stores, nor did it request that related financial warranties or contractual representations be included in the Distribution Agreement.

205.  On the basis of the analysis above, the Tribunal must reject Origin's arguments that JFI made fraudulent misrepresentations or omissions in relation to financial performance of the Joe Fresh New York stores and the monthly sales figures of its North American stores.

*Pricing and SKUs*

206.  The Tribunal now considers the allegations that JFI made fraudulent statements concerning pricing, SKUs and sell-through rates for Joe Fresh merchandise.

207.  These allegations relate to the presentation made by Mr Feigen on 13 November 2012 in New York and again on 28 January 2013 in Korea.[139] The presentation included a slide (Exhibit O-32, slide 4) representing that Joe Fresh had "15,000 SKUs", "50%+ CHANGE EVERY 4 WEEKS" and "AVERAGE ITEM PRICE OF $13".[140]  The presentation noted that Joe

---

[138] R-5.
[139] O-32.
[140] O-32, slide 4.

Fresh had products in the categories of menswear, womenswear, babywear, accessories (including eyewear), shoes and beauty. Origin stated that "[g]iven the gulf between the statements and the reality, an inference arises that the statements in Exhibit O-32 about price, mix and sell-through were false to begin with",[141] and suggested that the evidence offered by JFI to substantiate the presentation statements, in particular the annual SKU summary data in Exhibit R-276, was insufficient.

208.    Mr Freedman, who was appointed Joe Fresh's COO in March 2015 and was JFI's President from September 2016, provided evidence that Joe Fresh had 14,410 SKUs in 2013.[142]   However, Mr Freedman admitted that the information in the relevant Exhibit R-276 was provided by his staff, and he had no personal knowledge of the SKUs that were available during 2012 and 2013, as he was not part of the business at that time.[143]  Mr Freedman also gave evidence that the average price of the SKUs "in (a) 2012 was $13.30; (b) 2013 was $12.04; (c) 2014 was $14.18; and (d) 2015 was $14.67".[144] Again, this information was not within his personal knowledge or recollection, but came from evidence collected and supplied to him by his "team".[145]

209.    Mr Feigen gave evidence that the Joe Fresh marketing department had given him the information in his slide presentation about the number of SKUs and average prices and said that he "believed these statements to be accurate".[146]

210.    As noted above, Mr Freedman was not part of the Joe Fresh business in 2013 and the documentary evidence in the record concerning SKUs and prices was not contemporaneous. Nonetheless, the Tribunal has no reason to believe that the information in the slide presentation O-32 were false. Although the Tribunal does not rely on this, the summary SKU figures in Exhibit R-276 accord with the representations made by Mr Feigen as to the total number of

---

[141] Origin's Post-Hearing Memorial, para 59.
[142] Freedman II, para 21; R-276.
[143] Transcript, 2 June 2017, (Freedman) at 76:18-24. Also see Freedman I, para 1.
[144] Freedman II, para 24.
[145] Transcript, 2 June 2017, (Freedman) at 78-79.
[146] Feigen II, para 60.

SKUs in the Joe Fresh range in 2012. There was no obvious motivation for Mr Feigen to falsify these figures, given that the documentary record up to that date shows that Origin was the party driving the negotiations and wanted to partner with Joe Fresh.

211.    Origin also alleged that, even if the slide presentation statements as to SKUs and prices were technically true, JFI made the statements with the intention of conveying a false impression of the merchandise Origin would receive from Joe Fresh and therefore were still fraudulent.[147] The Tribunal does not find this argument convincing. The information was included in a slide presentation provided to Mr Chung at the first meeting in New York in November 2012, and repeated by Mr Feigen in Korea in January 2013. This was at the very early stages of pre-negotiation discussions. The Tribunal considers that the presentation was designed to give ILJIN an overview of, and introduction to, the Joe Fresh business. Following ILJIN's decision to enter into formal negotiations, experienced lawyers were involved in months of intensive discussions. The Tribunal is not convinced that Origin would have relied on the SKU and price information in the earlier presentation, in the way it has alleged, without at least discussing or explicitly referencing the presentation in later negotiations.

212.    It is insufficient to found a fraud allegation on the basis of this slide presentation alone. Put simply, there is nothing to suggest that the statements in the slide presentation were false at the time they were made or that Mr Feigen set out to dupe Origin into entering the negotiations and ultimately the Distribution Agreement.

213.    It was also clear later, in 2014, that JFI was offering Origin only a selection of the full range of Joe Fresh SKUs, which means that the total number of SKUs – as presented to Mr Chung in 2012 – must have been larger. The more relevant issue for this dispute, then, is whether the full range of SKUs (and price points) should have been made available to Origin in 2014. This

---

[147] Origin's Post-Hearing Memorial, para 60.

is an issue for analysis under Origin's allegations of contractual breach and bad faith, rather than an issue in relation to fraud or deceit.

214.   In summary, applying the civil standard of proof applicable under New York law, the Tribunal finds that Origin has not made out its fraudulent misrepresentation allegations on the evidence. Issues regarding SKUs and pricing will be addressed further in relation to Origin's allegations of contractual breach and bad faith.

*JCPenney and International Expansion*

215.   Origin alleged that Joe Fresh concealed the fact that between late 2012 and early 2013, when the negotiation team provided initial statements about the Joe Fresh-JCPenney partnership, and September 2013, when the Distribution Agreement was signed, the relationship with JCPenney had changed dramatically. Origin submitted that the demise of the JCPenney relationship had "profoundly deleterious effects on Joe Fresh",[148] such that Origin should have received advance warning.

216.   Origin also alleged that JFI made false representations regarding its international expansion plans. Mr Chung testified that Mr Feigen had told him that "Joe Fresh was looking to expand in South America, the Middle East and Europe and that there already was much progress with partners in South America".[149] JFI did not deny this. Mr Feigen acknowledged that it would be "typical" for him to have said that Loblaw was planning to invest heavily in global expansion of the Joe Fresh brand, although he could not recall this specific conversation.[150]

217.   It is evident from the documents that JFI was heavily focussed on the JCPenney deal in late 2012 and early 2013, and that it promoted this relationship to Origin.[151] It is also clear that broader international expansion was being contemplated by Loblaw. An email dated 8 January 2013 from

---

[148] Origin's Post-Hearing Memorial, para 62.
[149] Chung II, para 30.
[150] Transcript, 7 June 2017 (Feigen) at 45:12-23.
[151] O-32, slide 24 and O-283.

George Hamam, a financial analyst at Loblaw, to Mr Feigen, Mr Mimran and others recorded the outcome of a meeting with Loblaw Chairman and CEO, Mr Weston:[152]

> International prospects (Korea, Mexico, others)
> • We agreed to work with 2-3 prospects in parallel with an objective to rollout with one partner in about 6-12 months following the roll out of JCP (towards the end of 2013). We would aim for others to follow roughly 3-6months following.
> • Subject to more due diligence Jonathan indicated that Korea was most preferred; we will evaluate as discussions progress.
> • Criteria —minimal capital, similar economics to JCP

218.   Similarly, a Joe Fresh presentation dated 22 July 2013 entitled "Joe Fresh International Organic Growth" demonstrates a continued enthusiasm for considerable international expansion.[153]   Slide 3 shows potential interest in expanding to North America, Latin America, Eastern and Western Europe, Asia and the Middle East.  As it happened, in addition to the United States and Korea, Joe Fresh contracted with partners to enter markets in the Middle East and Central America.[154]

219.   In relation to the JCPenney relationship, Origin's primary complaint was that JFI concealed the deterioration of the JCPenney relationship during 2013.[155] In April 2013, unbeknownst to Origin, the CEO of JCPenney was ousted and the company decided to move back to its original strategy of positioning itself as a promotion-driven, family brand appealing to "middle America".  This resulted in a decision to reduce in-store outlets like Joe Fresh significantly. Origin also alleged that Joe Fresh, to increase JCPenney sales, "Pennified" its range so as to appeal to an older and less "fast fashion" conscious demographic.

220.   Origin's fashion expert, Ms Kernan, opined that Joe Fresh would have been aware of this change in JCPenney strategy by mid-2013 due to media

---

[152] O-283.
[153] O-312.
[154] Transcript, 29 May 2017 (Tay) at 77:13-19.
[155] Origin's Post-Hearing Memorial, para 62.

reports,[156] well before the Distribution Agreement was signed in September 2013. Origin contended that honest disclosure of the JCPenney events would have alerted it to the lack of qualification and experience of the JFI team leading international expansion.

221. JFI refuted Origin's suggestion that it should have disclosed the changes at JCPenney prior to signing of the Distribution Agreement and said that all statements made about the JCPenney relationship at the time were true.[157] JFI also alleged that Origin had waived any right to bring a fraud claim in respect of the JCPenney relationship, as Origin continued with the Distribution Agreement for a number of months after learning of the end of the Joe Fresh-JCPenney relationship in May 2015.

222. JFI further maintained that the internal Joe Fresh expansion plans demonstrated that JFI intended to, and in fact did, internationalise its business and that plans to expand outside North America were not contingent on the success of the U.S. ventures.[158]

223. While Joe Fresh's international expansion plans and team might well have had "latent weaknesses" as claimed by Origin, the Tribunal finds no evidence of a deliberate plan to mislead Origin as to the Joe Fresh international program. Internal Joe Fresh documents demonstrate a genuine intention to expand internationally, and these expansion plans were initiated in various countries including Korea. The relationship with JCPenney was initially as JFI had represented, and its demise – which was not until 2015 -- appears to have resulted primarily from internal JCPenney business changes. However, the fact that Joe Fresh's relationship with JCPenney in the United States failed and its broader international expansion proved unsuccessful, possibly because of the lack of international experience of the company and its team, cannot form the basis of a fraud or deceit claim under New York law.

---

[156] Transcript, 6 June 2017 (Kernan) at 18:5-12, 57:6-58:5.
[157] JFI's Reply Memorial, para 250 et seqq.
[158] O-312 and O-323.

67

224.   The Tribunal acknowledges that the Joe Fresh - JCPenney relationship and plans for further international expansion were factors that would have given Origin comfort that Joe Fresh was the right partner for Origin in its bid to launch a "fast fashion" business in Korea. However, based on the evidentiary record, the Tribunal rejects Origin's claims based on alleged fraudulent misrepresentations and omissions by JFI in relation to its international expansion plans and any failure to keep Origin updated as to the details of Joe Fresh's interactions with JCPenney.

*The Role of Joe Mimran*

225.   Origin alleged that one of the key initial attractions of partnering with Joe Fresh was its "celebrity designer" president, Joe Mimran – the "Joe" in Joe Fresh. This differentiated Joe Fresh from other SPA brands in the market. Mr Mimran's name and identity were inextricably linked to the brand, and he featured in its marketing, live fashion shows and other promotional events.[159] According to Origin, he was a "critical and highly material factor in ILJIN/Origin's entry into the agreement".[160]

226.   Origin submitted that Origin stressed Mr Mimran's role during negotiations, and that Mr Feigen played a video at the meeting in Korea on 28 January 2013 with senior ILJIN executives which highlighted Mr Mimran's celebrity and his role as founder and creative designer of the brand. Mr Chung testified that during this January 2013 meeting, Mr Feigen promised Mr Chung that "Mr. Mimran would personally oversee the JOE FRESH® collection each season and would continue to be heavily involved in supporting the brand expansion going forward."[161] Mr Chung then met Mr Mimran in person in Toronto on 5 March 2013.

227.   However, according to Origin, JFI failed to disclose that, as early as 2013, plans were being put in place for Mr Mimran's departure. In September 2013,

---

[159] Origin's Post-Hearing Memorial, para 65.
[160] Origin's Post-Hearing Memorial, para 66.
[161] Chung II, para 65.

Mr Grauso was recruited as part of a "succession plan", as later stated by Mr Weston in an email of 16 March 2015.[162]  Origin contended that it should have been informed of this succession plan before execution of the Distribution Agreement, given Mr Mimran's importance and high profile.

228.   JFI rejected these allegations, stating that there was never any suggestion during negotiations that Mr Mimran's role in the Joe Fresh brand would continue in perpetuity. According to JFI, Mr Mimran's personal role was not a key feature emphasised by either party during negotiations and, in particular, was not raised by Origin as an important factor. JFI emphasised that Mr Mimran did not feature in any of ILJIN's business plans nor was he mentioned in the Distribution Agreement.[163]

229.   Mr Feigen gave evidence that all statements he made during negotiations regarding Mr Mimran during were true and correct at the time.[164]  He denied making any statements during the negotiations regarding Mr Mimran's continuing involvement in the business, as suggested by Mr Chung.[165]  At the hearing, Mr Feigen testified that he did not learn that Mr Mimran was exiting the business until sometime around February or March 2015, which was the time of Mr Mimran's departure.[166]

230.   JFI submitted that even if its personnel had been aware during negotiations of Mr Mimran's intention to depart in 2015, there was no duty under New York law to disclose this information. A legal disclosure duty would arise only if Origin were in a particularly vulnerable position relative to JFI, which was not the case.[167]

231.   The issue of Mr Mimran was prominent in the hearing, and the Tribunal has reviewed the underlying evidence in particular detail.  The Tribunal concludes that Origin simply cannot sustain the allegation that JFI

---

[162] R-24.
[163] JFI's Reply Memorial, para 275 et. seqq.
[164] Feigen II, para 71.
[165] Feigen II, para 73.
[166] Transcript, 7 June 2017 (Feigen) at 4:3-9.
[167] JFI's Reply Memorial, para 273.

fraudulently misrepresented Mr Mimran's status during negotiations in 2012 and 2013 by omitting to disclose that Mr Mimran might or would resign in 2015. The Tribunal bases this conclusion on the following evidence:

a.  The references to Mr Mimran in the presentations delivered by Mr Feigen to Origin in late 2012 and early 2013 were true at the time. Mr Mimran was only referred to in two slides.[168]

b.  Mr Feigen was not aware at the time that Mr Mimran would depart in 2015. He only learned of Mr Mimran's departure in February or March 2015, which appears to be when the majority of Joe Fresh staff also learned of the departure.

c.  The only evidence suggesting that JFI might have anticipated Mr Mimran's departure was the memorandum of 16 March 2015 from Mr Weston to his "Joe Fresh Colleagues" informing them that Mr Mimran "will step away from the day-to-day business" of Joe Fresh and that "Joe Mimran hired a successor in Mario Grauso who would take over as President.[169] Mr Grauso had been hired in late 2013 as the CEO for Joe Fresh, and became President when Mr Mimran left in March 2015.

d.  As the new Joe Fresh leader, Mr Grauso made a number of changes in the business, including by significantly reducing SKU numbers and cancelling fashion shows.

e.  In the letter agreement signed by Mr. Mimran on 9 April 2015, he agreed to stay on as an "ambassador" for Joe Fresh, whereby he would make himself available for 10 days per year for appearances or other assistance required by Joe Fresh. He was paid CDN$1 million per year for three years as a retainer for these services.[170] The record reflects that, as it happened, Joe Fresh never asked Mr Mimran to make any

---

[168] See O-32. JFI's Reply Memorial, para 269.
[169] R-24.
[170] R-273.

appearances as ambassador, leading the Tribunal to conclude that the 9 April 2015 letter was essentially a non-compete agreement.

232. The existence of the technical "ambassador agreement" with Mr Mimran and the changes made under Mr Grauso together suggest that Loblaw had decided to take the Joe Fresh business in a different direction and that it considered Mr Grauso to be the better person to lead Joe Fresh forward. This was affirmed in Mr Weston's public notice of Mr Mimran's departure, "announcing a new age of Joe Fresh" under Mr Grauso.[171] The timing of Mr Mimran's departure also coincided with the demise of the JCPenney relationship.

233. Overall, the evidence does not suggest that Mr Mimran's exit from the business had been planned for a number of years or that it was anticipated as early as 2012 and early 2013.

234. As noted above, the Tribunal acknowledges that Mr Weston's reference in his memorandum of 16 March 2015 to "Joe Mimran [having] hired a successor in Mario Grauso" could be read as meaning that Mr Mimran had decided sometime earlier than 2015 that he would leave. However, in the Tribunal's view, the memorandum is more likely to have been a general statement regarding Mr Grauso's place in the company as the natural successor to Mr Mimran, if and when Mr Mimran were to depart. Even if Mr Mimran had hired Mr Grauso in 2015 with a view to departing, there is no evidence that he shared this view with Mr Feigen or anyone else from Joe Fresh.

235. The most important factor for the Tribunal is that ILJIN did not ask or require JFI to include any representations in the Distribution Agreement concerning Mr Mimran's long-term commitment to the Joe Fresh brand. Indeed, he was not even included in the "Key Personnel" clause in the Distribution Agreement.

---

[171] R-24.

236.    Although the Tribunal accepts Origin's evidence that Mr Mimran's celebrity
        was an important element in its original attraction in 2012 to the Joe Fresh
        brand, it does not follow that ILJIN would not have executed the Distribution
        Agreement if JFI had known and disclosed Mr Mimran's future departure.
        This is speculation, given that Mr Mimran's position was not emphasised in
        the negotiations and no related representations were included in the
        Distribution Agreement. Further, although unrelated to the fraud allegations,
        the Tribunal also observes that Origin's difficulties in the Korean market
        began well before Mr Mimran's departure, and it is unclear what, if any,
        impact his departure had on the business in Korea.

237.    The Tribunal therefore rejects Origin's claim that JFI made fraudulent
        misrepresentations by omitting to reveal prior to execution of the Distribution
        Agreement that Mr Mimran would depart in 2015.

*Disclaimers*

238.    JFI advanced an argument that the disclaimers contained in Sections 1.2 and
        15.8 of the Distribution Agreement (as set out in paragraph 181 above) bar
        Origin from pursuing the fraudulent misrepresentation claims in this
        arbitration. Given the Tribunal's findings above, the Tribunal is not required
        to decide this alternative ground for dismissing Origin's fraud claims.

*Conclusion*

239.    In conclusion, the Tribunal holds that Origin has failed to substantiate any of
        its claims for fraudulent misrepresentations or omissions by JFI during
        negotiation of the Distribution Agreement. The Tribunal therefore dismisses
        Origin's claims of fraudulent misrepresentation under New York common
        law.

240.    Given the Tribunal's dismissal of Origin's fraud claims, the Tribunal does
        not consider it necessary to address JFI's alternative defence that, if

fraudulent misrepresentations had induced Origin to enter into the Distribution Agreement, Origin had waived its right to seek rescission of the Agreement for fraud by proceeding with the contractual relationship with JFI and failing to raise any fraud claims. [172]

241.  The Tribunal also considers it unnecessary to address Origin's claims concerning the role that Loblaw, as compared to JFI, may have had during the negotiations. The Partial Award on Jurisdiction addressed the role of Loblaw during this period and no separate claim has been brought against Loblaw regarding fraudulent misrepresentation under common law, so as to require the role of the parent to be distinguished from that of JFI as subsidiary. In any case, no fraud has been made out by Origin against either JFI or Loblaw during the negotiations.

## C.   Implied and/or statutory covenant of good faith and fair dealing

242.  In this section, the Tribunal introduces Origin's claim that JFI breached the implied and/or statutory covenant of good faith and fair dealing. The relevant issues, as set out in Appendix 1, are:

   a.   What is the content of the implied and/or statutory covenant of good faith and fair dealing?

   b.   Does the implied and/or statutory covenant of good faith and fair dealing effectively create new, independent obligations on JFI that were not otherwise found in the express terms of the Distribution Agreement?

   c.   Can Origin advance claims for breach of the implied covenant of good faith and fair dealing on the basis of allegations that duplicate its claims for breaches of express terms?

---

[172] JFI's Reply Memorial, para 204.

    d.   Did any of the conduct complained of (if proven true) amount to a breach by JFI of an implied covenant of good faith and fair dealing i.e., did the alleged conduct by JFI rise to the level of being arbitrary or capricious?

*Good Faith Performance of Contractual Obligations*

243.   There is no dispute that New York law implies a covenant of good faith and fair dealing into every contract.[173]  Further, Section 1-304 of the Uniform Commercial Code (**the U.C.C.**) provides that "[e]very contract or duty within [the U.C.C] imposes an obligation of good faith in its performance and enforcement".

244.   The content of the duty of good faith and fair dealing is well-summarised by the New York Court of Appeals as follows: [174]

> The covenant 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' And '[i]n some cases, the covenant may even require affirmative steps to cooperate in achieving the contract's objective.'

245.   The good faith obligation also requires parties to act "reasonably and with proper motive" when exercising discretion, in that they should not act "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties."[175]

246.   Origin alleged that JFI acted in breach of the duty to perform the contract in good faith as follows:[176]

> After the Distribution Agreement was signed, JFI drastically changed the pricing structure, merchandise assortment and brand marketing of Joe Fresh, without any apparent regard for the negative impact on the Korean market or Origin's reasonable expectations regarding the pricing structure and merchandise assortment – expectations that were based on the representations

---

[173] *Travelers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) (OL-86). See also *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2001); OL-93.

[174] *Dalton v. Educ. Testing Services*, 87 N.Y.2d 384, 389 (1995); OL-94.

[175] *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2001); OL-93.

[176] Origin's Statement of Claim, para 247.

JFI made to induce Origin to enter the Distribution Agreement. It failed to fulfill its contractual obligations to supply Asian-sized clothing – the key contractual promise that induced Origin to agree to the Distribution Agreement. Further, JFI failed to provide the tools and approvals Origin needed to succeed in the marketplace, by, among other things, failing to provide appropriate and timely marketing approvals, insisting on inappropriate store sizes and design, delaying merchandise delivery, failing to provide the agreed upon number of annual line reviews and insisting on longer than agreed pre-order times, and, ultimately, improperly drawing down on the Letter of Credit and terminating the Distribution Agreement.

247.   Before examining whether any breaches of good faith occurred, the Tribunal notes that the doctrine of good faith and fair dealing under New York law does not allow a party to impose additional obligations into a contract that do not exist within the text of the negotiated agreement.[177] The doctrine simply requires parties to perform their agreed obligations in good faith. New York law also requires that a claim for breach of good faith in the performance of a contract cannot be duplicative of a claim for breach of contract.[178]

248.   The Tribunal considers that the doctrine of good faith and fair dealing under New York law does not create separate contractual claims for the parties, but instead is part of claims that particular provisions of the Distribution Agreement have been breached. The Tribunal will therefore examine the allegations of bad faith performance alongside the alleged breaches of express terms of the Agreement, as to both Origin's and JFI's cases, in Section X(D) below.

**D.     Alleged Breaches of Contract by JFI**

249.   This section addresses the following breach of contract issues, as set out in the List of Issues in Appendix 1:

---

[177] An allegation cannot have the effect of the effect of "creating independent contractual rights" not found in the contract (see *Fesseha v TD Waterhouse Investor Services, Inc.*, 305 A.D.2d 268, 761 N.Y.S.2d 22 (N.Y. App. Div. 2003) at 268, RLA-147.
[178] See JFI's Reply Memorial, paras 333-335.

    a.    Did JFI breach the obligations concerning pricing and assortment of Joe Fresh merchandise contained in Section 5.1?

    b.    Did JFI breach the obligations concerning sizing of Joe Fresh merchandise contained in Section 5.1(d)?

    c.    Did JFI breach the obligations concerning brand management, positioning and marketing contained in Sections 3.3, 6.2, 7.1, and 7.13?

    d.    Did the departure of Mr Mimran amount to a breach of contract?

    e.    Did JFI breach the obligations concerning store design and location contained in Section 3.2?

    f.    Did JFI breach the obligations concerning guidelines, manuals and training contained in Sections 7.10 and 7.13?

250.    At a general level, the Tribunal reiterates that Origin's position with regard to contractual breaches was that "JFI's express obligations, while stringent, were further informed by the implied covenant of good faith and fair dealing, which is part of every contract governed by New York law".[179] Indeed, JFI contended that "the vast majority of ILJIN's contractual claims revolve around an allegation that JFI breached its implied covenant of good faith and fair dealing".[180] As noted above, the good faith and fair dealing element of Origin's claims are analysed herein together with the alleged breaches of express terms of the Distribution Agreement.

*Unreasonable Assortment and Related Pricing*

251.    Origin argued that JFI's power in the Distribution Agreement to determine the range of merchandise and to set the upper limit of the Korean pricing

---

[179] Origin's Post-Hearing Memorial, para 87.
[180] JFI's Post-Hearing Memorial, para 118.

made Origin highly vulnerable and, thus, increased JFI's responsibility to ensure that its pricing and SKU assortment decisions were carried out in good faith, in furtherance of the long-term goals of the Distribution Agreement.[181] According to Origin, this good faith requirement meant that JFI should have had regard to the common assumptions of the parties established during negotiations, including that the Joe Fresh merchandise would have an average price of $13, with 15,000 SKUs available per year for Korea.

252.    There are two aspects to this allegation: the first concerns the range of products available to Origin and whether that range was appropriate; the second, the effect that the actual narrower range of products had on the overall average retail price of items that could be offered by Origin to its customers in Korea.

253.    The Tribunal is cognizant of the importance of these issues, given Mr Chung's evidence that the high price of items compared to Origin's competitors in South Korea was, in his view, one of the main reasons that the venture failed.[182]

254.    In their submissions, both sides appeared to acknowledge that Origin's complaints with regard to pricing and assortment primarily related to the good faith of JFI's conduct, rather than to specific breaches of the obligations in Sections 5.1 and 7.3 of the Distribution Agreement.

255.    Section 5.1 states (in part):

> During the Term, JFI shall supply (or cause its designated Affiliates to supply) Distributor with Joe Fresh Merchandise in accordance with the terms of this Agreement, and Distributor shall purchase Joe Fresh Merchandise solely and exclusively from JFI or its designated Affiliates in accordance with the terms of this Agreement.
>
> ...
>
> Distributor acknowledges that the pricing for Joe Fresh Merchandise as above provided, constitutes the bona fide wholesale price for such merchandise. JFI has the sole and exclusive right (i) to establish the lines of Joe Fresh Merchandise from time to time, including, types, styles, fabrics, colors, etc.

---

[181] Origin's Post-Hearing Memorial, para 91.
[182] Transcript, 1 June 2017 (Chung) at 130:18 – 131:9.

(provided JFI agrees to scale the sizes of clothing for the Korean market); (ii) to discontinue, modify, substitute or add to its lines of Joe Fresh Merchandise, and (iii) to modify at any time its Standard Retail Prices on thirty (30) days' notice to Distributor. For the avoidance of doubt, JFI may not modify Joe Fresh Merchandise or pricing for purchase order that JFI has accepted without consultation with Distributor and obtaining Distributor's approval, which shall not be unreasonably withheld.

Section 7.3 states (in part):

Distributor agrees that its Free-Standing Stores and Shop-In-Shops will offer for sale a reasonable assortment of Joe Fresh Merchandise with such product mix as JFI determines from time to time to be reasonably appropriate in consultation with Distributor.

256.    As required by Section 5.1, JFI made a range of Joe Fresh merchandise available to Origin. Section 5.1 does not specify the percentage of Joe Fresh's overall SKUs to be offered to Origin, while Section 7.3 places an obligation on Origin to "offer for sale a reasonable assortment of Joe Fresh Merchandise", but not a full assortment. Origin complained that, having represented in the negotiations that it had some 15,000 SKUs at an average price of $13, JFI did not perform its contractual obligations in good faith when it "sprang a totally new pricing and brand structure on Origin, one in which: (i) prices were suddenly, and inexplicably, far higher than Joe Fresh's competitors (and far in excess of $13 on average); (ii) only 2,000 SKUs per year were available".[183]

257.    Origin alleged that JFI refused to allow it access to certain products, such as cosmetics, and allowed access to only limited ranges of other products, such as children's merchandise, at the high-price end. As a result of these and other limitations, Origin contended that its stores had an insufficient product assortment to be competitive in the Korean SPA fashion market.[184]

---

[183] Origin's Statement of Claim, para 250.
[184] Origin's Statement of Claim, para 251.

78

258. JFI defended the limited selection offered to Origin, stating that it was never intended that Origin be able to access the full range of SKUs and no provision to this effect was included in the Distribution Agreement. Origin was unable to access a number of SKUs in the children's collection as it had not gained the requisite Korean regulatory approvals.[185] JFI emphasised that, other than in 2014, Origin did not even choose to purchase all of those SKUs made available to it and that the evidence contradicts Origin's claim that JFI only made available high-priced items.[186]

259. Mr Freedman provided the following evidence with regard to the total number of SKUs available to Joe Fresh from 2012 to 2016:[187]

Total Joe Fresh SKU summary*:

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Total Women's SKUS | 4308 | 5030 | 4346 | 3017 | 2988 |
| Total Men's SKUS | 1263 | 925 | 799 | 915 | 855 |
| Total HIS SKUS | 2091 | 2416 | 2145 | 1696 | 1272 |
| Total Children's SKUS | 4556 | 4985 | 5494 | 4275 | 2851 |
| Sunglasses | 168 | 229 | 246 | 221 | 234 |
| Cosmetics, jewellery, bath, holiday | 701 | 825 | 1053 | 1125 | 646 |
| GRAND TOTAL: | 13087 | 14410 | 14083 | 11249 | 8846 |

* Number of SKUS in each year reflects the actual year in which the SKUs are available, but design and ordering of SKUs occurs earlier.

260. In relation to the SKUs offered by JFI to Origin for purchase in 2014 to 2016, and to the SKUs actually purchased by Origin over that same period, Mr Freedman provided in the following evidence:[188]

---

[185] JFI's Post-Hearing Memorial, para 195.
[186] JFI's Post-Hearing Memorial, para 162; JFI's Reply Memorial, para 243(ii); see also R-18 (Letter Agreement dated 30 October 2014 concerning the price point for certain basic apparel items).
[187] O-318 / R-276.
[188] R-276 and Freedman II, para 23.

SKUs offered to and purchased by Origin

|  | 2014* | 2015 | 2016 |
|---|---|---|---|
| Total SKUs offered to Origin | 1472 | 3462 | 3083 |
| Total SKUs purchased by Origin | 1472 | 2018 | 2115 |

*Brand launched in Korea midyear: this is a partial year figure

261.   The Tribunal is not satisfied that Origin has proven that JFI breached its contractual obligations with regard to the Joe Fresh merchandise assortment and price.  While the Tribunal accepts that the assortment offered by JFI to Origin for purchase was considerably smaller than the overall SKU range available, the Tribunal finds that this in itself is not a breach of any contractual obligation, as there was no obligation in the Distribution Agreement that JFI provide a full or even a large range of Joe Fresh merchandise to Origin.   This was consistent with ILJIN's request in negotiations that it be allowed to maintain a "reasonable" assortment of Joe Fresh merchandise, rather than the "full line" available.[189]  There were also factors making the full range inappropriate or impossible to offer in Korea, including the proportionally smaller store sizes in Korea than elsewhere (meaning the stores could only carry a limited range of products) and regulatory restrictions preventing certain products from being imported and sold.[190]

262.   The same factors that warrant against a finding of contract breach also preclude a finding of bad faith on JFI's part.  Not only can the doctrine of good faith not be used to import a new obligation into a contract, Origin itself must have been aware that it could not carry the full SKU range in its much smaller Korean stores, as compared to the flagship New York store Mr Chung had viewed.  As noted above in connection with Origin's unsuccessful fraud claims, Origin did not insist on clarification as to how many SKUs would be made available, nor did it in negotiations appear to place any emphasis on the 15,000 SKUs or $13 price point in Mr Feigen's November 2012 slide

[189] R-239.
[190] JFI's Reply Memorial, para 386.

presentation. Indeed, Origin's primary position in relation to product assortment was that it did not want to be obliged to carry the full range of SKUs, as evidenced by its amendments to the draft Distribution Agreement. Origin specifically deleted from Section 7.3 of the draft Distribution Agreement a requirement that it carry the full line of Joe Fresh merchandise and amended the requirement to a "reasonable assortment" as indicated by the following mark-up: [191]

> Distributor agrees that its Free-Standing Stores and Shop-In-Shops will offer for sale a reasonable assortment the full line of Joe Fresh Merchandise with such product mix as JFI determines, in consultation with Distributor, from time to time to be reasonably appropriate.

263.   As for certain product ranges, specifically cosmetics and children's wear, that were not made available to Origin, the Tribunal understands that these were "side range" products, rather than the core Joe Fresh line of women's and men's clothing. Therefore, to find a breach of good faith in JFI's failure to make these products available to Origin, Origin would need to prove that it considered cosmetics and children's wear important to the Korean business and that it made this known to JFI when entering into the Distribution Agreement. The Tribunal has found no evidence in the record that these side range products were raised or discussed during negotiations, other than in JFI's generic initial representation that it manufactured 15,000 SKUs. Under the circumstances, any failure of JFI to offer Origin cosmetics and children's wear cannot be a breach of the duty of the covenant of good faith and fair dealing under New York law.

264.   As noted above, Origin also complained that the lower number of SKUs offered by JFI resulted in the average retail price of items offered for sale by Origin being much higher than $13. The pricing of items in Korean Won is discussed in more detail in the next section. In the Tribunal's view, it is evident that the average price of goods offered for sale in Origin's stores

---

[191] R-239.

would differ from the $13 average price across the full range of Joe Fresh products, because it was not possible, nor anticipated, that Origin would stock the full range of Joe Fresh SKUs. The Distribution Agreement did not contain any obligation or representation regarding the average price of items to be offered for sale by Origin in Korea and therefore any claim in this regard is not contractual in nature. The Tribunal has already dismissed Origin's allegation of fraudulent misrepresentation regarding the $13 average price, and does not consider that there is anything further to add in this context.

265.   In sum, while Origin may now say that it would have preferred JFI to have offered the full range of SKUs for selection for the Korean market, the fact that JFI did not do so does not, in itself, amount to a breach of contract or breach of JFI's duty of good faith and fair dealing.

*JFI Purchase Pricing*

266.   Origin also complained that, aside from assortment and related retail price issues, JFI's purchase pricing for Joe Fresh merchandise lead Origin to be uncompetitive in the Korean market. Origin claimed that this pricing was a breach of both JFI's obligations in Section 5.1 of the Distribution Agreement and its good faith performance of the contract.

267.   Section 5.1(a) of the Distribution Agreement set the rates at which Origin was to purchase merchandise from JFI by reference to the U.S. Standard Retail Price:

> during the first two (2) Agreement Years, prices for Joe Fresh Merchandise will be 41.3% of the Standard Retail Price, provided if more than $15 million worth of Joe Fresh Merchandise is purchased (i.e., ordered and delivered, assuming timely delivery by JFI in accordance with the purchase orders) during any such Agreement Year, then the prices will be 39.0% of the Standard Retail Price for all Joe Fresh Merchandise purchased during such Agreement Year, and any excess payments made for Joe Fresh Merchandise so purchased shall be refunded or credited to Distributor within thirty (30) days after the end of such Agreement Year; during each subsequent Agreement Year, prices

> for Joe Fresh Merchandise will be 39.0% of the Standard Retail Price, provided if $15 million or less worth of Joe Fresh Merchandise is purchased during such Agreement Year, then the prices will be 41.3% of the Standard Retail Price for all Joe Fresh Merchandise purchased during such Agreement Year, and any deficiency in payments made for Joe Fresh Merchandise so purchased shall be paid by Distributor to JFI within thirty (30) days after the end of such Agreement Year; if in any Agreement Year Distributor purchases $50 million or more worth of Joe Fresh Merchandise that is categorized as men's or women's apparel, the parties will discuss any further volume rebate on such merchandise to be refunded or credited to Distributor for such year (provided a failure to agree on any further rebate shall not constitute a breach of this Agreement); …

268.   However, Section 7.1 of the Distribution Agreement gave Origin discretion to determine the retail selling price for the merchandise in the Korean market, provided that price was not more than 140% higher than the U.S. Standard Retail Price. Origin's possible profit margin fell between these two prices.

269.   The Distribution Agreement contained no provision or representation concerning competitive pricing in Korea. However, the importance of competitive pricing was acknowledged by both parties in a letter from ILJIN to Ms Hanratty (Managing Director of JFI) dated 30 October 2013,[192] which sought to "memorialise" an agreement on certain basic pricing items. The letter stated that "JFI and ILJIN acknowledge that the pricing for Joe Fresh Merchandise is important to be competitive in Korea, and agree that ILJIN has the discretion to set the pricing for Joe Fresh Merchandise to be marketed in Korea…." The letter then went on to say that the parties:

> acknowledge that the opening price point (i.e., the lowest priced item in a merchandise category) for certain categories of basic apparel (identified in Section 3, below) is important in order to be competitive with the pricing of comparable basic apparel of other competitors in Korea, including but not limited to Uniqlo and H&M. Accordingly, the parties agree to set the Standard Retail Price (as defined in the Distribution Agreement) for these opening price point items based on such competitive factors, rather than the U.S. non-discounted standard retail price as set forth in the Distribution Agreement.

---

[192] O-55 / R-18.

270.    This agreed discount in the purchase price demonstrated a desire on the part of both Origin and JFI to ensure that Joe Fresh merchandise was competitively priced in the Korean SPA market. This was an agreement put in place prior to the opening of the first Korean Joe Fresh store.

271.    Given JFI's flexibility on purchase pricing, the Tribunal considers that Origin's claims of a breach of good faith by JFI in relation to pricing are, yet again, primarily founded upon the representation in Mr Feigen's November 2012 slide presentation that Joe Fresh manufactured a total of 15,000 SKUs at an average price point of $13. As noted in paragraph 210 above, the evidence reflects that this representation was likely to have been true at the time it was made, and the breach of good faith allegation stems from JFI's failure to offer Origin the full range of SKUs which operated to increase the average price point of the items purchased by Origin. It is therefore the issue of assortment, rather than pricing, that is underlies this claim, and the Tribunal has already rejected Origin's bad faith claims based on assortment.

272.    The only additional point that the Tribunal wishes to address in this context relates to the overall competitiveness of Joe Fresh prices in Korea. Origin primarily compared its pricing to that of Uniqlo and to U.S. dollar prices for Joe Fresh merchandise available to Korean consumers online. As for online sales, Origin rightly contended, as a practical reality, that it could not price Joe Fresh items in its stores above the online U.S. dollar price or Korean consumers would simply purchase the items online from U.S. stores.

273.    As for Uniqlo, JFI submitted that "Uniqlo's Korean prices also revealed that Uniqlo deliberately adopted a strategy of setting lower retail prices in Korea than in the U.S. This was in stark contrast to ILJIN's decision to adopt the opposite pricing strategy, to sell Joe Fresh merchandise in Korea at prices that were higher than in the United States."[193] A comparison of Uniqlo's U.S. and Korean pricing demonstrates that Uniqlo sold certain items in Korea at a significant discount. For example, men's flannel shirts retailed in U.S.

---

[193] JFI's Post-Hearing Memorial, para 141.

stores for approximately US$29 for both Joe Fresh and Uniqlo, but in Korea Joe Fresh flannel shirts were priced at ₩49,000 and Uniqlo flannel shirts at only ₩29,000.[194] In U.S. stores, women's cardigans were sold by Joe Fresh at US$5 below Uniqlo prices, but the same item cost ₩10,000 more in Joe Fresh stores in Korea than in Uniqlo stores. Similar pricing discrepancies could be seen for women's polyester blouses, men's chinos, men's basic tee shirts and a number of other items.

274.   JFI set out in its Post-Hearing Memorial the following table first summarising ILJIN's expected pricing for Joe Fresh as compared to Uniqlo merchandise, and then comparing these expectations with the actual prices which eventuated.[195] The items highlighted in red show where the actual Joe Fresh prices were outside the range of the early estimates:

| Prices shown in R11 | | | Prices shown in O-74 and O-57 (also in O-222) | | |
|---|---|---|---|---|---|
| ILJIN's study of competitor prices in Korea before signing the Distribution Agreement (February 2013) | | | ILJIN's study of competitor prices in Korea after signing the Distribution Agreement (September 2014 to May 2015) | | |
| Product Type / Category | Expected ILJIN Retail Price Range for Joe Fresh (KRW) | Expected Uniqlo Price Price (KRW) | Product Type / Category | Actual ILJIN Retail Price Range for Joe Fresh (KRW) | Actual Uniqlo Price (KRW) |
| WOMENS | | | | | |
| T-Shirts | 9, 900 to 39,900 | 14,900 to 39,900 | O-222: Novelty Tee | 29,900 | 19,900 |
| Shirts/Blouse | 25,900 to 66,900 | 29,900 to 49,900 | O-222: Poly Blouse | 49,900 | 19,900 |
| Knit/Sweater | 25,900 to 135,900 | 29,900 to 149,000 | O-222: Core Cardigan | 45,000 | 29,900 |
| Dress | 32,900 to 89,900 | 29,900 to 79,900 | O-222: Knit Dress | 49,000 | 29,900 |
| Skirt | 39,900 to 53,900 | 29,900 to 39,900 | O-74: Skirt | 59,900 | 29,900 |
| Pants | 25,900 to 69,900 | 29,900 to 79,900 | O-222: Skinny Jeans | 49,900 | 39,900 |

[194] O-57.
[195] JFI's Post-Hearing Memorial, para 141.

| Outer | 49,900 to 179,900 | 49,900 to 249,900 | O-74: Biker Jacket | 145,000 | 12,900 |
|---|---|---|---|---|---|
| | | | O-74: Fur Vest | 129,000 | 39,900 |
| **MENS** | | | | | |
| T-Shirts | 9,900 to 39,900 | 14,900 to 39,900 | O-222: Basic Tee | 19,000 | 7,900 |
| | | | O-222: Polo | 18,000 | 29,900 |
| Shirts | 25,900 to 39,900 | 29,900 to 39,900 | O-222: Flannel Shirt | 49,000 | 29,900 |
| Knit/Sweater | 25,900 to 139,900 | 29,900 to 149,900 | O-222: Cotton Blend Sweater | 49,000 | 34,900 |
| Pants | 25,900 to 89,900 | 25,900 to 79,900 | Classic Chino | 49,000 | 39,900 |
| | | | Denim | 65,000 | 49,900 |
| Outer | 49,900 to 179,900 | 69,900 to 249,000 | Sweatshirt | 49,000 | 29,900 |

275.  JFI submitted that the evidence in this table demonstrates that ILJIN's initial market research and pricing analysis were inaccurate, and that it was these inaccuracies – not the JFI U.S. Standard Retail Price marker – that led to the pricing difficulties faced by Origin. The table was also said to demonstrate that, while Joe Fresh products in Korea were often sold at prices higher than Uniqlo's and (less so) H&M's, Joe Fresh apparently was positioned at around mid-market when a wider range of competitors is considered.[196]

276.  Pricing was clearly a concern for Origin, and it is evident that JFI was cognisant of this concern. As noted at paragraph 268 above, JFI and Origin agreed a discount for certain basic items in October 2013.[197] In May 2015, JFI also agreed to amend the Distribution Agreement to include a discounted purchase prices to attempt to alleviate Origin's financial stress. Although the draft Amendment to the Distribution Agreement was not signed by Origin, JFI nonetheless implemented the discounted prices. These concessions, said JFI, should have made Joe Fresh products more competitive in the Korean marketplace.

---

[196] O-223 (demonstrating that Joe Fresh was often cheaper than Zara and Mango stores in Korea).
[197] O-55 / R-18.

277. The actions of the parties regarding Korean retail pricing, and JFI's willingness to reduce purchase prices as described above, suggest to the Tribunal that both parties were addressing pricing concerns in good faith. The Tribunal does not find a breach by JFI of purchase pricing obligations under the Distribution Agreement, or that JFI took pricing actions with a lack of good faith or fair dealing.

*Scaled Sizing*

278. The Tribunal turns next to the highly contentious issue of clothing sizing for the Korean market.   In express terms, Section 5.1 of the Distribution Agreement required JFI to "scale the sizes of clothing for the Korean market".

279. To comply with this obligation, JFI alleged that it manufactured for JFI proportionately smaller versions of the garments it sold in other markets in standard sizes, and also created one new smaller size for women's clothing which was labelled "XXS" and for men's clothing which was labelled "XS". These new sizes, which did not exist in Canada or the United States, were created to cater to the smaller body-size typically found in Asian countries. JFI did not customise its clothing products to make other adjustments to typical Asian body-size.

280. Origin contended that even these smaller sizes were still too large for most Koreans, which was one of the key reasons that the Joe Fresh business failed in Korea. Origin also argued that JFI's obligation under Section 5.1 of the Distribution Agreement was not just to provide a proportionately smaller standard size and one new smaller size, but instead to manufacture clothes that would fit the Korean body shape; simply cutting garments smaller and relabelling the sizes was never going to result in a good fit for Korean customers.

281.    There was substantial discussion at the hearing as to what the term "scaling" means in the fashion industry, as opposed to "grading" or "customisation" of size.

282.    One thing that is clear from the evidence is that the parties, in Section 5.1 of the Distribution Agreement, did not intend customisation – meaning creating unique patterns for apparel items – for the Korean market.  The exchange over an earlier iteration of the Agreement demonstrates that JFI would not accept a requirement to customise.[198]  In that iteration, Origin inserted its preferred sizing formulation:

> JFI acknowledges and agrees that (i) body types, sizes, and shapes of Western people could be different from those of Asian people, and, hence, (ii) the Joe Fresh Merchandise as ordered by Distributor may need to be customized before delivery, and (iii) for the purpose of such customization, Distributor may request, from time to time, samples of any Joe Fresh Merchandise to be delivered to Distributor and (iv) when requested by Distributor, JFI shall cause Joe Fresh Merchandise to be manufactured in accordance with Distributor's customization requests.   For avoidance of any doubt, no change in the prices of such Joe Fresh Merchandise shall be made in association with such customization.

This amendment, as proposed by Origin as its preferred approach to sizing, contemplated customisation.  However, JFI refused to agree and Origin then agreed to substitute the more limited obligation that JFI would scale the Joe Fresh sizes for the Korean market.

283.    The Tribunal now considers what scaling in Section 5.1 of the Distribution Agreement means.

284.    Origin's fashion expert, Ms Kernan, testified:

```
A. Sure. I think of this in a kind of a spectrum
of
24 possibilities. One is customisation of the
pattern and
```

---
[198] R-239.

25 that's expensive to do, you know, it means that's taking

1 at the very beginning of the process and making
2 a special pattern. And then the other extreme is just
3 vanity sizing, changing the labels, and that's
4 a band-aid of a sort, but the middle ground is I think
5 what they were referring to in their agreement when they
6 refer to -- I can't remember the exact words in the
7 agreement, but the scale -- grading, I'll start with
8 grading.
9 Grading is the means of achieving the correct
10 scaling of an assortment for a marketplace. So I think
11 they agreed to start with JFI's patterns, not customise
12 them, but simply ensure that the grading between the
13 sizes would reflect the proportions that would be
14 appropriate for the Korean market. So instead of the
15 grading for the Canada market, let's say for a T-shirt,
16 let's say to go from a size medium to a size small the
17 width would be -- for a T-shirt might be reduced by one
18 inch, let's just say, and the sleeve length might be
19 reduced by half an inch.
20 Those measurements of the differences between the
21 medium, the small, the extra small, the extra extra
22 small, that's the grading. And when those are -- those
23 grading measurements that could have been respecified
24 for the Korean market to reflect the proportions for
25 that Korean fit and/or body type and that would be

scaling. And I don't think that was ever achieved. But

89

2 when I read the agreement, that's what I thought they
3 were talking about, that middle ground. It's less
4 expensive than customisation and it's not a band-aid
5 solution, it would actually have achieved proportionate
6 body fit, proportion is correct for the Korean body
7 type.

285. JFI's fashion expert, Professor Jung said that:

A. Right. Scaling means that you basically scale down or
18 up proportionately so you have basically the sizes and
19 in industry, you take the middle, the average model, the
20 fit model is actually medium size, 6 to 8, and you scale
21 down to develop size small or you scale up to develop
22 large or extra large. So it is proportional change we
23 are referring to without the pattern.
24 And so -- but then you have the grading. Grading is
25 that you take one pattern but you come up with different

various sizes but it also adapt to the individual body
2 types. So it's more -- definitely more customised
3 manner in terms of how you develop the garment. For
4 example, you have that, you know, the bridesmaids and
5 they wear same type of dress but everybody has different
6 body sizes so then you can actually put, you
7 know, a small group of bridesmaids, you could basically
8 do the grading of the patterns to adapt to individual
    9  body types.

286.   Ms Kernan appeared to suggest that scaling sizes and grading sizes are effectively the same thing, and involve a certain level of proportionate adjustment to the contours of a pattern to reflect the smaller or larger typical body-size of the relevant market.  Professor Jung appeared to suggest that scaling involves creating smaller or larger sizes of the same pattern without changing the overall proportions of the item, while grading involves more customisation of measurements.

287.   JFI contended that Ms Kernan's definition of grading was effectively the same as customisation, where the pattern is adjusted to achieve unique proportions for the market.  JFI argued that it rejected this approach during negotiations, and agreed only to provide smaller (non-customised) sizes – what JFI referred to as scaling down apparel sizes.

288.   Looking at the contemporaneous evidence of the negotiations, the Tribunal considers that the shared focus during discussions was to make each garment smaller (i.e., a North American "small" would be a "medium" in Korea) and supply one additional smaller size for the Korean market:

   a.   An internal Joe Fresh email written by Mr Feigen on 12 July 2013 records: "Based on the woman's samples Sungho brought back on his last trip he thinks the sizing scale will be one grade down".[199]

   b.   On the same day, Mr Feigen wrote another internal email saying "As we know, our scaling is off for their market (i.e. M is like their L and our S is like their M etc.) he [an unidentified Origin representative] wanted to know if we can have their merchandise tagged accordingly (to avoid confusion with customers)".[200]

   c.   On 27 September 2013, Mr Feigen emailed Mr Chung stating:

   Hi Sungho

   …

   We would also like you to confirm the size ratio for both men's and women's (i.e. what % of each size do you

---

[199] R-242.
[200] R-243.

want) We are assuming the following scale:

Men's – XS, S, M, L?

Woman's – XXS, XS, S, M.

d.   Mr Chung replied to Mr Feigen on 27 September 2013, as follows:[201]

Hi Jonathan,

According to our research, the basic assortment is as follows:



1.   Men's
   o  Top XS(S): 20% S(M) 40% M(L) 30% L(XL) 10%
   o  Bottom: 28: 10%, 30: 20%, 32: 40%, 34: 20%, 36: 10%
   o  Shoe: 250: 10%, 260: 30%, 270: 40%, 280: 20%
2.   Women's
   o  Top XXS(XS): 30% XS(S) 40% S(M) 20% M(L) 10%
   o  Bottom: 00: 10% 0: 20%, 2: 40% , 4: 20%, 6: 10%
   o  Shoe: 230: 30%, 240: 40%, 250: 20%, 260: 10%

e.   On 10 April 2014, before the first Korean store opened, a Ms Annette Kim of ILJIN wrote to Mr Leve: "please understand kindly XL sizes is XXL size for our market which is diffult [sic] for sale . . . ."[202]

289.   On balance, this contemporaneous evidence supports an understanding of size scaling that accords more closely with the explanation provided by Professor Jung, than with the concept of scaling/grading propounded by Ms Kernan.  JFI would produce garments in proportionately smaller (but not customised) sizes for each garment, and add one new smaller size (again, not customised) for the Korean market.  The goal was to avoid Korean consumer confusion, meaning for example that a "small" Korean woman would buy a "small" labelled tee shirt or pants in a Korean Joe Fresh store.

290.   Mr Chung also appeared to confirm this understanding of size scaling during the hearing:[203]

---

[201] O-60.

[202] O-125.

[203] Transcript, 1 June 2017 (Chung), 126:8-17.

MS REED:  So scaling would be, as I think you were trying

to say, if you have got a small North American women's

T-shirt, it gets shrunk proportionately all around and

it would be sold as a small in Korea, is that accurate?

A.  Yes.  For example small size for US, you change the

shrinking grade to be 20 per cent, but instead of 20

per cent for Asia, we'll make it 30 per cent, something

like that.

MS REED:  So overall shrinking, 20 per cent.

A.  Yes.

291.    JFI did in fact provide one new smaller size for both men's and women's apparel and relabel clothing up one size (i.e., a North American "large" became a Korean "extra-large"). There does not seem to be any suggestion that this scaling was not done adequately.  Origin's complaint was rather that even these smaller sizes were too big and ill-fitting for its Korean customers, because they had not been customised to an Asian fit.

292.    While the apparently poor fit of Joe Fresh clothes may well have been one of the reasons for the failure of the brand in Korea, this does not alter the obligation contained in the Distribution Agreement.  The Tribunal is satisfied that JFI's obligation in Section 5.1 of the Distribution Agreement to scale Joe Fresh apparel for Origin was not an obligation to customise fit to an Asian body type, but rather an obligation to provide proportionately smaller sizes of the standard clothing pattern.

293.    The Tribunal is also satisfied that JFI met this obligation by providing scaled clothing, and performed the scaling in good faith.  The record reflects that JFI intended and understood that these smaller sizes would be appropriate for the Korean market.

93

294.    There was a related disputed issue concerning how many of the smaller sizes of each item, as compared to larger sizes, were provided to Origin in each shipment. Although accepting that JFI provided comparatively more of the smaller sizes to Origin than it would have provided to its Western markets, Origin alleged that an even larger percentage of smaller sizes was required for Korea. However, Origin did not link this complaint to any specific contractual breach, and there is no related requirement in the Distribution Agreement. The Tribunal therefore does not find any breach of contract by JFI in this regard.

*Brand Management, Positioning and Marketing*

295.    Sections 3.3, 6.2, 7.1 and 7.13 of the Distribution Agreement contain obligations relating to marketing/advertising, store fit-out, the Joe Fresh "image", and compliance with Store Operation Manuals and Brand Use Guidelines. The obligations are primarily placed on Origin as the Distributor to act in accordance with Joe Fresh brand policies and guidelines.

296.    These Sections state (in part):

> 3.3 **Furniture, Fixtures, Equipment and Signs**. Distributor agrees to purchase or lease all required furniture, fixtures, equipment, POP displays, visual merchandising systems, signs, and supplies for each Free-Standing Store and Shop-In-Shop. Distributor agrees to purchase or lease only such types, brands and models of furniture, fixtures, equipment, POP displays, visual merchandising systems, signs and supplies that meet JFI's standards and specifications, including standards and specifications for quality, design, warranties, appearance, function and performance as set forth in the Store Operation Manual and Brand Use Guidelines...
>
> 6.2 **Distributor's Advertising.** Distributor agrees to obtain JFI's prior written approval for advertising and merchandising materials and programs used to promote its Free-Standing Stores and Shop-In-Shops, or sales of Joe Fresh Merchandise, and Distributor shall not publish, broadcast, telecast or use any advertising which JFI has not approved in writing in advance.
>
> In order to maintain the prestige image and quality associated with Joe Fresh Merchandise, JFI shall have the right to require

> any or all advertising and merchandising materials be approved in writing by JFI…
>
> **7.1 Brand Image.** Distributor acknowledges the aspirational, fashionable and value-centered image of Joe Fresh Merchandise, their distinctiveness in the minds of consumers, and their reputation for being of the highest quality. Distributor agrees to promote such image in every aspect of marketing and sale, including visual merchandising, advertising, and public relations. Subject to applicable Legal Requirements, Distributor agrees to sell Joe Fresh Merchandise at not more than the local currency equivalent of 140% of Standard Retail Prices.
>
> **7.13 Store Operation Manual and Brand Use Guidelines.** JFI will provide Distributor with access to the Store Operation Manual and Brand Use Guidelines. Distributor agrees to comply fully with all mandatory standards, specifications and operating procedures and other obligations contained in the Store Operation Manual and Brand Use Guidelines, subject to Legal Requirements. …

297.  Origin's specific allegations regarding store manuals, guidelines and training are addressed below at paragraphs 326 to 344. However, Origin also referred to these provisions of the Distribution Agreement when making a more generalised allegation of poor brand management. Origin alleged that JFI's good faith performance of its obligations concerning brand management were especially important in a situation where, as here, one party – Origin – "is at the mercy" of the other party, which has complete control over the brand.[204] Hence, Origin argued that it was vulnerable to small shifts in Joe Fresh brand policy that could significantly impact its business.

298.  Origin contended that it had the right, as an exclusive multi-year contractor, to expect that "the brand manager (Joe Fresh/JFI) would manage the brand professionally and would not engage in major brand changes without proper diligence; it also had the right to expect transparency and honesty."[205] JFI, according to Origin, fell far short in these areas. Origin's complaint appears to be based primarily on a lack of good faith and fair dealing by JFI in the way that it managed the brand.

---

[204] Origin's Post-Hearing Memorial, para 87; Origin's Reply Memorial, para 245.
[205] Origin's Post-Hearing Memorial, para 88; Origin's Reply Memorial, paras 126-27.

299.  Origin highlighted that the Joe Fresh logo was changed multiple times during the relationship, as demonstrated by the image below.



According to Origin, a change in logo is a major event as it "risks creating confusion, instability and the perception of problems with the product"[206] and are symptomatic of a dysfunctional brand.[207]  One of these changes was not properly notified to Origin, as evidenced by Mr Chung's complaint to Mr Leve that "[w]e would never build this store with old logo if anyone told me when it was changed during construction . . . Customers will feel funny when they come to this new store with old logo."[208]  JFI would not pay for Origin to change the store logos, which resulted in inconsistent branding between the stores.

300.  Origin alleged that JFI was aware of its incompetent brand management as evidenced by an internal email from Mr Leve to his new boss, Mr Freedman, in April 2015. Mr. Leve said that "[w]e as a brand don't have a clear message at times and are continually changing branding elements and overall brand strategy so it is hard to provide to [Origin]".[209]

---

[206] Origin's Statement of Claim, para 100.  Kernan I, paras 57-59.
[207] Kernan I, para 57.
[208] O-70 at 1-2.
[209] O-364 at 2.

96

301.   JFI rejected the allegation that it made arbitrary changes to the Joe Fresh logo.  JFI emphasised that it was entitled to change the logo under Section 8.2(n) of the Distribution Agreement, which gave JFI exclusive control over the JOE FRESH® trademarks:

> JFI reserves the right, in its sole discretion, to designate one or more new, modified or replacement Marks for use by Distributor and to require the use by Distributor of any such new, modified or replacement Marks in addition to or in lieu of any previously designated Marks.

302.   JFI pointed to documentary evidence that Origin was aware that Joe Fresh was going through a logo change in December 2013.[210]  JFI also noted that the logo changes were minimal, were implemented worldwide, and had no negative impact on the brand's core business.[211]

303.   The Tribunal considers that JFI was right to emphasise that the Distribution Agreement expressly reserved to JFI the right to change its "Marks" as it wished.  The issue therefore is whether JFI's multiple logo changes were consistent with a good faith performance of this provision. In this regard, the Tribunal considers it relevant that the differences between the logos were relatively minor, in particular the changes post-June 2014.

304.   Ms Kernan referred to the potential for significant negative consumer reaction to logo changes, using illustrations of damaging changes by The GAP and Tropicana to make her point.[212]  However, in the present case, there were no allegations of any significant negative Korean consumer reaction to the Joe Fresh logo changes, which may reflect that the logo changes were relatively minor.  The only consequence of the logo changes asserted by Origin was some additional cost in changing signage at one store.

---

[210] See R-19 where Ms. Kim (of Origin) emailed Ms. Cook (of Joe Fresh) stating "("I know that JOE FRESH® is working to change [the] logo".
[211] JFI Reply Memorial, para 396.
[212] Kernan I, para 58.

305.   In the Tribunal's view, Origin may be correct that the several (though minor) changes to the Joe Fresh logo over a short period was symptomatic of a JFI marketing team that was not functioning at an optimal level. The changes did not, however, amount to a breach of the express terms of the Distribution Agreement and nor were they sufficient to amount to a breach of JFI's obligation of good faith contractual performance.

306.   Other examples of dysfunctional brand management alleged by Origin overlapped with complaints that are addressed and dismissed elsewhere in this Award. These include the changing customer demographic (paragraphs 309 – 325 below), the departure of Mr Mimran (paragraphs 225 – 235 above), marketing approvals and inadequate manuals, guidelines and training (paragraphs 326 – 344 below). The Tribunal finds no breach by JFI of Sections 3.3, 6.2, 7.1 or 7.13 of the Distribution Agreement, or any breach of JFI's obligations of good faith and fair dealing.

*Departure of Mr Mimran*

307.   As discussed above, while Origin alleged that the departure of Mr Mimran in 2015 constituted a breach of JFI's good faith obligations, no clause in the Distribution Agreement expressly addressed Mr Mimran's role in Joe Fresh. The Tribunal cannot find breach of a non-existent contract commitment, nor can the good faith doctrine be used to manufacture a new obligation relating to Mr Mimran's tenure in the Distribution Agreement.

308.   The proper place to address the issues surrounding Mr Mimran's departure was in connection with Origin's fraudulent misrepresentation allegations. The Tribunal refers to its findings in paragraphs 225 – 235 above and does not consider that there is anything to add on this matter.

*Store Design and Location*

309.   Section 3.2 of the Distribution Agreement stated that Origin "may open and operate Free-Standing Stores and Shop-In-Shops only at those sites in the Territory that JFI has approved in writing" and provided a procedure for obtaining such approval.   Origin's allegations regarding store design and location related primarily to its decision to locate stand-alone stores in shopping areas frequented by young fashion-conscious consumers based on JFI's alleged misrepresentations regarding the target demographic of the Joe Fresh brand.[213]   Origin contended that Joe Fresh then changed its target demographic in order to "pennify" its range to appeal to the older JCPenney target consumers (as discussed at paragraphs 215 to 224 above, and below). Origin did not plead any specific breaches of the approval process contained in Section 3.2.

310.   According to Origin, JFI approved the locations and design which Origin had selected based on alleged misrepresentations about the youth-based target demographic for the brand.   JFI then made an abrupt shift away from the youth market to target the late 30s/early 40s market.[214]   Origin stated that "whereas Origin had gone into the Distribution Agreement at a time when Joe Fresh was a youthful brand, by mid-2014, Joe Fresh had shifted itself to targeting the 35-45 age demographic".[215]

311.   Origin referred to a conversation in April 2015 between Mr Chung and Ms Siburg and Mr Freedman (of Joe Fresh) as evidence to support its claim that Joe Fresh had moved its target demographic.   Mr Chung gave evidence that when he suggested that Joe Fresh make its own version of a competitor's popular women's sweater, Ms Siburg replied that such an item would be popular for the 20s age group, but that Joe Fresh would not design a similar item because Joe Fresh was targeting mainly the 40s age group.[216]

---

[213] Origin's Statement of Claim, paras 181-184.  Note that Origin's store design complaint also includes the changes to the logo discussed at paragraphs 297 – 306, as well as the provision of guidelines and manuals discussed at paragraphs 326 – 344.
[214] Origin's Statement of Claim, paras 262 and 268.
[215] Origin's Statement of Claim, para 95.
[216] Chung II, para 155.

312.   Origin's fashion expert, Ms Kernan, also observed that:[217]

> By January 2014, Joe Fresh merchandise was still seen in JCPenney stores, but it appears that, in order to remain in place there, it had become much more "traditional" (and less youthful) in styling in those locations. That shift spread to other locations as well. In retrospect, it seems possible that the shift by Joe Fresh management was a panicked attempt to salvage its relationship with JCPenney, whose customers include the 35-45 age demographic.

313.   JFI refuted the allegation that it had changed its target market. Mr Freedman stated that the target demographic of Joe Fresh has also been the 25-45 age group while he has been with the business.[218]  Ms Cook (Senior Director, Global Marketing for the Joe Fresh business) gave evidence that, since March 2009, the Joe Fresh brand has maintained a wide target market of consumers among the 25-45 year age bracket, with a particular focus on shoppers who make purchases for their families.[219]  This was consistent, she said, with Joe Fresh's origins as a brand sold in Loblaw's grocery stores and meant that – while Joe Fresh certainly offered clothing that appealed to younger shoppers – this group has never been the primary or exclusive target market.[220]

314.   JFI noted that, while Joe Fresh offered a "runway collection" at certain New York and Canadian stand-alone stores which was targeted at younger consumers, these items were limited in number and did not form part of the "core business".[221]  JFI also pointed out that Origin chose to spend over US$ 1 million on a marketing campaign involving the well-known Korean celebrity Ms So-Young Ko, specifically targeted at the female 40s demographic.[222]  In contrast, Ms Cook observed that Joe Fresh hired internationally-recognized models such as Karlie Kloss and Behati Prinsloo who appeal to younger consumers.[223]

---

[217] Kernan I, para 27
[218] Freedman II, fn 4.
[219] Cook II, para 8.
[220] Cook II, para 8.
[221] JFI's Reply Memorial, para 390.
[222] JFI's Reply Memorial, para 390; O-231.
[223] Cook II, para 14.

315.   JFI observed that Origin itself had acknowledged that the decision to employ Ms Ko may not have been "suitable".  The Meeting Minutes from an April 2015 Origin "Status Meeting" record a consensus that "[g]iven that the targeted customers are in their 20s, it does not seem suitable to pick Ko So-young [sic] as the model …. Even the customers in their 40s prefer to wear the clothes advertised by a model in her 30s".[224]

316.   With regard to the alleged statements by Ms Siburg regarding targeting women in their 40s, Mr Freedman said that he was present during that conversation and cannot recall Ms Siburg saying anything to that effect.[225]  Ms Cook also gave evidence that she would be surprised if Ms Siburg had made such a statement and that "[t]he JOE FRESH brand has never "mainly" targeted the forties age group to the exclusion of the twenties age group".[226]

317.   Finally, JFI pointed out that, although there was in fact no shift in demographic, the Distribution Agreement did not contain any provision relating to the target market for the merchandise in any case.[227]  Indeed, the Agreement granted JFI "the sole and exclusive right (i) to establish the lines of JOE FRESH® Merchandise from time to time, including, types, styles, fabrics, colors, etc. (provided JFI agrees to scale the sizes of clothing for the Korean market)" and "(ii) to discontinue, modify, substitute or add to its lines of JOE FRESH® Merchandise".[228]

318.   The Tribunal observes that "The Robin Report", written in June 2014, queries whether Joe Fresh is still "fresh enough".[229]  Ms Kernan described the Robin Report as an "industry bible".[230]  The Report (written by Jane Singer, a consumer product marketing consultant specializing in branding and marketing strategy) refers to a "pennification" of the brand at JCPenney (primarily it seems through the models used in advertising the brand on

---

[224] R-298.
[225] Freedman II, fn 4.
[226] Cook II, para 11.
[227] JFI Reply Memorial, para 389.
[228] Distribution Agreement, Section 5.1.
[229] O-267.
[230] Transcript, 6 June 2017 (Kernan) 44:1.

jcp.com), but also notes the reduction in the presence of Joe Fresh products in JCPenney stores as it did not fit JCPenney's return to its middle-American roots. The article suggested that some young US shoppers found Joe Fresh's association with JCPenney unattractive.

319.   Although there were some negative points made by the Robin Report regarding the JCPenney association, the Report observed that "the feeling at a Joe Fresh store is open, bright and contemporary" and of the New York flagship store, it said:[231]

> The space is open, light and airy with 27-foot-high glass windows and a large interior escalator ... the Joe Fresh merchandise set that day was early spring bright blue and white, lime green and white, and black and white with very effective displays and good looking, low-priced merchandise including some Chanel inspired pieces. There were brightly colored skinny, stretchy, cropped jeans sharply priced at $19 and luscious looking men's and women's lollipop colored cashmere sweaters ...
> I asked consumers what they thought of Joe Fresh. Many liked it, echoing fast fashion's formula for success: "great prices for current trends," "good design and price," "very fashion forward and good prices," "prices seem reasonable and the styles are clever."

320.   There were consumers who gave a negative response to the brand, primarily around the quality or fit of the clothing, rather than whether it was fashionable. However, overall the Robin Report concluded that "Joe Fresh is definitely a fresh new brand" and nothing in this Report suggested that – as of June 2014 – Joe Fresh was a brand that targeted an older demographic, aside from the models used on the JCPenney website. The Tribunal concludes therefore that the Robin Report – the "industry bible" – overall placed Joe Fresh in the "fast fashion" sector and JFI's position that it targeted the wide 25-45 age bracket would appear consistent with the Report's conclusions.

---

[231] O-267.

321.  In her First Expert Report, Ms Kernan said that "Joe Fresh merchandise was designed with supremely vibrant colors (e.g., 15 different colors for a pair of corduroy pants), trendy silhouettes and key must-have items. This is appealing to a younger customer, and is appropriate for casual or school attire". However, the Tribunal has not been presented with examples to demonstrate that, for example, the bright colours no longer featured in the range (indeed, the Robin Report suggested they continued to be a signature feature) or that certain "key must-have items" were removed from the range. It may be that the "trendy silhouettes" no longer featured on the JCPenney website jcp.com, but without more the Tribunal is unable to conclude that there was a clear change of demographic between September 2013 and May 2014 that would have rendered Origin's selection of store location unviable.

322.  This conclusion is further supported by the fact that the concerns raised by Origin during 2015 regarding low sales did not feature prominent concerns regarding the demographic or store locations.  For example, a presentation dated 14 April 2015 entitled "Origin & Co Business Current Situation" identified the problems facing the brand in Korea to include lack of brand awareness, uncompetitive pricing, high rate of costs, and high inventory levels.[232] Nothing in this document suggested that Origin considered that Joe Fresh's target demographic had changed in 2014 or that, as a result, store location was a concern.

323.  As noted above, the minutes from Origin's "Status Meeting" of April 2015[233] suggest that Origin came to the conclusion that it had made an error in hiring Ms Ko as its primary model for the Joe Fresh brand given she was in her 40s. The minutes do not record anywhere that Origin considered that the styling of the Joe Fresh merchandise was aimed at an older demographic or that this was a contributing factor to poor sales.  Reflecting that the hiring of Ms Ko raised pricing concerns, the minutes stated that:[234]

---

[232] R-291, slide 3.
[233] Mr Chung said that he attended this meeting along with Mr Seo, the CEO; Senior and Junior Chairman Huh; an auditor who has been professionally experienced 14 Korean fashion industry over 20 years; and Mr JW Park (Transcript, 1 June 2017 (Chung) at 78: 12-15).
[234] R-298.

UNIQLO advertises with newbies for KRW 9,900, whereas Joe
Fresh hires Ko So-young and charges KRW 99,000.
▶ It raises doubt whether Joe Fresh has picked the wrong concept

324.   The focus of those attending the 2015 Status Meeting was still very much on
targeting the younger demographic. Had Origin considered that the Joe Fresh
merchandise was aimed at the late 30s to 40s demographic, the Tribunal
would have expected to see some reference to this in the minutes and for the
discussion to reflect this change in the target age group.

325.   Having considered the evidence, the Tribunal concludes that there is
insufficient proof demonstrating a change in style supporting Origin's
allegation that Joe Fresh's target demographic had shifted. Nor has the
Tribunal been presented with any specific representations that JFI personnel
were alleged to have made regarding the target demographic. Therefore, the
Tribunal finds that Origin's allegations regarding a changing demographic
and breach of the Distribution Agreement in relation to store locations are
not sustained.

*Guidelines, Manuals, and Training*

326.   Section 7.13 of the Distribution Agreement (quoted at paragraph 296 above)
required JFI to "provide Distributor with access to the Store Operation
Manual and Brand Use Guidelines". Origin alleged that, in breach of Section
7.13, JFI failed to provide adequate Store Operation Manual or Brand Use
Guidelines in a timely manner.

327.   The purpose of a Store Operation Manual was to provide Origin with detailed
instructions on how to set up store layouts, displays and signage, website
design, marketing and related matters. JFI sent the Joe Fresh Store Operation
Manual to Origin on 12 May 2014.[235] This was a 100-page document
featuring guidelines for business operations, the hiring and training of

---

[235] R-22.

employees, store maintenance and inventory matters, customer service issues and other matters pertaining to the day-to-day operations of the stores.[236] Origin complained that JFI's providing this Manual just before the first Korean store opened in May 2014 was too late.[237]

328.     Origin also argued that the quality of the Store Operation Manual, when finally provided, was insufficient. In support of this claim, Ms Kernan compared the Joe Fresh Manual with the manuals produced by George and Marks & Spencer, two UK brands which had also pursued international expansion. She testified that those manuals were "extremely detailed" and in comparison, the Joe Fresh manual was "woefully deficient".[238]

329.     JFI rejected the allegations of delay. Ms Lindsey Cook, Senior Director of Global Marketing for Joe Fresh, first sent the Brand Use Guidelines to Mr Chung on 11 November 2013, and then again to Gana Kim (who was working on the store openings) on 5 December 2013, after it appeared that the Guidelines either had not been received or were not passed on to Ms Kim.[239] Ms Cook agreed in her testimony that the Brand Use Guidelines provided to Origin in November 2013 were in the process of being updated at the time to reflect logo changes, and were therefore for Origin's internal reference only.[240] Mr Leve sent an updated set of the Brand Use Guidelines to Mr Chung on 26 August 2014.[241] This set supplemented the initial Guidelines by addressing topics such as the use of the brand icon, brand patterns, stationary and packaging.[242]

330.     JFI also alleged that the Joe Fresh Visual Standards Manual, which was sent to Origin on 30 April 2014, included "detailed and comprehensive" instructions for visual marketing and merchandise presentation.[243] JFI also

---

[236] R-22; JFI's Reply Memorial, para 349 (iii).
[237] Origin's Reply Memorial, para 158.
[238] Kernan I, paras 49-51.
[239] Cook I, para 29; R-162 and R-19.
[240] R-162 and Transcript, 5 June 2017 (Cook) at 24:6-24.
[241] R-163.
[242] Cook II, para 22.
[243] R-21; JFI Reply, para 349 (ii).

sent Origin monthly directives with instructions on how to comply with seasonal marketing campaigns and how to present new merchandise in the stores.[244]

331.  It appears to be common ground that JFI based its Manuals and Guidelines on those it had produced for the JCPenney relationship.[245]  Origin criticised this, as the documents were not tailored to the Korean market.  However, in Section 7.13 of the Distribution Agreement Origin explicitly agreed that it was "solely responsible for assuring that the Store Operation Manual and Brand Use Guidelines … are relevant and appropriate to the Territory and comply with all Legal Requirements".  Whether or not this is standard industry practice, this was the bargain struck between the parties.  It appears that there was no obligation on JFI to provide a "Korean" store manual or guidelines, but rather to provide "standard" international documents that Origin was then responsible to tailor for the Korean market.

332.  Accordingly, the Tribunal finds that JFI's using such standard manuals and guidelines, based on what had been provided to JCPenney, met the requirements of Section 7.13 of the Distribution Agreement.  The Tribunal cannot find JFI in breach of the Distribution Agreement for failing to comply with an obligation that was specifically placed on Origin.

333.  While Origin, supported by the expert testimony of Ms Kernan, alleged that the various manuals and guidelines were deficient in quality and detail, this allegation was made in a general manner with little detail as to specific differences between the Joe Fresh documents and comparable SPA fashion manuals.  Even if the Joe Fresh Store Operation Manual was less detailed than those created by the two UK retailers noted by Ms Kernan, this is not enough for the Tribunal to determine that the Store Operation Manual did not comply with the Distribution Agreement or with the reasonable expectations of Origin.  The Tribunal notes that there are no documents in the record demonstrating any contemporaneous Origin concerns about the adequacy of

---

[244] JFI's Reply Memorial, para 349 (iv).
[245] Origin's Post-Hearing Memorial, para 116; Transcript, 5 June 2017 (Cook) at 25:12-16.

the Store Operation Manual or Brand Use Guidelines. At most, the Tribunal might possibly infer a lack of detail in the Guidelines due to the addition of further detail in the second set of Guidelines sent by Mr Leve in August 2014.[246] However, such an inference is inappropriate without evidence that the missing detail should have been included initially in any adequate set of guidelines. Finally, Origin did not offer detail on the alleged impact that the perceived deficiencies in the Store Operation Manual and Brand Use Guidelines might have had on the profitability of the business.

334. Ms Kernan also referenced in a general way a lack of cultural specificity and sensitivity in the Joe Fresh manuals. However, as noted above, the Tribunal recalls that Section 7.13 specifically placed on Origin the responsibility for ensuring that the manuals met local requirements and were "relevant and appropriate" to the Korean market. For this purpose, and subject to JFI approval, Origin could modify the manuals so far as it "reasonably believe[d] to be necessary to comply with all Applicable Laws and local customs and practice".

335. Origin also alleged JFI deficiencies in training. Sections 4.2 and 7.10 of the Distribution Agreement required Origin personnel to attend mandatory training for key personnel, and Section 4.2 of the Agreement contemplated "periodic or additional training".

336. JFI held a training session for key personnel in New York in May 2014, prior to the opening of the first Korean store. Mr Seo gave evidence at the hearing that he understood that Mr Chung and two other employees responsible for VMD/marketing attended the training.[247] Emails from February and May 2014 indicate that Mr Chung, Annette Kim and Gana Kim were planning to attend the training,[248] and also possibly Junior Chairman Huh.[249]

---

[246] R-163.
[247] Transcript, 30 June 2017 (Seo) at 20:22 – 21:5.
[248] O-201.
[249] O-202.

337.  Ms Kernan opined that a one-off training session was "unusually short and cursory in nature"[250] and fell far short of "industry standard for launching new stores, which is to conduct staff training for at least a few weeks or even a few months".[251]   Origin observed that JFI offered no ongoing training programmes, and alleged that the overall lack of training provided was "emblematic of the lack of professionalism in the Joe Fresh organization, as well as its unwillingness to commit resources".[252]

338.  JFI refuted the allegations, stating that its New York training was timely and adequate and that Origin was "inventing" obligations that did not exist in the Distribution Agreement.[253]

339.  The Tribunal considers it warranted to set out the relevant paragraphs of Section 4.2 of the Distribution Agreement:

> Prior to the opening of the first Free-Standing Store, all Key Personnel (and any trainer of Distributor's own training program) shall be required to attend and successfully complete initial training at such time(s) and place(s) as reasonably determined by JFI (training may be in New York, Toronto or at one or more locations in the Territory, as JFI may reasonably determine).
>
> Prior to the opening of the first Free-Standing Store and during the remainder of the Term, Distributor shall be required to establish and operate its own training program for store managers and other personnel in accordance with JFI's requirements.
>
> JFI may require Key Personnel and the trainers of Distributor's training program to attend and complete periodic or additional training. All replacement, periodic or additional training shall, at JFI's discretion, be provided by JFI or by Distributor's own training program established in accordance with JFI's then-current standards.

340.  The Tribunal finds that the training offered by JFI for Origin in New York satisfied the Section 4.2 requirements to provide initial training to key

---

[250] Kernan II, para 30.
[251] Kernan I, para 52.
[252] Origin's Post-Hearing Memorial, para 117.
[253] JFI's Reply, paras 354-355.

personnel. Further training appears to be optional under Section 4.2, and therefore JFI cannot be said to be in breach of its obligations under the Agreement.

341. Equally, the Tribunal considers it warranted to set out the express requirements of Section 7.10:

> All Free-Standing Store and Shop-In-Shop [sic] must at all times be under the direct, on-premises supervision of managers who have completed a JFI approved training program and must be staffed by a sufficient number of competent and properly trained employees. Distributor must establish on-going training for employees.

342. The substantive obligations in this section fell on Origin, not on JFI, and the requirement was for Origin personnel to attend a "JFI approved training program" and to provide training for local staff. The last sentence clearly contemplates that it was for Origin to put such local training in place.

343. However, the Tribunal observes that JFI has offered little to refute Ms Kernan's evidence that the short training session offered by JFI in New York in May 2014 was sub-standard by industry practice. The Tribunal found Ms Kernan to be a credible and knowledgeable witness and accepts her evidence that the initial training provided, while not technically a breach of the Distribution Agreement, was sub-optimal for the industry. This likely was a contributing factor to the overall failure of the business in Korea. However, equally, the lack of local staff training provided by Origin, as JFI complained, also likely contributed to the failure of the business. Overall, the evidence suggests a general lack of appreciation by both JFI and Origin as to the level of commitment required for a successful fashion venture.

344. Overall, the Tribunal finds that JFI did not breach the Distribution Agreement with regard to training obligations, or breach its implied duty of good faith and fair dealing in contractual performance.

E.    **Alleged Breaches of Contract by Origin**

345.   In this section, the Tribunal addresses the alleged breaches of the Distribution Agreement by Origin, as described in JFI's counterclaim.  In particular, as set out in the List of Issues in Appendix 1, the Tribunal addresses whether Origin breached its obligations under the Distribution Agreement by failing to:

     a.   Make timely payments for its orders in breach of Section 5.3;

     b.   Obtain necessary approvals for marketing and advertising campaigns and materials in breach of Sections 6.1, 6.2 and 6.3;

     c.   Comply with JFI's Visual Merchandising Standards, JFI's instructions and other related contractual requirements in breach of Sections 7.2, 7.4, 7.8, 7.9 and 7.13; and

     d.   Meet the minimum purchasing requirements of Section 2.3 and Exhibit 2.3.

*Outstanding and Late Payments*

346.   JFI alleged that Origin did not make timely payments for its orders in breach of Section 5.3 of the Distribution Agreement, which provided that payments for merchandise "shall be made to JFI in U.S. Dollars within thirty (30) days of Distributor's receipt of invoice, and deposited, wire transferred or transferred by other means designated by JFI, at Distributor's cost, to such bank account(s) JFI shall designate".

347.   The record reflects that Origin's difficulties in making payments began early. In an email from Mr Leve to Mr Chung on 30 September 2014, Mr Leve asked "[c]an you please provide an understanding on when we can expect payment on the number of outstanding invoices as we have discussed"[254] Mr

---

[254] R-142.

Chung responded that ILJIN would provide more capital and that invoices would be settled before 10 October 2014.[255]

348. It is evident that Origin's payment difficulties did not abate and, by 12 February 2015, Origin's overdue invoices totalled US$1,029,000.[256] The parties agreed a plan to settle outstanding invoices through four lump sum payments to be made on the 10th of each month from April to July 2015.[257] However, Origin missed the first payment, and Ms Hanratty emailed Mr. Chung on 11 April 2015 asking for confirmation that funds would be forthcoming.[258]

349. Mr Chung responded on 13 April 2015 by noting Origin's difficult cash flow situation and referencing a discussion he had had with Mr Leve requesting "JFI's comprehensive support" and the potential for further discounts from JFI.[259] This exchange appears to have come to fruition in the May 2015 discussions about amending the Distribution Agreement to provide concessions to help Origin towards profitability. Under the draft Amendment to the Distribution Agreement which resulted from these negotiations,[260] JFI agreed to (1) a US$750,000 write off of overdue accounts receivable on the condition that an equivalent amount would be spent by Origin on approved advertising, resulting in the overdue accounts decreasing from US$2,148,988 to US$1,398,988; (2) a 50% discount on almost US$3 million in outstanding purchase orders, provided they were timely paid by Origin; (3) temporary discounting of wholesale prices to 27% and 30% of Standard Retail Price (as defined by the Distribution Agreement) and permanent discounting on adult apparel; and (4) advertising subsidies of US$2,400,000.  The draft Amendment also included a number of significant obligations for Origin, including the increased advertising commitments and a reduction in implementation of competitive consumer pricing (effectively a reduction in its retail price).

---

[255] R-142.
[256] JFI's Memorial, para 138.
[257] R-146.
[258] R-147.  Hanratty II, para 35.
[259] R-147.
[260] R-196.

350.   Although the proposed amendment to the Distribution Agreement was never signed by Origin, JFI honoured the price discounts and the debt reduction going forward.

351.   The US$750,000 discount on outstanding invoices was contingent under the proposed Amendment on Origin paying the outstanding amounts by 15 August 2015.[261]   In the event, Origin paid the outstanding amounts (less US$750,000) on 21 August 2015.  At that time, all outstanding invoices were finally settled.

352.   In this arbitration, JFI claimed interest on the late payments at the New York statutory rate of 9% per annum under Section 5.5 of the Distribution Agreement, which provided for interest "at the highest contract rate of interest permitted by law, not to exceed 10% per annum".  JFI calculated the interest to total US$340,744, up to 30 June 2017.

353.   Origin disputed that any interest was owed on the late payments, as they were effectively settled by agreement as at 21 August 2015.  Origin also alleged that JFI's interest calculation of US$340,744 was based on faulty data ignoring the revised payment schedule agreed between Ms Hanratty and Mr Chung and the discount provided in the May 2015 amendment discussions.

354.   By the time JFI drew down the Letter of Credit in November 2015 (discussed below), Origin once again owed JFI payments for outstanding invoices. Mr Chung sent the following email to Mr Freedman on 2 November 2015:[262]

> Dear Ian,
> Hope you are well.
> I heard that Jeong Gyun had a chat with you while he was in Canada. I also heard that Woo Young contacted you to discuss our situation.
> Regardless all these, I truly believe that we should have followed the agreement and the payment date in any case. In other word, we had to meet the minimum requirement before asking for

---

[261] Section 2.1(a) of the (unsigned) First Amendment to the Distribution Agreement, R-196.
[262] R-205.

112

anything. I regret to tell you that I have been persuading this so far and am still on the way. Please do understand this as it is so hard a situation that it has not been easy for me to have the persuasion to go through. Our constant failure of meeting the budget leaded us to be in a situation of only one-sided communication so far.

However, Ian, if you go ahead with the SBLC withdrawal, it means the end of everything. **It may secure the amount of your outstanding invoices and orders** but the brand in Korea will have to go through real bad situation.

**I will do my best to make the payment of the outstanding invoices and send you the TT copy today. So please, please hold the SBLC withdrawal. Then I will come over to meet you** to discuss the best way of settling down all this.

Thank you very much in advance.

Best regards,

Sungho Chung

355.  Mr Harington provided evidence that the amount of the outstanding invoices referred to by Mr Chung in his 2 November 2015 email was US$1,769,158.[263] It is clear that JFI has claimed for the US$750,000 discount that it extended to Origin on the outstanding invoices, on the basis that the proposed Amendment to the Distribution Agreement did not come into effect due to Origin's failure to sign that document.

356.  JFI also claimed interest of 9% per annum until the date of the final Award. Origin opposed, on grounds that the New York rate of interest applied by JFI does not reflect standard arbitral practice which favours a reasonable commercial rate.

357.  The Tribunal discusses at paragraph 390 JFI's retrospective reversal of the discounts provided following the May 2015 contract amendment discussions. It is sufficient to note here that the Tribunal does not consider that JFI can unilaterally undo the discounts it had voluntarily provided after those discussions, in the full knowledge that Origin had not signed the draft Amendment to the Distribution Agreement.

---

[263] Harington 1, para 40.

358.    Similarly, JFI's request to be paid interest in the amount of US $340,744 on Origin's untimely payments for Joe Fresh merchandise cannot stand.  The discounts implemented as a result of the May 2015 discussions settled all outstanding invoices with an agreed payment that was made in August 2015, as discussed above in paragraph 351.   Just as JFI is not entitled retrospectively to amend the discounts it implemented as a result of those discussions, JFI cannot undo the agreement to settle the outstanding invoices with one payment.  As a result, the outstanding invoices were settled in August 2015. The Tribunal does not consider that JFI can now request additional interest payments on those late amounts.  Although the Tribunal acknowledges that Origin's late invoice payments were technically in breach of Section 5.3 of the Distribution Agreement, the parties dealt with this default at the time and settled the outstanding amounts.

*Marketing and Advertising*

359.    JFI complained that Origin engaged in advertising that damaged the Joe Fresh brand and did not seek its permission for such advertisements as required under the Distribution Agreement, thereby supporting claims for contract repudiation and damages.  JFI provided the following examples of such advertisements:

a.    Signage containing purportedly vulgar phrases to advertise sale prices in Origin's stores;

b.    An advertisement featuring a Korean television star and captioned "Doesn't something smell very lovely and girly? Maybe it's from that blouse.", with the hashtag #joefresh #thegirlwhoseessmells;[264] and

c.    An advertisement featuring a model wearing Joe Fresh apparel and a duck hat.[265]

---

[264] JFI's Memorial, para 83.
[265] JFI's Memorial, para 84.

360.    The Tribunal notes that, although JFI's complaint was initially expressed broadly, it became apparent during the proceedings that the majority of advertisements had in fact been approved or, in the case of social media posts, did not require specific approvals.[266]  Indeed, Ms Cook in cross-examination acknowledged that Origin had a positive obligation to update social media posts regularly.[267]  Mr Chung testified that "Origin created literally thousands of social media posts, in-store signage, and other such marketing material, and the Joe Fresh management team did not complain about them".[268]

361.    JFI's primary complaint therefore related to the specific advertisements identified above.  During cross-examination, Ms Cook acknowledged that the advertisements with the phrase "the girl who smells" and the model wearing a duck hat both were references to popular Korean television shows. Ms Cook testified that she came to understand this after the advertisements went live, but would have liked the opportunity to have approved them.[269]

362.    The Tribunal does not accept Origin's contention that JFI's complaint regarding advertisements was "issue spotting" after Origin began to complain about JFI's performance.  The contemporaneous internal emails between Joe Fresh personnel demonstrate genuine concern in relation to these advertisements.  For example, on 3 June 2015, an internal email at Joe Fresh raised concerns that Origin "[has] not been submitting any content for approval and have gone rogue".[270]

363.    The Tribunal understands why JFI was initially affronted by such advertisements.  However, it became clear during the hearing that JFI's objections to the advertisements arose primarily from cultural misunderstandings.  The record reflects that the advertisements, including those using apparently vulgar phrases, were well understood as used in the Korean market.  Origin's explanation as to their meaning in cultural context

---

[266] Transcript, 5 June 2017 (Cook) at 32:3-16, 33:6-9; Chung III, para 39.
[267] Transcript, 5 June 2017 (Cook) at 32:3-16.
[268] Chung III, para 39.
[269] Transcript, 5 June 2017 (Cook) at 34-36.
[270] R-173 (from Arielle Trop to Aprille Thomas).

leaves the Tribunal in no doubt that they were not damaging to the Joe Fresh brand.

364. The Tribunal accepts that Origin was in technical breach of the Distribution Agreement by not seeking advance approval for every advertisement. However, these breaches were minor and technical and, most important, there was no evidence of damage to the Joe Fresh brand.  The Tribunal finds that the breach was not sufficient in nature to provide a basis on which JFI could repudiate the Distribution Agreement.

365. The lack of actual damage is confirmed by JFI's attempt at damage quantification.  Rather than point to particular damage or a specific amount required to remedy the damage, JFI (supported by Professor Jung) simply claimed the full US$3,718,959 that Origin had spent on advertising overall. This inability to quantify specific damage is telling.

366. The lack of actual damage suffered by JFI extends to other alleged breaches of the Distribution Agreement relating to Origin's delays in furnishing marketing plans.  In the context of the relationship, these delays were minor and were managed by the parties at the time.  In the same vein as its rejection of Origin's complaints about minor infractions by JFI in being late in supplying the Store Operating Manual and Brand Guidelines (see paragraphs 329-344 above), the Tribunal rejects these allegations by JFI against Origin.

367. In conclusion, while Origin technically breached advertising related obligations in the Distribution Agreement, the Tribunal finds them irrelevant for the purposes of assessing repudiation or damages.

*Visual Merchandising Displays*

368. The relevant allegations here are that Origin failed to comply with JFI's VMD guidelines, JFI's instructions regarding visual merchandising, and related contractual requirements in breach of Sections 7.2, 7.4, 7.8, 7.9 and 7.13 of the Distribution Agreement.

369.   The relevant provisions of the Distribution Agreement are as follows:

> 7.2     Distributor must maintain the condition and appearance of each of its Free-Standing Stores and Shop-In-Shops so that it reflects the aspirational, fashionable and value-centered image of JOE FRESH® Merchandise and so that it is attractive, clean and operated efficiently in a first class manner. Distributor agrees to make such modifications and additions to the layout, decor, and general image of each Free-Standing Store or Shop-In-Shop, as JFI may reasonably require from time to time

> 7.4     Distributor must maintain at each of its Free-Standing Stores and Shop-In-Shops at all times inventories of JOE FRESH® Merchandise sufficient in quantity and variety to realize its full potential during each seasonal market.

> 7.8     … to comply with all JFI's mandatory standards and policies communicated to Distributor in writing, as modified from time to time, relating to the appearance, function, cleanliness or operation of Distributor's Free-Standing Stores and Shop-In-Shops, including: (a) the manner of display, variety and seasonality of all merchandise; (b) sales, labelling and packaging procedures and customer service; (c) advertising and promotional programs; and (d) appearance and dress of employees.

> 7.9     … to refrain from any business or advertising practice which may be injurious to JFI's business or to the goodwill associated with the Marks.

> 7.13     … to comply fully with all mandatory standards, specifications and operating procedures and other obligations contained in the . . . Brand Use Guidelines, subject to Legal Requirements.

370.   JFI relied on a number of internal reports to evidence Origin's breach of the above provisions by failing to comply with JFI's VMD guidelines and ignoring JFI's guidance on merchandising buys, store operations, brand standards and marketing practices. These included:

    a.    A report sent by JFI to ILJIN following a JFI trip to Korea in September 2014, detailing concerns that directives were not being followed.[271] The report, which was to be the subject of discussion, recommended

---

[271] R-183.

that each season JFI set up one Korean store and then provide photos for the other stores to copy;

b.   A further report prepared by Mr Leve in April 2015 after another visit to Korea, in which he noted Origin's continued failure to comply with standards;[272] and

c.   A further report in May 2015, which identified Origin's "[n]ot following brand visual and merchandising directives" as a point which needed to be addressed for future success.[273]

371.   Origin countered that it was very difficult to follow JFI's VDM instructions and sample displays precisely, because the merchandise in the Korean stores was not the same as in the North American stores and therefore adaptions had to be made. Mr Seo said of the VDM guidelines that "there were quite a lot that we could not possibly implement in the field so we would discuss the directives and discuss what can and cannot be implemented in the field and conduct our business".[274] Mr Chung further explained that "we didn't carry shoes, we didn't carry infant, cosmetics … so to follow that directive, there is a lot of product discrepancy".[275]

372.   The Tribunal understands JFI's frustrations that Origin did not take more care with regard to VDM and that certain Korean visual displays and store layouts did not appear to be reflective of the "global" Joe Fresh brand. Nonetheless, the Tribunal does not consider that JFI should or could have expected Origin to mirror precisely the displays provided in the VDM guidelines, as the products and store size in Korea differed from those in North America and some adjustments consequently were necessary.

373.   While the reports following JFI Korean store visits certainly identified points for improvement, the photographs of the stores in the record do not support

---

[272] R-31.
[273] R-33.
[274] Transcript, 30 May 2017 (Seo) at 35:9-12.
[275] Transcript, 1 June 2017 (Chung) at 13:11-18.

JFI's allegations that the level of Origin non-compliance was significant, less still sufficient to constitute a material breach of the Distribution Agreement.

374.   Although Professor Jung called the state of Origin's stores "sloppy",[276] the Tribunal is more inclined to Ms Kernan's expert assessment that the majority of the photographs of the Korean Joe Fresh stores shows the merchandise to be neat and tidy.   Examples are the photographs sent to Mr Leve on 31 October 2015,[277] which show shelves of neatly folded and stacked items and racks of items neatly hung and well spaced.   The reports themselves do not evidence serious distress on the part of JFI about Origin's VDM efforts, but rather that small improvements (for example, re-positioning mannequins and certain advertisements and posters) would bring the stores into compliance with global brand imaging.   The strongest concerns seemed to be around light stock levels, rather than arrangement of the stock.

375.   The Tribunal notes that the opening points in the April 2015 report sent by Mr Leve to Mr Chung revealed that the purpose of Mr Leve's visit to Korea was to "train new visual merchandising team and visit new and existing stores from a previous visit in September 2014" and that "[o]verall [he] saw some good improvement in compliance to directives and merchandising standards but there is still some opportunity to strengthen the presentation on the selling floor to ensure we maintain Brand Integrity".[278]   While the report included a number of suggestions for improvement, in particular remedying light stock levels, the "Final Comments" did not suggest any significant level of dissatisfaction by JFI:

> • The new visual team was very engaged and we worked closely together to review brand standards, product and category flow as well discussed process for directive execution and importance of compliance with assortment available
> • There is much opportunity to partner with this market and strengthen approach to promotional activity for better results
> • While stores feel like they are well staffed focus on maintaining standards and replenishment needs to be reinforced

---

[276] Jung I, para 32.
[277] R-192.
[278] R-31.

376.  The record reflects that JFI personnel did do some rearranging of displays when they visited the Korean stores. Ms Kernan testified that JFI's "changes re-positioned already neatly presented items, moving them forward or back within the space, but not perceptibly changing the shopping experience for the customer".[279]

377.  Ms Kernan also pointed out that, in order to conclude that the condition of the stores diminished the brand in the eyes of customers, she would expect to see evidence of "customer intercept surveys to reach such a conclusion, or at a minimum, would point to customer complaint logs, blog postings, press reports or other similar third-party evidence to support such a conclusion".[280] No evidence of this nature was presented by JFI, suggesting that customers were not adversely impacted by any Origin breaches of the VDM standards.

378.  Although it may well be that JFI staff rearrangements resulted in more appealing Korean stores, the Tribunal considers such rearranging to have been minor, and finds no evidence that the changed displays had any significant impact on sales.[281]   The Tribunal is further satisfied, having assessed the evidence, that compliance issues regarding VDM were minor or caused by differences in product selection and store size in Korea.

379.  In conclusion, the Tribunal finds that any breach by Origin of the VDM obligations in the Distribution Agreement were technical in nature and non-material in impact.  Moreover, there was no evidence linking the brand damage alleged by JFI to Origin's compliance with VDM standards, and the related damages claim must fail for lack of causation.

---

[279] Kernan II, para 39.
[280] Kernan II, para 45.
[281] R-183 ("before" and "after" photographs).

*Minimum Purchase Requirements*

380.   JFI alleges that Origin failed to purchase 80% of its minimum purchase requirements in 2015 and was therefore in breach of Section 2.3 and the related Business Plan in Exhibit 2.3 of the Distribution Agreement. Section 2.3 states:

> ... The Distributor's Business Plan [Exhibit 2.3] thus reflects the parties' agreement of Distributor's minimum obligations for development of Free-Standing Stores, as well as minimum annual purchases of Joe Fresh Merchandise, and JFI has relied on Distributor's promise to perform its minimum obligations under the Distributor's Business Plan in entering into this Agreement and in foregoing other opportunities. Accordingly, Distributor agrees ... to purchase (i.e., ordered and delivered) at least the annual volume of Joe Fresh Merchandise (the "Minimum Purchase Requirement") set forth in Distributor's Business Plan.

381.   The 2015 minimum purchase requirement was US$10 million, meaning that Origin had to purchase at least 80%, or US$8 million, of merchandise to be compliant with Section 2.3.   Origin's total purchases in 2015 reached US$6,814,323.83.

382.   Origin countered that in the May 2015 discussions to amend the Distribution Agreement, JFI had reduced the minimum purchase requirement for 2015 to a maximum of US$8 million, along with other pricing concessions. Specifically, the proposal discussed on 8 May 2015 stated that the price discounting "assumes maximum of $8M of orders per year at old prices" and were conditional on "Origin continuing to order a reasonable amount of new product".[282]  Although Origin never signed the Amendment, JFI nonetheless unilaterally implemented the concessions and so could not retract them retrospectively; Origin argued equitable estoppel, on grounds that it continued to operate the stores, which it would not have done if it had "been on notice that JFI might unilaterally reverse" the price concessions [283] Accordingly, based on the revised minimum purchase requirement of US$8

---

[282] O-365.
[283] Chung II, para 214; Origin's Reply Memorial, paras 180-181 and 240.

million, Origin had to purchase only US$6.4 million to be compliant with the 80% requirement, which it achieved by purchasing $6.8 million of merchandise in 2015.[284]

383.   JFI contended, conversely, that having never signed the proposed Amendment, Origin could not expect to enforce its favourable terms. JFI had voluntarily granted Origin certain financial relief but could rightfully retract that relief after Origin terminated the Distribution Agreement. (Termination is discussed in the next section.)

384.   The Tribunal analyses the evidence provided by the parties in the discussion below.

385.   On 8 May 2015, following an earlier meeting on 5 May, the parties met to discuss Origin's financial difficulties and attempted to agree a way forward that might offer Origin relief. A proposal was tabled by JFI which included, amongst other concessions and discounts, "Pricing Support Going Forward (assumes maximum of $8M of orders per year at old prices)" which was conditional upon "Origin continuing to order a reasonable amount of new product" and paying invoices on time.[285]

386.   Following discussions, JFI prepared the formal Amendment to the Distribution Agreement, entitled "First Amendment to the Distribution Agreement",[286] which did not include any revision of the minimum purchase requirements. JFI sent the proposed Amendment to Origin for signature on 22 May 2015.[287]

387.   Origin decided not to sign the Amendment on the basis that the discounts offered were not sufficient to "get out of red numbers for three years".[288] Mr Chung sent Mr Freedman certain counterproposals.[289] Mr Freedman

---

[284] Transcript, 29 May 2017 (Origin's Opening Submission) at 48. See also Origin's Reply Memorial, para 175 and fn 310; Chung III, para 57.
[285] O-365.
[286] O-81 / R-195.
[287] O-154.
[288] O-39.
[289] O-39.

responded that "I wanted to make sure you understood that we really have no further room for additional concessions. We had to do a fair bit of convincing to get permission to make the offer we made".[290]

388.   It appears that there was a further meeting on 28 May 2015[291] at which Junior Chairman Huh of ILJIN and Mr Pavi Binning, a Director of Loblaw and President/CEO of George Weston Limited, were present. Mr Chung did not attend the meeting, but gave evidence that he understood "Mr. Binning informed the Origin team that the adjustments previously proposed by JFI (including the price adjustments and minimum purchasing adjustments) would be brought into operation immediately ...".[292] Although there appear to be no documents confirming this, it is undisputed that the discounts were in fact operationalised.

389.   Mr Chung testified that, in light of the discounted prices, it would not have made sense to retain the original minimum purchase requirements in the Distribution Agreement after the Amendment.[293] Further, according to Mr Chung, it was clear from JFI's proposal of 8 May 2015 that it intended a reduction in those requirements; that proposal stated that it "assumes maximum of $8m of orders per year at old prices", with Origin obligated to purchase a "reasonable amount".[294] This is also consistent with later negotiations regarding the Amendment Agreement. In an email of 1 August 2015 from Ms Siburg to Mr Choi and others at ILJIN/Origin, she said in relation to future discounts being discussed for 2016 and 2017 "[w]e will however adjust the minimum purchase requirements as we believe that the current requirements in the contract are too aggressive, so we will reduce the minimum purchases to $8M for 2016 and $10M for 2017 and this will be called out separately in the amendment".[295] As Origin pointed out, all of its purchase orders for 2015 had already been submitted by May of that year

---

[290] O-39.
[291] R-278 (There appears to be some confusion as to whether this meeting took place on 28 or 29 May 2015. The travel itinerary contained in R-278 suggests that 28 May 2015 is the correct date).
[292] Chung III, para 59.  See also Chung II, para 213.
[293] Chung III, para 57.
[294] O-365.
[295] O-368.

when Mr Binning operationalised the discounts. JFI was therefore aware of the total purchases for the year. Not only were the reduced purchase requirements stated in writing at the 8 May meeting, but JFI never voiced any protest at the purchase amount for 2015 until after termination, and indeed, not until January 2016.[296]

390.   Having reviewed this evidence, the Tribunal is satisfied that – on balance – JFI did not intend the original minimum purchase requirements in the Distribution Agreement to remaining binding while the discounted pricing – on the initiative of JFI – was in operation. The proposal advanced by JFI clearly included an adjustment to the minimum purchase order, whereby a maximum of US$8 million of purchase orders at the pre-discount price was contemplated, with Origin's obligations being to purchase a "reasonable amount" of product. JFI chose to implement the discounted pricing regime, with the associated reduction in the minimum purchase requirements, despite knowing that Origin had not signed the Amendment Agreement and with no suggestion that the discounted pricing was conditional on Origin's signature of the Amendment or that the discounts could be reversed at JFI's discretion. The decision to implement the changes was made by Mr Binning – President and CEO of George Weston Ltd and a director of Loblaw – and therefore had the endorsement of top levels of management.

391.   Without having to decide whether or not the Distribution Agreement was effectively amended by conduct, the Tribunal agrees with Origin that, in light of the language of JFI's 8 May 2015 proposal and actual implementation of the discounted pricing despite Origin's failure to execute the Amendment, JFI could not fairly retract those revisions and revert to the original minimum purchase requirements. When JFI gave Origin the benefit of the reduced pricing, seemingly on the authority of senior management, JFI was well aware that Origin had not signed the formal Amendment. The amendment discussions and JFI's implementation of the discounts demonstrated JFI's willingness to try to make the venture work, for its own benefit as well as Origin's. There is no evidence that JFI told Origin that the discounts it gave

---

[296] See Transcript, 29 May 2017 (Origin's Opening Submission) at 48-49.

Origin after May 2015 were *ex gratia* and reversible, while the parties continued for some time to operate on this new basis and, in specific, Origin continued with the Joe Fresh stores. The Tribunal accepts Origin's position that had it "been on notice that JFI might unilaterally reverse [the concessions] – and then use the "original" figures as a basis for terminating the contract and pursuing a multi-million dollar damages claim – Origin's position during the summer of 2015 undoubtedly would have been different."[297]

392.   Under the circumstances, the Tribunal finds no breach by Origin of the minimum purchase requirements in the Distribution Agreement.

**F.    Termination**

393.   One of the most contentious issues in this arbitration is which party repudiated or terminated the Distribution Agreement. The specific issues arising out of the alleged termination, as set out in the List of Issues in Appendix 1, are:

a.   What is the proper construction of Mr Choi's email of 5/6 October 2015 (quoted in paragraph 398 below) and the subsequent correspondence between the parties?

b.   Did Origin repudiate or terminate the Distribution Agreement in October 2015? If so, was any such repudiation / termination of the Distribution Agreement wrongful?

c.   Did JFI repudiate or terminate the Distribution Agreement in January 2016? If so, was any such repudiation / termination of the Distribution Agreement wrongful?

d.   Are either JFI or Origin entitled to recover damages for wrongful termination / repudiation?

---

[297] Origin's Reply Memorial, para 140.

394.  Origin painted a picture of a deliberate strategy by JFI to rid itself of troublesome international partners like Origin so that it could revamp the Joe Fresh business into a discount brand, specifically through the U.S. store Nordstrom Rack. Origin posited that the price concessions offered by JFI to Origin in May 2015 were an aggressive "take it or leave it" proposal made conditional on obtaining a wide, one-way release of claims against JFI and Loblaw.[298]  Origin claimed that Mr. Freedman thereafter began actively to pursue an exit strategy for JFI.

395.  Despite this negative characterisation of the May 2015 meeting, Origin admitted that high-level Loblaw executives did implement the agreed price concessions to Origin, without requiring Origin to sign the First Amendment containing a corresponding release of claims.[299]

396.  Conversely, JFI described a scenario in which ILJIN executives had decided in April 2015 to give Origin six months to turn the Joe Fresh stores around, after which, if the business was still making a loss they might be "become unable to continue."[300]  In this scenario, it was six months later – in October, with the business still unprofitable – that Mr. Choi sent his email implementing ILJIN's plan to terminate the Distribution Agreement. According to JFI, ILJIN's goal was to exit the Joe Fresh relationship and enter the fashion market on its own, as evidenced by Mr. Chung's approach to Mr. Feigen in 2016 to work together on launching a new brand.[301]

397.  In the Tribunal's view, the contemporaneous emails and documents demonstrate that JFI and Origin well recognized the difficulties in the relationship, tried repeatedly to address them in discussions, and attempted corrections with concessions. However, in parallel if not mutually, JFI and Origin eventually desired to exit the relationship. There was clear evidence of this development, including:

---

[298] Origin's Post-Hearing Memorial, para 120.
[299] See discussion at paragraphs 388 - 390.
[300] R-298.
[301] JFI's Post-Hearing Memorial, paras 110-113.

a.  In its presentation at the 5 May 2015 meeting entitled "Road Map to Success in Korea" with its "retail price solution", JFI offered significant pricing discounts.[302]

b.  Mr. Freedman emailed Mr. Choi on 4 June 2015 following the pricing discussions, stating that, on the basis that Origin did not want to accept the proposed concessions and JFI could not offer further concessions:[303]

> If I understood correctly, in such circumstances **your preference would be to arrange a transition/exit** by you from the business ... we are of course interested in discussing with you how best to give effect to this for both parties. (Emphasis added.)

c.  Following that email, Origin decided to accept the proposed pricing concessions and to continue its Joe Fresh business.[304]

d.  Ms. Tanja Siburg then sent an email to Mr. Choi on 30 June 2015 saying "[w]e are pleased to send you the finalized amendment reflecting the outcome of our most recent discussions. Please present the document to the Chairman for signature."[305]

e.  Mr Freedman gave evidence that "JFI also internally considered the possibility of terminating the relationship given the already extensive breaches by Origin by June 2015",[306] but decided not do so.

f.  Mr Freedman and Ms Siburg visited Korea in August 2015 to tour the stores and met with Origin's Mr. Chung, Mr. Choi, and Mr Seo.

398.  This culminated in the email from Mr. Choi, who was ILJIN's General Counsel, to Mr. Freedman of 6 October 2015. This critical email, which bore

---

[302] R-33.
[303] R-198
[304] R-199.
[305] O-392 / R-143 (R-196 contains the First Amendment to the Distribution Agreement).
[306] Freedman I, para 20.

the subject line "Confidential Business Discussion", bears reproducing (emphasis added):[307]

> Dear Ian,
> I hope you are doing well. I am writing this letter to discuss with you the current situation of our Joe Fresh business in Korea.
>
> As you know well, we had launched the Joe Fresh business based upon the business projections recommended by the Joe Fresh Headquarter. But, during the initial period, the actual performance had been far from the projections, and we had to drastically adjust our business plan.
>
> Unfortunately, however, despite of the adjustment from the Joe Fresh Headquarter, our operation has not been adequately improved, and we are struggling with the huge inventory and the increasing financial debt. Our business operation is unlikely to be improved, and we will continue to lose money without any realistic probability of recovering our accumulated loss in the future.
>
> So, we think that **we have no choice but to discontinue our Joe Fresh business in Korea.** In that regard, we want to discuss with you cancelling all outstanding purchase orders and deliveries. In addition, we would like to request your proposal as to disposition of our inventories and other assets. Although, we are willing to cooperate and accommodate your wish for a smooth transition with a minimal negative impact to your brand reputation, as you know well, **we want to close our operation as quickly as possible since we keep losing approximately $800,000 per month.** So, we will highly appreciate your proposal for a short transition period.
>
> I look forward to hearing from you. Regarding this matter, for the time being, please communicate directly with me only and do not discuss with any of our person. Thank you.
>
> Best regards,
> Wooyoung Choi

399.  As Mr. Choi was the head of ILJIN Group's legal department,[308] it appears that the decision to terminate the Distribution Agreement was made by ILJIN. Given the concluding paragraph of Mr. Choi's email, the Tribunal

---

[307] R-35.
[308] Transcript, 30 May 2017 (Seo) 69:18-21.

finds that it is likely that those at Origin were not aware of Mr. Choi's approach to Mr. Freedman, or its content.

400. Based on the cumulative evidence of the fraught dealings between JFI and Origin leading up to Mr Choi's email, it is the Tribunal's view that JFI reasonably read this email as an unequivocal notice that Origin intended to close its stores and terminate the Distribution Agreement. The only discussions to be had, according to Mr. Choi, were to facilitate an orderly exit and transition (if a new Korean partner could be found).

401. Origin emphasised, and the Tribunal acknowledges, that the subject title of Mr. Choi's was "Confidential Business Discussion". However, the Tribunal cannot accept Origin's interpretation that the email was intended merely to start a discussion about whether and how to move the relationship forward (or not). It is clear to the Tribunal that Mr. Choi, the senior ILJIN lawyer, instead intended to inform JFI in this email that Origin could not and would not continue with the Distribution Agreement. Any doubt in this regard is belied by the exchange that followed.

402. On 17 October 2015, Mr. Freedman responded to Mr. Choi as follows (emphasis added):[309]

> We are in receipt of your email of October 6, 2015 in which you indicate you intend to close your Joe Fresh business. We are obviously very disappointed, as we've made numerous attempts to help turn the business around, including a proposal to make various significant financial concessions that far exceed our obligations under the Agreement. Further, we reject any suggestion that we are responsible for your business projections prepared by you at the time you entered into this relationship with us. Certainly the contract between us makes this very clear.
>
> Putting aside that Origin is in material breach on a number of different fronts and the subsequent obligations Origin has upon termination, **we are prepared to work with you (without waiving our rights under the Agreement) to close the business in a manner that is least disruptive to both of our businesses, both in terms of mitigating financial and brand exposure to our respective companies (hereinafter referred to as a**

---
[309] R-36.

"**Settlement Plan**"). In this respect time is of the essence and we would ask that we rapidly convene to discuss and agree on such a plan. If at any time we are unhappy with the progress in this respect, we will look to the full enforcement of our Agreement as the basis for moving forward.

On the basis that you are willing to work towards a Settlement Plan per the above, and on the basis that you continue to strictly adhere to s. 15.15 of the Agreement (where you agree to keep confidential and not make any public announcement with respect to this Agreement which includes the exit thereof), I will address your specific issues relating to inventory and assets. First, we are willing to assist you with reducing your financial exposure by seeking to cancel our underlying orders for certain products that you have ordered from us. This does not absolve you from your responsibility for the orders you placed with us but, where cancelation of the production of the goods is achieved, will serve to reduce the amount of your liability to us. Kindly inform us within 48 hours of receipt of this communication, if you do not want us to seek to cancel the production of product from any particular purchase order and we will make best efforts to honour that request. Second, for those orders where the production of the goods is not canceled, you will remain responsible for paying for the goods but we will work with you to find alternative channels acceptable to us to dispose of such inventory for your benefit. Third, as to your existing inventory, we are willing to facilitate the introduction of a reputable jobber in our discretion to liquidate your inventories.

Please indicate your agreement to trying to develop a mutually acceptable Settlement Plan and advise when we can speak to discuss.

403.   Had that not been Origin's intention – if JFI had misunderstood Mr. Choi's email of 5/6 October – Mr. Choi would have corrected Mr. Freedman straight away. Rather, Mr. Choi confirmed JFI's understanding in his email of 20 October 2015, where he stated (emphasis added):[310]

> … **we confirm that we want to cancell [sic] all outstanding purchase orders and deliveries**. Regarding a settlement plan, **we are willing to work towards an amicable and mutually beneficial settlement plan**. To be productive, we want to see a draft settlement plan listing all topics you want to discuss with us prior to a meeting.

---

[310] R-37.

404.  Mr. Freedman's response on 22 October 2015 reflected the, by then, mutual understanding that Origin was exiting the relationship:[311]

> While of course all key termination provisions, including but not limited to, length of sell-off period, collection of debt, handling of IP etc. are covered under the Distribution Agreement, we are open to reviewing the termination provisions and discussing potential alternatives with you with the objective of ensuring a well-organized exit that will minimize any associated brand damage and will allow us to consider possible avenues that might reduce your financial exposure on exit.

405.  Mr. Choi again confirmed on 30 October that:[312]

> ... tentatively, we plan to close down all of our 8 stores at once within a couple of months period. We may want to keep one store open a little longer than other 7 stores in order to clear our inventory. We have yet to establised [sic] a plan for closing our internet on-line shopping site, and whether an after-service center should be maintained for a certain period.

406.  Mr. Freedman responded on 2 November 2015,[313] thanking Mr. Choi for providing further details about Origin's proposal for an orderly closure of stores and disposition of inventory.  He then informed Mr. Choi that, as Origin had not renewed its Letter of Credit, JFI intended to draw down the existing Letter of Credit.  (The circumstances of the draw down are discussed in the next section.)  Mr. Freedman went on to say:

> Given that Origin has effectively terminated the agreement, I think it is fair to assume you have waived any requirements of notices of default and termination from us. I'd like to remind you of the contractual post-termination provisions in the agreement, which we can discuss in further detail in our telephone call,

407.  Mr. Choi said in response that Origin was "disappointed by your decision to draw on the Letter of Credit in the full amount while we are in the middle of discussing how orderly we should close our relationship and the outstanding

---

[311] R-201.
[312] R-201.
[313] O-85.

account payables are far less than the full letter of credit amout [sic]."[314]  He
requested that JFI withdraw its application until after they had spoken.

408.   In the Tribunal's view, the above correspondence made it clear that, as of
early October 2015, Origin intended to terminate the Distribution Agreement
and to trigger the post-termination provisions of the Distribution Agreement,
which relate to exit and settlement planning.  Viewed in context, Origin's
intention to exit the Distribution Agreement was not ambiguous in any way,
and should therefore be treated as repudiation or anticipatory termination,
even if for practical purposes the JFI – Origin relationship did not
immediately cease.

409.   Section 12.1 of the Distribution Agreement allows a non-defaulting party to
terminate the Agreement where an "Event of Default" has occurred.  Section
12.1 states (in part):

> 12.1 **Events of Default**. The following actions or events shall
> constitute an "Event of Default" under this Agreement:
> (a) failure by either Party to perform in any material respect any
> of the covenants, duties or obligations set forth in this Agreement
> to be performed by such Party (including Distributor's failure to
> perform its obligations set forth in the Store Operation Manual
> and Brand Use Guidelines) that is not cured within sixty (60) days
> following written notice of such default from the non-defaulting
> Party to the defaulting Party (other than under Section 2.3, which
> is the subject of Section 12.1(c));
> (b) A breach by a Party of any representation or warranty
> expressly set forth in this Agreement; ...

410.   As set out in that Section, an event of default includes a failure to perform in
any material respect obligations under the Agreement and requires the non-
defaulting party to give written notice of the default and allow the defaulting
party 60 days in which to cure the default.  A breach of an express warranty
would also allow a party to terminate the Distribution Agreement, but
without requiring the 60 day notice period to be observed.

---

[314] O-85.

411. Section 12.2 of the Distribution Agreement allows a party to terminate the Agreement where an Event of Default is not cured:

> 12.2 **Remedies for Event of Default**. Subject to the terms of this Agreement, if any Event of Default shall have occurred, the non-defaulting Party shall have the right to terminate this Agreement effective upon notice of termination delivered to the defaulting Party ...

412. The Tribunal has already determined that neither party breached the Agreement in any material way, including breach of warranty. Consequently, no Event of Default occurred. Mr Choi's email of 6 October 2015 does not expressly refer to any breach of the Distribution Agreement or to Section 12.1. It simply refers to the failing state of Origin's business in Korea. Subsequent correspondence between the parties also made no mention of any grounds for the termination under Section 12.1 (aside from JFI's general reservation of rights in this regard).

413. The circumstances surrounding the demise of the relationship between the parties and collapse of the Distribution Agreement between October 2015 and January 2016 were less than clear, as were the parties' exact legal arguments. JFI charged Origin with breach, anticipatory breach and/or repudiation without distinction.[315] Origin described Mr Choi's 6 October 2015 email as being a without prejudice call for further discussions, which was followed by further meetings by various Origin and JFI personnel.

414. Viewing the contemporaneous developments in overall context, the Tribunal considers that Origin repudiated the Distribution Agreement without cause on 6 October 2015 through Mr Choi's email. Mr. Freedman then accepted this repudiation in his email of 17 October 2015, leading to effective termination of the Agreement by Origin without cause.

415. Origin then appeared to change its mind, and sought to keep the Distribution Agreement on foot. It is not apparent from the documents why this change occurred, although it is notable that Origin personnel apparently were

---

[315] JFI's Post-Hearing Reply Memorial, paras 103 to 106.

initially unaware of Mr Choi's termination decision. Origin CEO, Mr Seo, gave evidence that he only learned of Mr. Choi's email when JFI drew down the standby Letter of Credit in early November 2015.[316] On 20 November – at the same time that Mr Choi was discussing exit strategies with Mr Freedman, Mr Seo was meeting with Mr Freedman and Ms Siburg and proposed a "new revamped partnership".[317] He had also foreshadowed this possibility in an email on 17 November 2015.[318] Mr Freedman gave the following evidence:[319]

> On November 20, 2015, representatives of Origin and JFI met at the Joe Fresh offices in New York. Among the attendees for Joe Fresh were myself and Tanja Siburg. At that meeting, Origin proposed a reinstatement of the business relationship between JFI and Origin. Out of professional respect to a former business relationship, we indicated that we would consider Origin's proposal, but also stated that we were certain that JFI did not want to reinstate the business relationship. Given Origin's prior termination, the parties agreed that if the relationship did not recommence, the parties would agree to a joint exit strategy for the business by mid-December. As I state above, prior to the meeting, Tanja Siburg made clear to Origin that the purpose of the meeting was to discuss the winding down of the business relationship.

416.   JFI reviewed Mr. Seo's "revamping" proposal but decided not to accept it. With ILJIN's approval, Mr. Seo presented a revised proposal on 5 December 2015,[320] which was also rejected.

417.   By this stage, in mid-December 2015, the parties were on opposite tracks. JFI was insisting on continuing with the exit negotiations commenced by Mr. Choi and Mr. Freedman, or the default provisions in the Distribution Agreement would apply.[321] These default provisions were set out in Section 13 of the Distribution Agreement and record the parties' obligations on termination or expiry of the Agreement. As explained by Mr. Freedman in

---

[316] Transcript, 30 May 2017 (Seo) at 69:11-14. See also O-258.
[317] O-261.
[318] R-207.
[319] Freedman I, para 43.
[320] O-441.
[321] See R-40.

his email of 22 October 2015, JFI was happy to discuss and agreement an alternative set of provisions to apply to Origin's termination. However, Mr. Freedman's email of 2 November 2015 reminds Mr. Choi of the contractual post-termination provisions which apply absent any alternative agreement. As events transpired, before any substantial progress could be made on an exit strategy, Origin and ILJIN attempted to reverse their position and pushed hard to revive the relationship,[322] despite clear opposition from JFI.

418.  While Origin may have initially repudiated the Distribution Agreement without cause, JFI accepted the repudiation and perfected termination by rejecting the attempts by Origin to retract the repudiation/termination and reinstate the relationship.  Ms Bos of Loblaw then formally sent a notice terminating the Distribution Agreement on 6 January 2016 to alleviate any doubt that might still exist.[323]

419.  Origin may have repudiated the Distribution Agreement without cause, but the Tribunal does not accept JFI's argument that it is entitled to lost profits exceeding US$47 million, as a result of accepting Origin's repudiation and sending its own notice confirming termination.  This is because the Tribunal simply cannot ignore the events that followed the October correspondence, as JFI would have us do.  This correspondence demonstrates that all parties were dissatisfied with the relationship and, however reluctantly, were intent on abandoning the Joe Fresh Korean venture.  JFI and Origin had each charged each other with wrongdoing, but the Choi-Freedman emails of 6 and 17 October 2015 reflect that, provided an orderly exit was negotiated, neither JFI nor Origin would seek to claim against the other under the Distribution Agreement.  While JFI was always careful to reserve its rights under the Agreement and both sides made reference to default by the other, the clear import of the email chain described above was that, in October and November 2015, both sides were seeking (and seemingly were content to seek) a mutually satisfactory way to end the relationship.

---

[322] See R-209.
[323] R-59. See also R-41.

420. The Tribunal considers it telling that, despite the back-and-forth on an exit plan, neither party initiated the formal post-Termination actions contemplated in Section 13 of the Distribution Agreement. Mr Freedman in his 17 October 2015 email expressly indicated his willingness to assist Origin "with reducing [its] financial exposure by seeking to cancel our underlying orders for certain products ordered" by Origin for purchase, which would appear inconsistent with JFI's claim for damages based on minimum purchase requirements for the remaining eight-plus years of the Agreement. If there were any doubt as to JFI's willingness to pursue a reasonable settlement and exit minimizing harm to both sides, the Tribunal considers that Mr Freedman's express reference to mitigation – albeit with a standard reservation of rights – dissipates that doubt:

> we are prepared to work with you (without waiving our rights under the Agreement) to close the business in a manner that is least disruptive to both of our businesses, both in terms of mitigating financial and brand exposure to our respective companies (hereinafter referred to as a "Settlement Plan").

421. In sum, the Tribunal considers it significant that JFI, which had the ability to revive the relationship under the Distribution Agreement and thereby avoid possible damage by loss of future Korean sales through Origin, opted instead to accept Origin's repudiation, proactively seek an exit from the relationship, and perfect the termination of the Agreement. As both sides wanted an end to their contractual relationship, the Tribunal considers that JFI, in good faith, should have – as envisioned in Mr Freedman's 17 October email – taken steps to mitigate rather than magnify any losses. In this context, the Tribunal considers that JFI's formal reservation of its rights was inconsistent with its actual conduct in late 2015 and early 2016.

422. The relevance of these facts goes to the damages for lost profits claimed by JFI as a result of Origin's repudiation of the Distribution Agreement. JFI has claimed it is entitled to be reimbursed for its lost profits under the Distribution Agreement, calculated by reference to the minimum purchase requirements set out in Exhibit 2.3 to the Agreement. Consequently, JFI has

claimed US$ 47,997,258 in lost profits as a result of the early termination by Origin of the Distribution Agreement.

423.    While Origin was the party that repudiated the Distribution Agreement, under New York law JFI had a duty to mitigate its losses. Origin contended in its Reply Memorial that, if Origin had wrongfully terminated the Distribution Agreement, JFI must still prove that Origin caused its losses and must account for mitigation.[324] Origin further submitted that JFI "fail[ed] to account for the value of the rights it re-acquired upon termination – the freedom to re-promote and sell its merchandise to anyone in the South Korean market."[325] JFI itself appeared to be well aware of the duty to mitigate, having referred to it in its correspondence on termination.[326]

424.    In summary, JFI – in the Tribunal's view – was provided with an opportunity by Origin to avoid the losses claimed as "lost profits" by entering into a revised proposal with Origin whereby the relationship would continue. The revised proposal, as set out in documents provided to the Tribunal,[327] did not make any reference to further reductions to the minimum purchase amounts that were in place prior to termination. The revised proposal therefore presented JFI with an opportunity to continue to sell its merchandise in the Korean market and recoup potential lost profits calculated by reference to the minimum purchase amounts. Had JFI opted to accept this revised proposal, the losses it now claims would likely have been avoided. Having decided not take this option, JFI is not entitled to claim these lost profits as damages.

425.    The other relevant factor is that even if JFI were entitled to damages despite its failure to mitigate, such damages would only be appropriate for lost sales between 6 October 2015 and 6 January 2016, when Ms. Bos sent Origin her notice of termination of the Distribution Agreement. While the Tribunal's view is that all losses could and should have been mitigated by JFI, any losses

---

[324] Origin's Reply Memorial, para 303 (heading).
[325] Origin's Reply Memorial, para 305.
[326] See, for example, R-36; O-313; Transcript, 2 June 2017 (Freedman) at 126, 128:17-129:2, 152:9-17.
[327] O-441. Note that the Tribunal's conclusion in paragraph 390 regarding the amendment to pricing is assumed to apply.

that might have occurred in this three-month period were inconsequential in the bigger picture.

426.   To conclude, the Tribunal determines to dismiss JFI's counterclaim for damages which was based on Origin's alleged termination of the Distribution Agreement without cause.

### G.   Letter of Credit Draw Down

427.   In this section, the Tribunal addresses the issues arising out of JFI's draw down of the Standby Letter of Credit.  In particular, the following issues, as set out in the List of Issues in Appendix 1, are addressed:

   a.   Did Origin breach the Distribution Agreement by failing to renew or replace the Letter of Credit (including Section 1.1(b) of Exhibit 5.4)?

   b.   Did JFI breach the Distribution Agreement when it drew down the Letter of Credit (including Section 5.4 and Exhibit 5.4)?

428.   In early November 2015, JFI decided to draw down the Standby Letter of Credit that had been provided by Origin under Exhibit 5.4 to the Distribution Agreement and was due to expire later that month.  Origin has alleged that in doing so JFI was seeking to gain a tactical advantage in settlement/exit discussions, rather than pursuing any legitimate purpose.  Origin insinuated bad faith on the part of JFI.

429.   JFI explained that the Letter of Credit[328] was due to expire and Origin had not responded to emails requesting confirmation of its renewal.  JFI therefore considered that it had no choice but to draw down the Letter of Credit to protect against amounts allegedly owed to it by Origin.

430.   The Tribunal notes that Section 1.1 of Exhibit 5.4 to the Distribution Agreement states:

---

[328] R-43 (containing a copy of the original Letter of Credit).

> JFI has the right to draw against the Letter of Credit at any time and without prior notice to Distributor, if JFI, in its sole discretion, determines that Distributor has failed to comply with any of Distributor's obligations under this Agreement, and to use funds drawn from the Letter of Credit to compensate JFI for unpaid amounts due and owing under this Agreement, and for its damages and related expenses resulting from any failure by Distributor to comply with this Agreement

431.   The Distribution Agreement also states at Exhibit 5.4:

> Not later than sixty (60) days before the scheduled expiration date of the original or any renewal or replacement Letter of Credit, Distributor shall provide to JFI, a firm commitment from the Issuing Bank to issue a renewal or replacement Letter of Credit in the Amount and otherwise in accordance with Section 1.1. A renewal/replacement Letter of Credit which is effective on or prior to the expiration date of the existing Letter of Credit shall be delivered to JFI by Distributor not later than thirty (30) business days prior to the expiration of the Letter of Credit then in effect.

432.   Exhibit 5.4 (at Section 1.1(b)) further provides that:

> if Distributor fails to provide JFI with a renewal or replacement Letter of Credit of the Letter of Credit in accordance with Section 1.3 below thirty (30) days prior to its expiration, JFI may draw against the Letter of Credit for the full amount and use the funds as collateral to secure Distributor's obligations and to apply the funds as described in subparagraph(a) above;

433.   Emails from October 2015 confirm that JFI requested confirmation from Origin that the Letter of Credit would be extended and decided to draw down the Letter of Credit only after Origin failed to provide such confirmation. In the context of Mr Choi's email of 6 October 2015 informing JFI of Origin's decision to exit the business, a failure to renew the Letter of Credit was unsurprising. While Origin's failure to renew the Letter of Credit in a timely manner would technically constitute a breach of the Distribution Agreement, the Tribunal's findings on termination in the previous section render this technical breach irrelevant.

434.   It is instructive to review the evidence in relation to the Letter of Credit drawdown:

139

a.  Ms Hanratty's emailed Mr Chung on 12 October 2015, seeking confirmation that the Letter of Credit would be renewed. Specifically, she stated:[329]

> As you may be aware, the SBLC with Woori Bank is due to expire on 20th November. In accordance with the terms of our Agreement with you, Origin is required to provide us with a renewal LC 30 days prior to expiry. Therefore please send us confirmation of renewal of the LC no later than 21st October 2015.

b.  It is not known whether Ms Hanratty knew at this time about Mr Choi's email of 6 October 2015, which was sent to Mr Freedman with the request that he not share it with the wider staff.[330]

c.  Ms Hanratty did not receive a response to her email and Origin did not renew the Letter of Credit by 21 October 2015 or confirm that renewal was forthcoming. It is unclear why Origin did not respond. Mr Chung suggested at the hearing that "I didn't respond back because I just assumed that ... it's going to be fine."[331] Although Mr Chung suggested in his hearing testimony that Origin had to wait until after the actual expiry of the original Letter of Credit before it could arrange a renewal to avoid an overlap, if this were the case, it would be expected that Origin would have informed JFI of this situation and its intention to renew in November. This is particularly so given that Origin's failure to renew by 21 October squarely put Origin in default of its obligations under the Distribution Agreement.

d.  Mr Freedman explained that:[332]

> ... the letter of credit was about to expire... on November 20 ... and we knew that once it expired we would be in a materially worse position than with the benefit of the letter of credit. Our party, Origin, I think, would have hoped that we didn't draw and that we would have been in that worse position. We had a partner that was planning to close the

---

[329] O-257 / R-202.
[330] Transcript, 2 June 2017 (Freedman) at 135:18 – 139:22.
[331] Transcript, 1 June 2017 (Chung) at 107:10-13.
[332] Transcript, 2 June 2017 (Freedman) at 162:3-17.

stores that had not yet communicated and finalized an exit strategy with us. And we were worried about damage to the brand. We were worried about amounts payable to us. And we wanted to make sure that we were able to do a successful draw in a foreign jurisdiction, so we took appropriate precautions trying to make sure that happened and to cover off for any eventuality.

e.   This position is mirrored in Mr Freedman's email to Mr Choi on 2 November where he said that JFI would still draw down the Letter of Credit as it "was originally contemplated between the parties specifically for the type of uncertain environment we find ourselves in today".[333]

f.   Internal JFI emails reveal that JFI management was then faced with the prospect that the Letter of Credit would expire and not be renewed. JFI considered that JFI was owed money by Origin for outstanding invoices at that time, and therefore decided that it was imperative to draw down the Letter of Credit before it expired.

435.   In drawing down the Letter of Credit, JFI followed the procedures in the Distribution Agreement.   The Tribunal can find no breach of JFI's contractual obligations in this regard, nor does it consider that JFI exercised its right to drawdown the Letter of Credit in bad faith.  JFI was faced with a situation where Origin had refused to confirm whether the Letter of Credit would be renewed, Origin owed JFI money, Origin had informed JFI that it was closing its Joe Fresh stores, and the parties were beginning to negotiate exit terms.  JFI was entitled to draw the Letter of Credit and behaved in commercially reasonable fashion in doing so under such circumstances.

436.   The Tribunal agrees that it would have been courteous of JFI to give Origin more warning of its intention to draw down the Letter of Credit, but the Letter of Credit expressly stated that no notice was required:[334]

> JFI has the right to draw against the Letter of Credit at any time and without prior notice to Distributor, if JFI, in its sole discretion, determines that Distributor has failed to comply with

---

[333] R-204.
[334] Distribution Agreement, Exhibit 5.4, Section 1.1(a).

any of Distributor's obligations under this Agreement, and to use funds drawn from the Letter of Credit to compensate JFI for unpaid amounts due and owing under this Agreement, and for its damages and related expenses resulting from any failure by Distributor to comply with this Agreement.

437. Therefore, the Tribunal finds that JFI's failure to provide Origin with any substantive notice that it intended to draw against the Letter of Credit cannot be deemed to be a breach of the Distribution Agreement.

438. However, the Tribunal considers that, as a result of the findings in this Award, JFI is not entitled to retain the full US$5 million sum that it received as a result of the drawdown. The clause quoted at paragraph 436 above specifically allows for the Letter of Credit funds to be used to "compensate JFI for unpaid amounts due and owing under this Agreement, and for its damages and related expenses resulting from any failure by Distributor to comply with this Agreement." This is consistent with Mr Freedman's assertion that the drawdown would "maintain the status quo" and was contemplated for this "type of uncertain environment we find ourselves in today".[335]

439. The Tribunal has determined that there are no damages due to JFI, but Origin has admitted that there were 11 outstanding invoices (dated between September and October 2015) due and owing to JFI at 3 November 2015.[336] Mr Harington has provided evidence in his Expert Report that these outstanding amounts totalled US$1,769,158.[337] This figure is comprised of US$1,724,572 for the invoices, plus interest accrued thereon of US$5,174 and US$39,411 of interest on late paid invoices. Mr Harington also identified two further invoices dated in November and December 2015 in his Supplemental Report, which totalled US$59,964.[338] JFI has not disputed the that invoices identified by Mr Harington in his Reports represent the outstanding invoices due and owing at the end of 2015. Indeed, in his

---

[335] O-85.
[336] Origin's Reply Memorial, fn 367; Origin's Post-Hearing Memorial, para 17.
[337] Harington I, para 40.
[338] Harington Supplemental Report, para 4; R-251.

Supplemental Report, Dr Korenko made adjustments to his calculation of lost profits to take account of the 13 additional invoices identified by Mr Harington as outstanding.[339]

440.   In his Supplemental Report, Mr Harington re-calculated the outstanding amount of these invoices to take account of the two additional invoices, but also to take account of the 50% discount Origin said should have been applied under the May 2015 pricing amendment to the Distribution Agreement. The Tribunal has found (in paragraph 390 above) that JFI was not entitled to retract the pricing discounts unilaterally implemented by JFI, despite the fact that Origin had not signed the amendment to the Distribution Agreement which is contained in Exhibit R-196. That amendment stated that JFI would discount all Outstanding Purchase Orders for in-store deliveries prior to 1 February 2016 by 50% "at the time of payment, provided each invoice for such Outstanding Purchase Orders is promptly paid in a timely basis in accordance with the terms of Section 5.1(c) of the Distribution Agreement".[340]

441.   As indicated by Mr Chung's email of 2 November 2015[341] (quoted in paragraph 354 above), outstanding purchase invoices had not been paid in a timely manner. They would, therefore, not have been subject to a 50% discount at the time of payment. The Tribunal therefore calculates that the amount owed by Origin to JFI is US$1,769,158, plus the two additional invoices of US$59,964, which together total US$1,829,122.

442.   The Tribunal directs JFI to refund to Origin the amount of US$3,170,878, being the difference between the amount of the drawdown and the amount owed to JFI at the end of 2015. Although Origin did not specifically claim this figure as part of its request for relief, it did claim that the drawdown was excessive[342] and also requested that the Tribunal grant "Origin such further

---

[339] Korenko Supplemental Report, para 3. See also Transcript, 6 June 2017 (Korenko) at 161:8 - 162:18.
[340] First Amendment to the Distribution Agreement, Section 2.2 (R-196).
[341] R-205.
[342] Origin's Statement of Claim, para 130. JFI argued that it was entitled to drawdown the full amount and hold it as collateral to secure payment in connection with Origin's multiple financial breaches and defaults under the Distribution Agreement (JFI's Reply Memorial, paras 310 and 402(ii)).

relief as the Tribunal deems just and proper".[343]  The refund of the amount overdrawn by JFI under the Letter of Credit falls within this request for relief by Origin.

*Interest*

443.   Origin submitted that, aside from its fraud claim under the Franchise Act to which a statutory rate would apply, interest on any other amounts owed to Origin are governed by Section 20 of the Singapore International Arbitration Act.  Section 20 states:

> (1)    Subject to subsection (3), unless otherwise agreed by the parties, an arbitral tribunal may, in the arbitral proceedings before it, award simple or compound interest from such date, at such rate and with such rest as the arbitral tribunal considers appropriate, for any period ending not later than the date of payment on the whole or any part of —
> (a)  any sum which is awarded by the arbitral tribunal in the arbitral proceedings;
> (b)  any sum which is in issue in the arbitral proceedings but is paid before the date of the award; or
> (c)  costs awarded or ordered by the arbitral tribunal in the arbitral proceedings.
> (2)    Nothing in subsection (1) shall affect any other power of an arbitral tribunal to award interest.
> (3)    Where an award directs a sum to be paid, that sum shall, unless the award otherwise directs, carry interest as from the date of the award and at the same rate as a judgment debt.

444.   Origin submitted that international commercial tribunals, in the exercise of their discretion, usually award pre-award interest based on an inter-bank offering rate with a reasonable commercial margin.  Where U.S. dollars are the currency in issue, Origin submitted that tribunals have established a practice of awarding compound interest plus a reasonable commercial margin, such as LIBOR plus 2%.[344]  Origin therefore claimed that interest should be awarded at LIBOR-based rate.

---

[343] Origin's Statement of Claim, para 298(c).
[344] Origin's Reply Memorial, paras 317-318.

445.  In its request for relief, JFI asked for an order that Origin "pay compound interest on all sums awarded to JFI, including interest running from the date that payment is due under any arbitral award until final payment of the corresponding sums".[345]  JFI did not specify a rate for such interest. However, in calculating interest on late payments (as discussed in paragraph 358 above) Dr Korenko, JFI's expert, used the New York statutory rate of 9%.[346]  Dr Korenko noted that this was consistent with Section 5.5 of the Distribution Agreement which states that interest on late payment of invoices for Joe Fresh merchandise shall accrue "at the highest contract rate of interest permitted by law, not to exceed 10%".  JFI did not comment on Origin's claim for interest.

446.  Section 20 of the International Arbitration Act grants the Tribunal a wide discretion to determine a reasonable interest rate.  The Distribution Agreement does not specify any interest rate to apply to damages awarded by an arbitral tribunal, but does allow the Tribunal to award "interest on unpaid amounts from date due" as part of "actual compensatory damages" (Section 15.4).  Under Section 15.4, the Tribunal may not award punitive damages or damages in excess of actual compensatory damages.  With this in mind, the Tribunal considers that a reasonable commercial interest rate should be applied.

447.  In the Tribunal's view, an interest rate based on LIBOR plus a small percentage reflects a commercially reasonable rate over the relevant period. As Origin has observed, this view is consistent with recent international arbitral practice.[347]  It is also consistent with recent practice to compound interest, rather than to award it on a simple basis.

448.  Taking the above into account, the Tribunal concludes that a commercially reasonable interest rate would be LIBOR plus 2%.  The Tribunal therefore orders that interest on the sum of US$3,170,878 be calculated at a rate of

---

[345] JFI's Memorial, para 194(vii).
[346] Korenko I, para 30.
[347] N Matthews et. al. "Calculating Pre-Judgment Interest," Global Arbitration Review, Nov. 23, 2011, OL-201.  See, for example also, *Khan Resources Inc., Khan Resources B.V., and Cauc Holding Company Ltd. v. The Government of Mongolia*, UNCITRAL, Award on the Merits, 2 March 2015.

LIBOR plus 2% compounded annually from 2 November 2015 (the date upon which JFI drew down the full amount of the Letter of Credit) until the date of payment of this Award.

## H.   Concluding Comments

449.   The Tribunal finds that no part of Origin's claims has been established at law or on the evidence and the same applies to JFI's counterclaims. The dismissal of JFI's counterclaims and the finding that Origin is not liable to pay JFI damages means that the Parent Guaranty cannot be invoked. Therefore, the Tribunal is not required to address the issues of whether the Guaranty was valid and, if so, whether ILJIN had any liability to JFI under the Guaranty. Consequently, the Tribunal has dismissed JFI's claims in relation to the Guaranty as stated in paragraph 462(m) below.

450.   In summary, this is a case where there were ample grounds for minor and technical complaints by both Origin and JFI, but no actionable breach of the Distribution Agreement under the New York Franchise Sales Act, New York common law or the covenant of good faith and fair dealing. Looking at the parties' relationship overall, the actions of all the parties contributed to the demise of the Korean venture, without legally actionable fault.

## XI.   COSTS

*The Parties' Claims*

451.   Origin and ILJIN claimed their costs and expenses in the total amount of US$6,927,406.52, comprising: legal fees and costs of US$5,854,071.76; expert witness fees of US$306,336.47; costs and expenses for travel, translation and data processing of US$402,998.29; and their share of ICC arbitration costs and expenses (through August 2017) of US$364,000.00.

They noted the Tribunal's well-established power to award such fees, costs and expenses under Article 37(4) of the ICC Rules.[348]

452.   JFI and Loblaw claimed their costs and expenses in the total amount of US$6,891,974.23 on an indemnity basis in the event they prevailed on the merits in this arbitration. The total comprises: legal fees and expenses of US$6,309,112.55; expert and witness-related fees of US$173,757.11; their share of ICC arbitration costs and expenses (through August 2017) of US$370,000.00; and other arbitration costs (stenographer fees and Maxwell Chambers' fees) of SGD$39,104.57. They submitted that they should be regarded as having prevailed as long as Origin and ILJIN's claims are substantially dismissed, and the Tribunal should apply the contemporary convention in international arbitration practice that "costs follow the event".[349]

*Arbitration Agreement*

453.   The Arbitration Agreement contained in Section 15.4 of the Distribution Agreement states that:

> *The arbitrators shall not have the power to award damages in connection with any Dispute in excess of actual compensatory damages, which may include interest on unpaid amounts from date due, consequential damages and recovery of legal fees and costs.*

454.   The parties did not focus specifically on this clause, but it is clear to the Tribunal that the clause defines "actual compensatory damages" to include "interest on unpaid amounts from date due, consequential damages and recovery of legal fees and costs". It is therefore within the power of the Tribunal to award legal fees and costs as part of actual compensatory damages. This is consistent with the parties' submissions that the Tribunal has the power to award costs and with the claims included in the Terms of

---

[348] Origin & Co., Ltd.'s and ILJIN Materials Co., Ltd.'s Cost Claims, filed 24 August 2017.
[349] JFI Global Purchasing, Ltd.'s and Loblaw Companies Limited's Statement of Costs, filed 24 August 2017.

Reference by both Origin/ILJIN and JFI/Loblaw for the recovery of such costs.

*The ICC Rules*

455.   Article 37 of the ICC Rules states that:

> 1. The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration
>
> …
>
> 4. The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.
>
> 5. In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.

*The Costs of the Arbitration*

456.   The advance on costs was initially fixed by the ICC Court on 25 August 2016 at US$650,000. The advance on costs was revised by the ICC Court on 10 August 2017 to US$740,000 to reflect the fully quantified claims. The Origin side and the JFI side have each paid US$370,000 towards the advance on costs.

457.   On 20 December 2017, the ICC Court has fixed the final amount of the costs of arbitration, including the fees and expenses of the Tribunal and the administrative expenses, at US$710,220.

*The Tribunal's Analysis*

458.   As the parties have recognized, the Tribunal has discretion to award costs.

459.   The Tribunal agrees with JFI's observation that the default position in international arbitration has become that costs should follow the event. In the present case, no party has been successful in its claims and, as expressed above, the Tribunal considers that overall the actions of all parties contributed to the demise of the Joe Fresh Korean venture.

460.   The Tribunal does not agree with JFI's and Loblaw's submission that they should be regarded as the prevailing parties if, as has happened, Origin's and ILJIN's claims are substantially dismissed.   Both sides brought and vigorously pursued substantial claims in this arbitration. JFI's objections to jurisdiction, while based on arguable grounds, were ultimately unsuccessful. The Tribunal does not consider the JFI side more entitled to an award of costs than the Origin side.

461.   Based on its discretion under Article 37(4) of the ICC Rules to award costs, the Tribunal decides that Origin/ILJIN and JFI/Loblaw should bear equally the costs of the arbitration and that each side should bear its own legal and expert costs and expenses.

## XII.   DISPOSITIVE SECTION

462.   For all of the foregoing reasons, and rejecting all submissions to the contrary, the Tribunal hereby FINDS, DECLARES, CONFIRMS AND AWARDS as follows in relation to the issues arising for determination in these proceedings:

   a.   CONFIRMS the findings set out in paragraph 188 of the Partial Award on Jurisdiction dated 8 February 2017;

   b.   DECLARES that the Distribution Agreement was not a franchise agreement for purposes of the New York Franchise Sales Act, and DISMISSES Origin's fraud claims based on alleged violations of the New York Franchise Sales Act;

149

c. DISMISSES Origin's claims based on JFI's alleged fraudulent misrepresentations or omissions in violation of New York common law;

d. DISMISSES Origin's claims based on JFI's alleged breach of the Distribution Agreement, including breach of the implied covenant of good faith and fair dealing;

e. DISMISSES JFI's claims based on Origin's alleged breach of the Distribution Agreement, including JFI's claim for interest based on Origin's alleged untimely payment of invoices;

f. DISMISSES JFI's claims based on ILJIN/Origin's alleged fraudulent inducement, unauthorised marketing campaigns and mismanagement;

g. DECLARES that ILJIN/Origin repudiated the Distribution Agreement on 6 October 2015, and that JFI accepted this repudiation on 17 October 2015 and notified ILJIN/Origin of formal termination of the Distribution Agreement;

h. DECLARES that JFI failed to mitigate its losses resulting from ILJIN/Origin's repudiation of the Distribution Agreement, and because of such failure, DISMISSES in its entirety JFI's claims for lost profits based on ILJIN/Origin's alleged wrongful termination of the Distribution Agreement;

i. DECLARES that JFI was entitled to draw down in full the US$5 million Standby Letter of Credit on 2 November 2015, subject to the obligation to reimburse Origin for any amount not necessary to cover any unpaid amounts under and damages for breach of the Distribution Agreement; and consequently DISMISSES Origin's claims based on JFI's alleged violations of the Distribution Agreement regarding the Letter of Credit

except to the extent Origin was entitled to reimbursement for amounts not owing under the Letter of Credit as of 2 November 2015;

j.  DECLARES that as of 2 November 2015 Origin owed JFI US$1,829,122 for outstanding invoices, (including US$5,174 in interest accrued thereon, and US$39,411 in interest accrued on late paid invoices); and, based on this Award, Origin owed JFI no amount for damages for breach of the Distribution Agreement, and consequently ORDERS JFI to reimburse and pay forthwith to Origin US$3,170,878 against JFI's draw down of the full Standby Letter of Credit, plus interest at the rate of LIBOR plus 2%, compounded annually, from 2 November 2015 to the date of payment of this Award;

k.  ORDERS that Origin/ILJIN and JFI/Loblaw shall each bear their own legal costs and shall bear the costs of the arbitration fixed by the ICC Court at US$710,220, equally between them;

l.  DECLARES that this Award will be provisionally enforceable;

m.  DECLARES that all other claims made in this arbitration, including without limitation JFI's claims against ILJIN under the Distribution Agreement and Guaranty, are dismissed.

Place of arbitration: Singapore

Date:   31   December 2017


_____
Professor Lucy F. Reed
*Arbitrator*


_____
Professor Bernard Hanotiau
*Arbitrator*


_____
Sir David A.R. Williams, Q.C.
*Presiding Arbitrator*

## APPENDIX 1: COMPOSITE LIST OF ISSUES ADDRESSED BY THE PARTIES

| Origin/ILJIN Issues | JFI/Loblaw Issues |
|---|---|
| What role (actual or apparent) did Loblaw and/or JFI have with respect to negotiations undertaken with ILJIN/Origin in the period October 2012 to September 2013? | |
| What (if any) statements were made by Joe Fresh negotiators to ILJIN's team during negotiations between October 2012 and September 2013 concerning the Joe Fresh brand, the operations of Joe Fresh stores and/or other issues pertaining to Joe Fresh? | Did JFI ever make any of the alleged statements that ILJIN/Origin base their pre-contractual claims on?  If so, is such a statement actionable for fraud? |
| Were such statements materially accurate and complete? | If an actionable statement is proven to have been made by JFI, was such a statement by JFI accurate and/or reasonably honest at the time of its making? |
| Did Origin/ILJIN reasonably rely on such statements in entering into the Distribution Agreement? | If not, did ILJIN/Origin actually rely on that statement to enter into the Distribution Agreement? If ILJIN/Origin relied on the statement, was such reliance by ILJIN/Origin reasonable in the circumstances? |
| | Can ILJIN/Origin advance such fraud claims in light of the following: (a)     the express contractual undertaking at Section 1.2 of the Distribution Agreement, which provides that "Distributor has conducted an independent investigation of the business contemplated by this Agreement, and Distributor has received all information necessary to make an informed decision to proceed with this Agreement. Distributor has not received or relied on any guaranty or assurance, express or implied, as to the revenues, profits or success of the |

| Origin/ILJIN Issues | JFI/Loblaw Issues |
|---|---|
| | business to be conducted pursuant to this Agreement"; |
| | (b) the express contractual undertaking at Section 15.8 of the Distribution Agreement (the "integration clause"), which provides that "Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement that either Party may or does rely on or that will have any force or effect"; |
| | (c) the fact that the parties were sophisticated entities, advised by external and internal legal counsel, during the contractual negotiations; and |
| | (d) the fact that, in respect of certain alleged representations, the Distribution Agreement deals with the very same subject matter of the alleged prior statement. |
| Can any such statements (or omissions) form the basis for claims under Sections 687 and 689 the New York Franchise Sales Act ("NYFA") and/or common law fraud/misrepresentation? | If the NYFA applies, have ILJIN/Origin established any violations of the statute? |
| Do the terms of the NYFA apply to the Distribution Agreement? In particular: | Does the New York Franchise Act ("NYFA") apply to the Distribution Agreement and/or JFI? Specifically, does the Distribution Agreement contain a 'franchise fee' as defined in Section 681(7) of the NYFA? |
| Does the Distribution Agreement (including Section 6.3, mandating that Origin pay certain monies annually by way of a minimum advertising expenditure) involve payment of a "franchise fee" as defined by Section 681(7) of the NYFA? | |
| What is the relevance and/or effect of the provisions of the Distribution Agreement (including Sections 1.2, 15.6 and 15.8 thereof) having regard to section 687(4) and (5) of the Act (providing that "[a]ny | |

| Origin/ILJIN Issues | JFI/Loblaw Issues |
|---|---|
| condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder, shall be void," and that "[i]t is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article.")? | |
| Assuming the NYFA applies, was Loblaw a "control person" that "materially aid[ed] in the act of transaction constituting" the alleged violations of the statute, so as to be liable under Section 691(3) of the NYFA? | If the NYFA applies, was Loblaw a "control person" that "materially aid[ed] in the act or transaction constituting" the alleged statutory violations, so as to be liable under Section 691(3) of the NYFA? |
| Is either Respondent liable for breaching the mandatory disclosure provisions of Section 683 of the NYFA?  In this respect<br><br>(a)  was either Respondent required to make disclosures in the form prescribed by Section 683 of the NYFA (and accompanying regulations);<br><br>(b)  as to JFI's claim that it was exempt from the provisions of Section 683 by reason of Section 684, did JFI comply with the pre-requisites for such exemption as stated in Section 684?<br><br>(c)  had prescribed disclosures been made, what (if any) would have been their materiality and/or effect with respect to the transaction? | |
| | Have ILJIN/Origin waived their rights to advance claims based on alleged fraud (either under common law or the NYFA)? |

| Origin/ILJIN Issues | JFI/Loblaw Issues |
|---|---|
| In the event either Respondent is liable for fraud (statutory or common law) as alleged by Origin/ILJIN:<br><br>(a) what effect (if any) does this have on the Distribution Agreement;<br><br>(b) what effect (if any) does this have on the Parent Guaranty executed by ILJIN?<br><br>(c) what remedies are available? | If JFI is found liable for fraud (whether under common law or the NYFA), have ILJIN/Origin proven losses (if any) that were caused by the actions that constituted fraud (and/or violation of the NYFA)? If so, what remedies are available? |
| Is there any liability to ILJIN or Origin (whether under the Distribution Agreement, Parent Guaranty or otherwise) as a consequence of: (i) the fact that the original signatory to the Distribution Agreement was not incorporated; (ii) the fact that Origin was incorporated in April 2014; and/or (iii) the fact that the Distribution Agreement was re-executed in December 2014? If so, what remedies apply? | |
| Is either party liable for breach of express representations and warranties contained in the Distribution Agreement? | |
| Is either party liable for breach of obligations in the Distribution Agreement (including the implied and/or statutory covenant of good faith and fair dealing)? | Regarding Origin's contract breach allegations (see list below):<br><br>(a) can Origin advance claims for breach of the implied covenant of good faith and fair dealing on the basis of allegations that duplicate its claims for breaches of express terms; and<br><br>(b) do the breach of implied covenant claims effectively create new, independent obligations on JFI that were not otherwise found in the express terms of the Distribution Agreement?<br><br>In any event, did any of the conduct complained of (if proven true) amount to a |

| Origin/ILJIN Issues | JFI/Loblaw Issues |
|---|---|
| | breach by JFI of an implied covenant of good faith and fair dealing i.e., did the alleged conduct by JFI rise to the level of being arbitrary or capricious? |
| Origin has raised contractual disputes concerning:<br><br>(a) pricing and assortment of Joe Fresh merchandise (including under Section 5.1);<br><br>(b) sizing of Joe Fresh merchandise (including under Section 5.1(d));<br><br>(c) brand management, positioning, and marketing (including Sections 3.3, 6.2, 7.1, and 7.13);<br><br>(d) departure of Mr. Mimran;<br><br>(e) store design and location (including Section 3.2);<br><br>(f) guidelines, manuals, and training (including Sections 7.10 and 7.13);<br><br>(g) drawdown of the letter of credit (including Section 5.4 and Exhibit 5.4); and/or<br><br>(h) conduct during late 2015/early 2016 (including negotiation concerning cessation of the relationship). | For each of Origin's allegations of 'contractual' breaches (listed below), are Origin's allegations regarding JFI's conduct true:<br><br>(a) pricing and assortment of Joe Fresh merchandise;<br><br>(b) sizing of Joe Fresh merchandise;<br><br>(c) brand management, positioning, and marketing;<br><br>(d) departure of Mr. Mimran;<br><br>(e) store design and location;<br><br>(f) guidelines, manuals, and training;<br><br>(g) drawdown of the letter of credit; and/or<br><br>(h) JFI's conduct during late 2015/early 2016? |
| Is JFI's conduct with respect to the above issues compatible with its obligations under the Distribution Agreement? | If true, would any of the allegations have constituted a breach by JFI of any express terms of the Distribution Agreement (and, if so, which provisions)? |
| | If there was any breach of contract by JFI, has Origin proven that its losses claimed were caused by the specific breach? Has Origin proven its damages? |
| Is Origin's conduct with respect to the below issues compatible with its | Did Origin/ILJIN breach the Distribution Agreement as follows:<br><br>Minimum purchasing obligations |

| Origin/ILJIN Issues | JFI/Loblaw Issues |
|---|---|
| obligations under the Distribution Agreement? <br><br> (a) compliance with directives concerning marketing, advertising and visual presentation; <br><br> (b) the provisions in the Distribution Agreement concerning approval of advertising, marketing and/or promotional materials (including Sections 6.1, 6.2, and 6.3); <br><br> (c) payment of invoices (including Section 5.3); <br><br> (d) minimum purchasing requirements (including Section 2.3 and Exhibit 2.3); <br><br> (e) posting of the standby letter of credit (including Section 5.4 and Exhibit 5.4); and/or <br><br> (f) conduct during late 2015/early 2016 (including negotiation concerning cessation of the relationship). | (a) by failing to meet the minimum purchasing requirements in breach of Section 2.3 and Exhibit 2.3 of the Distribution Agreement; <br><br> Outstanding and late payments <br><br> (b) by failing to make timely payments for its orders in breach of Section 5.3 of the Distribution Agreement; <br><br> Non-compliance with obligations on marketing, advertising and visual merchandising <br><br> (c) by failing to submit their annual marketing and advertising plans on time in breach of Section 6.3 of the Distribution Agreement; <br><br> (d) by failing to obtain necessary approvals for marketing/advertising campaigns and materials, and for deploying materials that were contrary to JFI's Brand Use Guidelines (and thus damaging to the brand) in breach of Sections 1.2, 6.1, 6.2, 6.3, 7.9 and 7.13 of the Distribution Agreement; <br><br> (e) by failing to comply with JFI's Visual Merchandising Standards, JFI's instructions and other related contractual requirements in breach of Sections 7.2, 7.4 7.8, 7.9 and 7.13 of the Distribution Agreement; <br><br> Expiration of the letter of credit <br><br> (f) by failing to renew or replace the letter of credit in breach of Section 1.1(b) of Exhibit 5.4 to the Distribution Agreement; and <br><br> Origin's corporate status <br><br> (g) by failing to incorporate the Distributor entity in accordance with the express representations and |

158

| Origin/ILJIN Issues | JFI/Loblaw Issues |
|---|---|
| | warranties in Section 2.6 and 15.4 of the Distribution Agreement? |
| | If Origin/ILJIN are liable for breaches of the Distribution Agreement, what remedies are JFI entitled to? |
| Were any of the contractual requirements concerning minimum purchasing obligations either modified and/or the subject of an "estoppel"? | |
| Did Origin/ILJIN repudiate and/or unilaterally terminate the Distribution Agreement in 2015 so as to entitle JFI to treat the contract at an end? | |
| What is the proper construction of Mr. Choi's email of October 5/6, 2015 and the subsequent correspondence between the parties? | What is the proper construction of ILJIN's in-house counsel Mr. Choi's email of October 5/6, 2015 and the subsequent correspondence between the parties?  Did ILJIN/Origin thereby prematurely repudiate the Distribution Agreement? |
| | Was such repudiation of the Distribution Agreement wrongful? |
| | If ILJIN/Origin wrongfully repudiated the contract, was JFI entitled to accept the repudiation and treat the Distribution Agreement at an end, while reserving its rights to claim damages? |
| | If so, what damages would JFI be entitled to recover? |
| Did JFI repudiate and/or unilaterally terminate the Distribution Agreement in 2016? | |
| Did JFI have the right to terminate the Distribution Agreement on the bases stated in the letter of January 6, 2016? | |
| Is ILJIN liable for breach of the Parent Guaranty? | Is ILJIN liable under the Parent Guaranty? |
| | What rate of interest is applicable on pre-award sums awarded? |

| Origin/ILJIN Issues | JFI/Loblaw Issues |
|---|---|
|  | What should the Tribunal order as to costs? |